UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────────

ISAAC K. STROMAN,

                                    Plaintiff,
                                                              9:18-cv-00149
v.                                                            (GLS/TWD)

DANIEL MARTUSCELLO, et al.,

                                    Defendants.
─────────────────────────────────────────────

APPEARANCES:                                OF COUNSEL:

ISAAC K. STROMAN
11-A-0292
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13021

BARBARA D. UNDERWOOD                        RYAN L. ABEL, ESQ.
Attorney General for the State of New York  HELENA O. PEDERSON, ESQ.
Counsel for Defendants                      Assistant Attorneys General
The Capitol
Albany, NY 12224


## ORDER AND REPORT RECOMMENDATION

## I.    INTRODUCTION

        This prisoner civil rights action commenced pursuant to 42 U.S.C. § 1983 has been

referred to the Court for Report and Recommendation by the Hon. Gary L. Sharpe, Senior United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

        Plaintiff, currently an inmate in custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"), alleges in his complaint the violation of

his rights under the Fifth, Eighth, and Fourteenth Amendments, along with state law claims of

assault, battery, false imprisonment, disparagement, misrepresentation, fraud, and neglect during his confinement at Coxsackie Correctional Facility ("Coxsackie"). (Dkt. No. 1.) Defendants remaining after initial review under 28 U.S.C. § 1915(e) and 1915A are Corrections Officer ("C.O.") Tirigllio[1] ("Tirigllio"), C.O. Bence ("Bence"), C.O. Steele ("Steele"), Scott Ranze (formerly known as Sgt. Ramsey) ("Ramsey"), C.O. Pasqurillio ("Pasqurillio"), and Sgt. Bailey ("Bailey"). (Dkt. No. 8.)

Claims surviving initial review are: (1) Eighth Amendment excessive force claims against Defendants Tirigllio, Bence, Steele, and Ramsey; (2) Eighth Amendment failure to intervene claims against Defendants Pasqurillio and Bailey; (3) First Amendment retaliation claims against Defendants Tirigllio and Bence; and (4) state law assault and battery claims against Defendants Tirigllio, Bence, Steele, and Ramsey. (Dkt. No. 8 at 19.[2])

Presently before the Court is Defendants' motion for partial dismissal of Plaintiff's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 20-1.) Defendants move to dismiss the following claims: (1) the Eighth Amendment failure to intervene claims against Defendants Pasqurillio and Bailey; and (2) the state law assault and battery claims against Defendants Tirigllio, Bence, Steele, and Ramsey. *Id.* at 6. Plaintiff has filed opposition to the motion. (Dkt. No. 22.) For the reasons that follow, the Court recommends Defendants' motion to dismiss be granted in part and denied in part.

---

[1] While spelled "Tirigllio" in Plaintiff's papers and on the Clerk's Office docket, the Defendant's name is spelled "Turigllio" in Defendant's motion papers. (Dkt. No. 20-1 at 1.)

[2] Page references to documents identified by docket number are to numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

## II.    BACKGROUND

The following relevant facts are derived from the face of Plaintiff's complaint and are accepted as true for the purposes of deciding this motion.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Plaintiff was a prison inmate being held in Coxsackie at the time the actions in the complaint occurred.  (Dkt. No. 1 at ¶ 2.[3])  On or about February 1, 2015, Plaintiff was locked in his cell when Defendant Tirigllio approached him.  *Id.* at ¶ 15.  Tirigllio questioned Plaintiff about grievances filed against other officers and threatened that Plaintiff would be leaving the facility in a body bag if the grievances were not retracted.  *Id.*  Plaintiff contacted the area supervisor to make him aware of the threat made by Tirigllio.  *Id.* at ¶ 16.  Plaintiff was then moved from 2 Company, where he was housed, to 3 Company. *Id.*

On February 9, 2015, Plaintiff was asked by Defendant Bence if he would like his keep-lock shower.  *Id.* at ¶ 17.  Plaintiff stated that he would.  *Id.*  Bence then asked Plaintiff if he knew Tirigllio.  *Id.*  Plaintiff confirmed that he did and asked why Bence wanted to know.  *Id.*  Bence responded "Because that's my brother. That's why."  *Id.*  Plaintiff was then released from his cell to take his shower.  *Id.* at ¶ 18.

Plaintiff entered the caged-in shower stall which was opened by Defendant Steele.  *Id.* at ¶ 19.  Later, Bence entered the shower area and stated that showers were over.  *Id.* at ¶ 21. Bence and Steele proceeded to release the other inmates from their caged-in showers for them to return to their cells.  *Id.*  Bence and Steele then re-entered the shower area to release Plaintiff. *Id.*

---

[3] Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

Bence raised his hand and arm towards Plaintiff's torso, effectively blocking Plaintiff's attempt to leave the caged-in shower. *Id.* at ¶ 22. Plaintiff then took two steps back into the shower. *Id.* Bence followed Plaintiff into the shower stall and began taunting him. *Id.* at ¶ 23. Bence stated Plaintiff was a "pussy" for writing grievances against fellow officers and that Plaintiff would take a swing at Bence now if he was not a "pussy." *Id.* Plaintiff responded that if Bence swung first, he would defend himself. *Id.* Bence then pushed Plaintiff. *Id.* at second ¶ 23. Plaintiff dropped his towel, soap and clothing in his hands to the floor and informed Bence that if he put his hands on him again that Plaintiff would give Bence what he was looking for. *Id.*

Bence responded by head-butting Plaintiff, resulting in a laceration on Plaintiff's forehead. *Id.* Plaintiff then swung and hit Bence in the jaw, causing Bence to fall to the ground. *Id.* Steele entered and attempted to strike Plaintiff. *Id.* at ¶ 24. Plaintiff threw two punches at Steele causing Steele to fall to the floor. *Id.* While falling, Steele grabbed onto Plaintiff's shorts. *Id.* Plaintiff struggled to prevent Steele from removing his shorts to avoid being naked and feeling defenseless. *Id.* at ¶ 25. Bence then struck Plaintiff in the shoulder and the chin. *Id.* Steele grabbed Plaintiff by the hair and pulled him to the ground. *Id.* at ¶ 26. Bence got on top of Plaintiff and struck him several times in the abdomen before continuing to strike Plaintiff in the facial area while Steele held down Plaintiff's arms. *Id.* In fear of becoming unconscious, Plaintiff turned over onto his stomach as Bence and Steele continued to strike him. *Id.* at ¶ 27.

A "response team" including Defendants Pasqurillio, Bailey and Tirigllio, then arrived and entered the shower area. *Id.* at ¶ 28. Tirigllio shouted, "This grievance writing mother-fucker" and proceeded to kick Plaintiff under his right eye and in his facial area. *Id.* On the third

kick Plaintiff raised his right hand, which was struck by the kick, causing his hand to fracture. *Id*.

Plaintiff was handcuffed and ordered to stand up by Pasqurillio. *Id.* Tirigllio used Plaintiff's towel to wipe the blood from Plaintiff's face. *Id.* at ¶ 29. Defendants told Plaintiff he was lucky they did not kill him and that Plaintiff would not be so lucky next time. *Id*. Defendants then twisted Plaintiff's arm, while he was cuffed behind his back, and took him to the infirmary. *Id*.

At the infirmary Defendant Ramsey had Plaintiff's handcuffs removed and ordered Plaintiff to put both hands on the wall. *Id.* at ¶ 30. Plaintiff informed Ramsey that he could not raise his arms high enough to do so. *Id*. Ramsey told Plaintiff he had better find a way. *Id*.

Dr. Miller entered the room to examine Plaintiff. *Id*. Dr. Miller informed Ramsey that Plaintiff needed to be taken to an outside hospital based on the seriousness of his injuries. *Id*. Dr. Miller was then escorted out of the examination room. *Id.* at ¶ 31.

Ramsey again ordered Plaintiff to place his hands on the wall. *Id*. Plaintiff informed Ramsey that he still was not capable. *Id*. Ramsey instructed the other Defendants to close the door first and followed by instructing the other Defendants to "beat him down but don't hit him in the face". *Id*. Tirigllio and another unidentified individual hit Plaintiff on his back and legs. *Id*. After a few seconds, Plaintiff fell to the floor. *Id*. Ramsey then ordered the other Defendants to stop. *Id*.

Plaintiff was handcuffed and taken to Albany Medical Center where it was determined that he suffered from multiple lacerations, contusions and fractured bones. *Id.* at ¶ 32. Plaintiff was given a CAT scan for his shoulder, neck, head and back. *Id*.

### III. LEGAL STANDARD

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Rule 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972). Satisfaction of the requirement that a plaintiff "show" he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

A complaint may be dismissed, pursuant to Rule 12(b)(6), only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombly*. 550 U.S. at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the

plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P,* 949 F.2d 42, 47 (2d Cir. 1991).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citations omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).

## IV.    ANALYSIS

Defendants move to dismiss the following claims: (1) the Eighth Amendment failure-to-intervene claims against Defendants Pasqurillio and Bailey; and (2) the state law assault and battery claims against Defendants Tirigllio, Bence, Steele, and Ramsey. (Dkt. No. 20-1 at 6.)

### A.    Failure to Intervene Pursuant to the Eighth Amendment

A prison official who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010); *Cicio v. Graham*, No.

9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010.)[4]  To establish

liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by

some other individual, and that the defendant under consideration: (1) possessed actual

knowledge of the use by another of excessive force; (2) had a realistic opportunity to intervene

and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally

refusing or failing to take reasonable measures to end the use of excessive force.  *Curley v. Vill.

of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).  Thus, mere inattention or inadvertence does not rise

to a level of deliberate indifference sufficient to support liability for failure to intervene.  *Cicio v.

Lamora*, No. 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010)

(citations omitted).  Indeed, officers generally "cannot be held liable for failure to intervene in

incidents that happen in a 'matter of seconds.'"  *Henry v. Dinelle*, No. 9:10-CV-0456

(GTS/DEP), 2011 WL 5975027, at *4 (quoting *Parker v. Fogg*, No. 85-CV-177 (NPM), 1994

WL 49696, at *8 (N.D.N.Y. Feb. 17, 1994)).

Defendants argue that Plaintiff's failure to intervene claim must be dismissed because he

fails to allege facts that plausibly demonstrate a claim that Defendants Pasqurillio and Bailey

failed to intervene.  (Dkt. No. 20-1 at 6.)  This Court disagrees.

As set forth above, Plaintiff claims while he was on the ground being struck by Bence

and Steele, a "response team," including Defendants Pasqurillio, Bailey and Trigllio, arrived and

entered the shower area.  (Dkt. No. 1 at ¶¶ 27-28.)  Trigllio shouted, "this grievance writing

mother-fucker" and proceeded to kick Plaintiff under his right eye and in his facial area.  *Id.* at ¶

28.  On the third kick Plaintiff raised his right hand, which was struck by the kick, causing

---

[4] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Plaintiff's hand to fracture.  *Id.*  According to Plaintiff, Pasqurillio and Bailey were also present during the assault.  *Id.* at ¶ 39, 42.  Plaintiff was handcuffed and ordered to stand up by Pasqurillio, and Tirigllio used Plaintiff's towel to wipe the blood from Plaintiff's face.  *Id.* at ¶ 29.

The facts alleged by Plaintiff plausibly show that both Pasqurillio and Bailey possessed actual knowledge of the use by another of excessive force, particularly watching Tirigllio kick Plaintiff three times.  *Id.*  Since Tirigllio was able to kick Plaintiff three separate times, both Pasqurillio and Bailey had a realistic opportunity to intervene and prevent the harm from occurring.  *Id.*  Lastly, since Pasqurillio and Bailey were present during the alleged use of excessive force, their inaction shows a disregard of the risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.  *Id.*

For the reasons set forth above, the Court recommends denying Defendants motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted against Defendants Pasqurillio and Bailey regarding Plaintiff's Eighth Amendment failure to intervene claims.

**B.  Assault and Battery Under New York State Law**

Defendants Tirigllio, Bence, Steele, and Ramsey seek dismissal of Plaintiff's claims for assault and battery on the grounds that New York Correction Law § 24 shields them from liability for the state law claims in both state and federal court.  *Cruz v. New York*, 24 F. Supp. 3d 299, (W.D.N.Y. 2014).  In relevant part, New York Correction Law § 24 states:

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, . . . in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the

duties by such officer or employee.

N.Y. Correct. Law § 24 (McKinney 2017).  An employee's actions are deemed to be within the scope of their employment when "the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions."  *Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997) (citations omitted).  "Consistent with this precept, various courts have held that a correctional officer who uses force while on duty is acting within the scope of employment, and therefore is entitled to the protections of [New York Correction Law] section 24."  *Deal v. Yurack*, No. 9:04-CV-0072 (LEF/DEP), 2007 WL 2789615, at *10 (N.D.N.Y. Sept. 24, 2007) (collecting cases).

Here, Plaintiff claims that "at all relevant times herein," Tirigllio, Bence, Steele, and Ramsey were employed by the State and DOCCS, were acting as agents, servants, and employees of the State and DOCCS, and were and acting "under color of state law and under their authority as" corrections officers and supervising employees.  (Dkt. No. 1 at ¶¶ 6-9.)  Since those Defendants were on duty when the alleged excessive force was used, New York Correction Law § 24 applies.  Accordingly, it is recommended that Defendants' motion to dismiss Plaintiff's state assault and battery claims against Defendants Tirigllio, Bence, Steele, and Ramsey be granted and that the claims be dismissed with prejudice.

## V.    CONCLUSION

Based upon the foregoing, if the District Court adopts this Report and Recommendation, the following clams remain: (1) the Eighth Amendment excessive force claims against Defendants Tirigllio, Bence, Steele, and Ramsey; (2) the Eighth Amendment failure to intervene claims against Defendants Pasqurillio and Bailey; and (3) the First Amendment retaliation claims against Defendants Tirigllio and Bence.  (Dkt. No. 8 at 19.)

**ACCORDINLGY**, it is hereby

**RECOMMENDED** that Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim (Dkt. No. 20-1.) be **GRANTED in part and DENIED in part**; and it is further

**RECOMMENDED** that Defendant's motion to dismiss Plaintiff's Eighth Amendment failure to intervene claims against Defendants Pasqurillio and Bailey be **DENIED**; and it is further

**RECOMMENDED** that Defendants' motion to dismiss Plaintiffs' state law assault and battery claims against Defendants Tirigllio, Bence, Steele, and Ramsey be **GRANTED** and that the claims be dismissed with prejudice; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with a copy of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: September 7, 2018
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
R. LAMORA, R. Scott, R. MacWilliams,
K. Crossett, E. Facteau, C.O. Demers,
R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

**1**    **Federal Civil Procedure**
👉 Civil Rights Cases in General

Genuine issue of material fact existed as
to whether corrections officer repeatedly hit
the inmate after the inmate was subdued
and thus summary judgment was precluded
on the inmate's excessive force claim. The
inmate alleged in his complaint, testified
under oath at his deposition, and stated in
a sworn affidavit that the corrections officer
punched him unnecessarily in the head several
times during the inmate's cell extraction.
Although the cell extraction was supposed to
be videotaped, the video was never recorded.
Despite the fact that the inmate's injuries were
slight and were at least indirectly brought
about by his own action of refusing handcuffs,
there were credibility issues to be determined.
U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

 **\*1**   Plaintiff Terry Cicio, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983,
alleging deprivation of his civil rights. In his complaint
Cicio, who refused multiple orders from prison officials
to exit his cell in order to effectuate a transfer to another
location, complains that in the course of the ensuing cell
extraction, during which he was removed through the use
of force, one of the corrections officers who participated
exerted excessive force causing him to suffer injuries, while
the others involved failed to intervene, all in violation
of the Eighth Amendment's protection against cruel and
unusual punishment. As relief for the violation, plaintiff
seeks the recovery of compensatory and punitive damages
from defendants.

Currently pending before the court is defendants' motion
for summary judgment seeking dismissal of plaintiff's
complaint. In their motion defendants challenge the legal
sufficiency of plaintiff's excessive force and failure to
intervene claims and additionally assert their entitlement
to Eleventh Amendment immunity from suit in their
official capacities and good faith qualified immunity from
suit as individuals. Because a reasonable factfinder could
conclude from the record now before the court that more
force than necessary to subdue and remove Cicio from
his cell was applied maliciously and sadistically by prison
officials, I am constrained to recommend that defendants'
motion be denied, except as to plaintiff's claims against
defendant Woods and those against defendants in their
official capacities, which are subject to dismissal.

I. *BACKGROUND* [1]

Plaintiff is a prison inmate entrusted to the care
and custody of the New York State Department of
Correctional Services ("DOCS"). *See generally* Complaint
(Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶
3 and Exh. A (Dkt. No. 35–17). At the times relevant
to his claims, plaintiff was designated to the Upstate

Correctional Facility ("Upstate"), located in Malone, New York.[2] *Id.*

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal of surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

**\*2** On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶

4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A (Dkt. No. 34–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶ 13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while

Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWilliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R.

Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections Officers Richard Scott, Richard MacWilliams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion,[3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under

the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620– 21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). [4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Excessive Force*

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. —— U.S. – – – – , —— S.Ct. ——, —— L.Ed.2d – – – – , 2010 WL 596513, at \*3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> **\*6** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of

> decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting Hudson, 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003)) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are

sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints. [5] Moreover, during his deposition, plaintiff acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

**\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

### C. *Failure To Intervene*

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants observed the incident but stood by without intervening on his behalf. [6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at \*4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). [7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

### E. *Qualified Immunity*

In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light

of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

**\*10**  In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right, [8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ). [9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the

relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.; see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, at \*14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to

[plaintiff's] excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

## IV. *SUMMARY AND RECOMMENDATION*

Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063875

Footnotes

1   In light of the procedural posture of this case, the following recitation is from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 128, 137 (2d Cir.2003). It should be noted that while most of the pertinent facts are undisputed, defendants sharply contest plaintiff's allegation that he was unnecessarily punched by defendant MacWilliams during the forcible removal from his cell.

2   Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).*

3   Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

4   With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement.

5   Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

6   Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

7   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

8   In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

9   In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

10  Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

---

End of Document                               © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2789615
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Derek A. DEAL, Plaintiff,

v.

Todd YURACK and Paul Almstead,[1] Defendants.

No. 9:04-CV-0072 (LEK/DEP).
|
Sept. 24, 2007.

**Attorneys and Law Firms**

Derek A. Deal, pro se.

Hon. Andrew Cuomo, Attorney General of the State of
New York, Jaime Irene Roth, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 31, 2007 by the
Honorable David E. Peebles, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt.
No. 79). After ten days from the service thereof, the Clerk
has sent the entire file to the undersigned, including the
objections by Plaintiff Derek Deal and Defendants Todd
Yurack and Paul Almstead, which were each filed on
September 17, 2007. Plntf's Objections (Dkt. No. 83);
Defts' Objections (Dkt. No. 84).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ...
may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate
judge." *Id.* This Court has considered the objections and
has undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No.
79) is **APPROVED** and **ADOPTED** in its **ENTIRETY;**
and it is further

**ORDERED,** that Plaintiff's Motion for leave to amend his
Complaint (Dkt. No. 71) is **DENIED;** and it is further

**ORDERED,** that Defendant's Motion for summary
judgment (Dkt. No. 69) is **GRANTED IN PART,** in
that Plaintiff's procedural due process claim and assault
and battery causes of action, as well as the portion of
Plaintiff's retaliation claim related to the January 18,
2003 misbehavior report be **DISMISSED,** but **DENIED
IN PART,** in that Plaintiff's excessive force claims
against Defendant and retaliation cause of action against
Defendant Almstead, related to the issuance of the
February 2 and February 3, 2003 misbehavior reports
remain pending for trial; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on
all parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Derek Deal, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983
against certain corrections workers assigned to the prison
facility in which he was located at the relevant times,
alleging deprivation of his civil rights. In his complaint,
plaintiff maintains that he was assaulted by one of the
named defendants and verbally harassed by others, and
that in retaliation for having complained regarding the
matter he was subjected to further harassment and verbal
abuse and endured other forms of recrimination, leading
to two disciplinary hearings and sixty days of disciplinary
keeplock confinement. Plaintiff further alleges that during
the course of those disciplinary proceedings he was
deprived of procedural due process.

**\*2** Currently pending before the court are cross-motions
filed by the parties. The motion process was initiated by
the defendants with the filing of a motion seeking the

entry of summary judgment dismissing plaintiff's claims on a number of bases. Plaintiff has opposed that motion and cross-moved for leave to file an amended complaint in which, *inter alia*, he seeks to add claims against seven newly-named defendants. For the reasons set forth below, I recommend that defendants' motion be granted, in part, and that plaintiff's procedural due process claims, state law causes of action, and portions of his retaliation cause of action be dismissed, but that their motion otherwise be denied. Turning to plaintiff's motion, I recommend that his application for leave to amend be denied, principally in light of the current status of the action and the amount of time which has elapsed since the commencement of suit.

I. *BACKGROUND* [2]

At the times relevant to his claims plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and designated to the Oneida Correctional Facility ("Oneida"). [3] The events giving rise to plaintiff's claims have, as their genesis, an incident which occurred on January 17, 2003. On that date, plaintiff was summoned to the officers' station by defendant Todd Yurack, a corrections officer at the facility. Amended Complaint (Dkt. No. 5) ¶ 7; Plaintiff's Aff. (Dkt. No. 76) ¶ 1. Following an initial conversation, during which defendant Yurack asked the plaintiff what was wrong with his face, Yurack ordered Deal to accompany him outside onto a small porch area enclosed with steel mesh bars; once there, Yurack grabbed the plaintiff around the neck, shoving him into a brick wall. Amended Complaint (Dkt. No. 5) ¶ 7; Plaintiff's Aff. (Dkt. No. 76) ¶ 2. As Yurack continued to squeeze the plaintiff's neck, making it difficult for him to breathe, he pulled Deal to an adjacent brick wall, causing him to scrape his hand and elbow. Amended Complaint (Dkt. No. 5) ¶ 7; Plaintiff's Aff. (Dkt. No. 76) ¶ 2. During the course of the incident Yurack stated to the plaintiff "don't f__k with me while you are on this dorm[,]" adding "I could put you in the box anytime I want to." Amended Complaint (Dkt. No. 5) ¶ 7; Plaintiff's Aff. (Dkt. No. 76) ¶ 3.

Following the incident, plaintiff was taken to the prison infirmary where he was examined, and photographs of his injuries were taken. Amended Complaint (Dkt. No. 5) ¶ 8; Plaintiff's Aff. (Dkt. No. 76) ¶ 6. A report of that examination, which was conducted by Registered Nurse Lori Cook, reveals that plaintiff's injuries included a skin abrasion on the right elbow, a red mark on the right side of the neck, scrapes on the fingers, and scratches on the shoulder, upper arm and wrist. [4] Cook Aff. (Dkt. No. 69-13) ¶ 6; *see also* Roth Aff. (Dkt. No. 69-14) Exh. A at pp. 49-50. No bleeding was reported, and Nurse Cook noted that plaintiff refused medical treatment for his injuries, other than to accept Bacitracin. *Id.*

**\*3** On January 22, 2003 plaintiff lodged a grievance, complaining of defendant Yurack's assault. Following an investigation, which did not yield evidence supporting plaintiff's version of the events, that grievance was denied by the acting superintendent at Oneida. [5] Yurack Aff. (Dkt. No. 69-11) ¶¶ 4-5, Exh. A.

During the relevant time period, plaintiff was issued three separate misbehavior reports for violating prison rules. The first of those, issued on January 18, 2003, accused Deal of smoking in the bathroom. Amended Complaint (Dkt. No. 5) ¶ 10. Two days later plaintiff admitted the violation, apparently during a tier hearing conducted by Corrections Lieutenant Santos. [6] *Id.* Plaintiff's disciplinary record lists the sanction associated with that guilty plea as "counsel." *See* Roth Aff. (Dkt. No. 69-14) Exh. C; *see also* Amended Complaint (Dkt. No. 5) ¶ 10(b).

On January 28, 2003, plaintiff was instructed to go to the tier office, where he was questioned by Corrections Lieutenant Paul Almstead regarding the alleged assault by Officer Yurack. Amended Complaint (Dkt. No. 5) ¶ 11; Plaintiff's Aff. (Dkt. No. 76) ¶ 10. During that meeting, after inquiring about the incident, defendant Almstead attempted to convince the plaintiff to withdraw his grievance regarding the assault. Plaintiff's Aff. (Dkt. No. 76) ¶ 10.

Plaintiff was again taken to the tier office on the following day at which time, at the directive of defendant Almstead, he was locked in a cell next to the tier hearing room. Amended Complaint (Dkt. No. 5) ¶ 12; Plaintiff's Aff. (Dkt. No. 76) ¶ 11. Plaintiff was later removed from the cell and brought before defendant Almstead, who verbally harassed and threatened Deal, stating in substance that in light of the plaintiff's actions Almstead was going to instruct corrections officers at the facility to issue misbehavior reports to him. Amended Complaint (Dkt. No. 5) ¶ 12; Plaintiff's Aff. (Dkt. No. 76) ¶ 11.

On February 2, 2003 plaintiff was issued a second misbehavior report, also for smoking in an unauthorized area, this time by Corrections Officer Velardi. Amended Complaint (Dkt. No. 5) ¶ 13; Plaintiff's Aff. (Dkt. No. 76) ¶ 13. Plaintiff attributes the issuance of that misbehavior report to retaliatory motives, based upon his proclaimed innocence of the charge and defendant Almstead's earlier statement regarding his instruction to corrections officers to issue misbehavior reports to the plaintiff. Plaintiff's Aff. (Dkt. No. 76) ¶ 14. A tier hearing was subsequently conducted regarding the incident on February 3, 2003, with defendant Almstead presiding as the hearing officer. Amended Complaint (Dkt. No. 5) ¶ 14; Plaintiff's Aff. (Dkt. No. 76) ¶¶ 16-17. Plaintiff maintains that at that hearing he was not properly advised of his rights, and was denied the opportunity to call witnesses on his behalf, and that the hearing officer was biased against him. Amended Complaint (Dkt. No. 5) ¶ 14; Plaintiff's Aff. (Dkt. No. 76) ¶¶ 16-17. At the close of the hearing plaintiff was found guilty of the violation charged and a penalty of thirty days of keeplock confinement, with a corresponding loss of recreation, package, commissary, and telephone privileges, was ordered, the hearing officer noting that "past dispositions of a less severe nature have been unsuccessful in convincing [the plaintiff] not to smoke in undesignated areas." Almstead Aff. (Dkt. No. 69-9) Exh. A at 6. Hearing Officer Almstead's determination was upheld on appeal to the facility superintendent.[7] *See* Amended Complaint (Dkt. No. 5) Exh. C; *see also* Roth Aff. (Dkt. No. 76) Exh. C.

**\*4** During the course of the February 2, 2003 hearing, plaintiff challenged defendant Almstead's impartiality and interrupted the proceedings in an effort to voice various objections. Almstead Aff. (Dkt. No. 69-9) ¶ 5 and Exh. A at p. 6; *see also* Amended Complaint (Dkt. No. 5) ¶¶ 15-16. After warning Deal that if he continued to engage in that conduct he would be issued a misbehavior report for refusing a direct order, without success, defendant Almstead instructed Corrections Officer Hodge to prepare and issue a misbehavior report setting forth a new charge based upon the discrepancies. Almstead Aff. (Dkt. No. 76) ¶ 5 and Exh. A.

A third tier hearing was conducted on February 6, 2003, with Corrections Lieutenant Santos presiding, to address this latest disciplinary charge, resulting in a finding of guilt and a penalty which included an additional thirty

days of keeplock confinement, with a corresponding loss of privileges. Roth Aff. (Dkt. No. 69-14) Exh. C. That determination was upheld on appeal to the office of the facility's superintendent. *See id.;* Deal Aff. (Dkt. No. 76) ¶ 18. As a result of the latter two disciplinary proceedings, plaintiff was placed in the special housing unit ("SHU") at Oneida for a period of sixty days, and additionally was removed from the Alcohol and Substance Abuse Treatment ("A.S.A.T.") program.[8] Amended Complaint (Dkt. No. 5) ¶ 16; Deal Aff. (Dkt. No. 76) ¶ 18.

## II. *PROCEDURAL HISTORY*
Plaintiff commenced this action on January 21, 2004. Dkt. No. 1. Following a finding by the court that plaintiff's initial complaint failed to satisfy the applicable pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure, *see* Dkt. No. 4, plaintiff submitted an amended complaint, filed on March 10, 2004. Dkt. No. 5. In his complaint, as amended, plaintiff has asserted claims under the First, Eighth and Fourteenth Amendments to the United States Constitution, alleging the use of excessive force, retaliation, and procedural due process violations stemming from the disciplinary hearings conducted, and additionally interposing pendent state law tort claims of assault and battery. Named as defendants in plaintiff's complaint, *inter alia,* are Corrections Officer Yurack and Corrections Lieutenant Almstead.[9]

On November 30, 2006, following the completion of pretrial discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 69. In their motion, defendants argue that 1) plaintiff's Eighth Amendment excessive force claims are legally deficient in that the assault allegedly perpetrated by defendant Yurack did not rise to a level of constitutional significance, either objectively or subjectively; 2) plaintiff's pendent tort law claims are barred by N.Y. Correction Law § 24; 3) plaintiff has failed to allege a cognizable retaliation claim, in that he cannot establish either adverse action taken by defendants or a nexus between the adverse action alleged and his protected activity; 4) plaintiff's procedural due process claims are deficient, both because he did not experience a liberty deprivation sufficient to trigger the protections of the Fourteenth Amendment and because, in any event, he received the full panoply of due process rights guaranteed; 5) plaintiff's procedural due process claims are barred under *Heck and*

*Balisok;* [10] and 6) in any event defendants are entitled to qualified immunity. Plaintiff has responded in opposition to the motion by affidavit, memorandum and supporting documents all filed on March 22, 2007. Dkt. No. 76.

**\*5** In addition to opposing defendants' summary judgment motion, by motion filed on November 30, 2006 plaintiff has requested permission to file a second amended complaint adding various claims, including against additional defendants not named in his original and first amended complaints. Dkt. No. 71. By letter brief filed on December 18, 2006, defendants have opposed that motion. Dkt. No. 73.

The parties' cross-motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [11] *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Motion To Amend*
Plaintiff's motion implicates not only Rules 15(a) and 21 of the Federal Rules of Civil Procedure, both of which, as will be seen, prescribe a fairly generous standard to be applied in connection with such motions, but additionally-since the established deadline for the filing of such motions has long since expired under the applicable scheduling order entered in the case-Rule 16 of the Federal Rules of Civil Procedure, which is significantly more exacting in its requirements.

Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted based upon the procedural circumstances of the case-something which is not applicable in this action-a party may amend its pleading "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be freely granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962); *Elma R.T. v. Landesmann Int'l Mktg. Corp.,* No. 98 CIV 662, 2000 WL 297197, at \*3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman* ).

Notwithstanding the familiar and well-accepted precept that such leave should be granted freely and amendment is typically permitted, where a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then allowing amendment would be an act of futility which should not be countenanced. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 124 (E.D.N.Y.1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a proposed claim sets forth facts and circumstances which may entitle the pleader to relief, futility is not a proper basis on which to deny the right to amend. *Saxholm,* 938 F.Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1029 (S.D.N.Y.1995) and *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief)).

**\*6** Generally speaking, while any delay in making a motion to amend pleadings must be weighed as a factor in deciding whether or not to grant the motion, delay in and of itself will not ordinarily suffice as a reason to deny the motion. *Phaneuf v. Tenneco, Inc.,* 938 F .Supp. 112, 115 (N.D.N.Y.1996) (Hurd, J.). A court must weigh any good cause shown for the delay in moving against any indication of dilatoriness of the moving party which results in last minute surprise and the inability of opposing party to address the newly added material. *Id.* When considering the issue of prejudice to the nonmoving party, a court may properly find that the longer the period of unexplained delay, the less that should be required of the nonmoving party in terms of a showing of prejudice. *Id.*

Plaintiff's motion for leave to add new defendants also implicates Rule 21 of the Federal Rules of Civil Procedure. That rule authorizes a court, "on motion of any party or of its own initiative at any stage of the action and on such terms as are just ..." to order the addition of parties to an action. Fed.R.Civ.P. 21; *see City of Syracuse v. Onondaga County,* 464 F.3d 297, 308 (2d Cir.2006). The provision also permits joinder "of a person, who through inadvertence, mistake, or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable." *Oneida Indian Nation of New York State v. County of Oneida,* 199 F.R.D. 61, 72 (N.D.N.Y.2000) (McCurn, S.J.) (quoting,

*inter alia, United States v. Hansel,* 999 F.Supp. 694, 697 (N.D.N.Y.1998)). A decision as to whether to permit joinder under Rule 21 is informed by the same general principles as those which govern motions for leave to amend under Rule 15(a). *See, e.g., id.* at 72-73 (citing *Expoconsul Int'l, Inc. v. A/E Sys., Inc.,* 145 F.R.D. 336, 337 (S.D.N.Y.1993)).

Overlaid against the standard typically governing motions for leave to amend and to join parties in this instance is Rule 16(b) of the Federal Rules of Civil Procedure. *See Kassner v. 2nd Ave. Delicatessen, Inc.,* --- F.3d ----, 2007 WL 2119769, at *8-10 (2d Cir. July 24, 2007). A scheduling order was issued in this case on November 23, 2004 establishing, *inter alia,* a deadline of January 30, 2005 for making non-dispositive motions, specifically defined within that order to include motions to join parties or to amend pleadings. *See* Dkt. No. 20 at 1-2. A party may obtain relief from such a scheduling order deadline only upon a showing of good cause. Fed.R.Civ.P. 16(b); *see Kassner,* 2007 WL 2119769, at *8. Despite this requirement, plaintiff has offered nothing in support of his motion, which was filed more than a year and a half after the passage of the controlling deadline, which even approaches a level sufficient to establish such good cause. Indeed, in his papers the plaintiff evinces his longstanding awareness of the identities of the proposed new defendants and the facts giving rise to his allegations against them, yet despite this offers virtually no justification for the delay in seeking leave to amend.

**\*7** Even if the court were to overlook this fatal deficiency under Rule 16 and apply the more liberal standard associated with Rules 15(a) and 21, I would nonetheless recommend against the granting of the application. Plaintiff's motion seeks leave to assert claims against seven additional defendants not previously sued in the case. While defendants have argued, with at least facial plausibility, the futility of the claims sought to be added against those seven individuals, the far greater concern is one of prejudice and undue delay. Discovery in this case, having been extended on several occasions at plaintiff's request, is now virtually completed and the case is well into the dispositive motion phase. This action has been pending for three and a half years. Under these circumstances it would be both manifestly unfair to the defendants, and an imprudent exercise of this court's discretion, to prolong the matter and overlook the undue and unexplained delay in plaintiff seeking leave

to amend at this late stage. *See, e.g., MacDraw, Inc. v. CIT Group Equip. Financing, Inc.,* 157 F.3d 956, 962 (2d Cir.1998) (affirming district judge's denial of leave to amend complaint where plaintiff inexplicably delayed the motion until the action was pending for several years and discovery was closed, and defendants would be unduly prejudiced); *Sly Magazine, LLC v. Weider Publications L.L.C.,* 241 F.R.D. 527, 532-33 (S.D.N.Y.2007) (denying leave to file amended complaint to add twelve new parties where plaintiff provided no explanation for delay, discovery had closed, dispositive motion practice was imminent, and undue prejudice would thus result to the defendant). Accordingly, I recommend that plaintiff's motion for leave to amend be denied.

B. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*8** When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with

Deal v. Yurack, Not Reported in F.Supp.2d (2007)
Case 9:18-cv-00149-MAD-TWD   Document 24   Filed 09/07/18   Page 27 of 56
2007 WL 2789615

respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Excessive Force Claim*

The centerpiece of plaintiff's complaint is his claim against defendant Yurack, alleging his use of excessive force which, in turn, set in motion a series of ensuing events allegedly resulting in further constitutional violations. Arguing that the use of force alleged by plaintiff was *de minimis,* and Deal's injuries suffered were legally insignificant, defendants assert their entitlement to judgment as a matter of law dismissing the excessive force claim.[12]

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Eighth Amendment analysis requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91. The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe' ", a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

**\*9** Seizing upon acknowledgment by the plaintiff that the injuries suffered by him at the hands of defendant Yurack were "minor" and "superficial", defendants allege that they are entitled to dismissal of plaintiff's excessive force claim as a matter of law, based upon Deal's failure to satisfy the objective element of the controlling test. The record now before the court, however, reveals that at least according to the plaintiff, he was assaulted by defendant Yurack, without provocation, on the date in question. The record also substantiates that plaintiff experienced some sort of incident on that date, causing him injuries which required medical attention. *See* Dkt. No. 68 (filed under seal); *see generally* Cook Aff. (Dkt. No. 69-13). The fact that Deal suffered injuries requiring medical attention distinguishes this case from others in which the lack of injury has justified the entry of summary judgment dismissing excessive force claims under the Eighth Amendment. *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed"

by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002). Under these circumstances it would be inappropriate to find, objectively, as a matter of law that plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

Turning to the subjective element, as defendants argue, to prevail, plaintiff must establish defendant Yurack acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d at 1033. When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

**\*10** *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." [13] *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

In this instance defendant Yurack has submitted an affidavit denying summoning the plaintiff to the officer's desk or making a physical or verbal attack against him. Yurack Aff. (Dkt. No. 69-11) ¶ 5. Given this denial and their assertion that there are no witnesses, nor any evidence, to support plaintiff's version of the facts, defendants invite the court to find as a matter of law that defendant Yurack did not act with a sufficiently culpable state of mind. Because such a determination would entail encroachment upon the prerogative of the factfinder and require the court to make a credibility determination inappropriate for a motion on summary judgment, I decline that invitation and instead recommend against the granting of summary judgment on this issue, finding the existence of genuine issues of material fact with respect to the subjective elements as well, requiring resolution at trial and precluding the entry of judgment on plaintiff's excessive force claim at this juncture.

### D. *Pendent State Law Tort Claims*

In his complaint, plaintiff has asserted pendent state law tort claims of assault and battery against plaintiff Yurack. Defendants argue that plaintiff's state law claims for assault and battery are subject to dismissal, as they are precluded by section 24 of the N.Y. Correction Law. [14]

Section 24 protects employees of state correctional facilities from claims for damages in state or federal courts arising out of actions taken in the scope of their employment, and in the discharge of their duties. *See* N.Y. Correct. Law § 24; *see also Ierardi v. Sisco,* 119 F.3d 183, 186-87 (2d Cir.1997); *Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996) (holding that section 24 applies to federal courts as well). The statute is designed to allow corrections officers to maintain safety and security at their facilities at their discretion, without fear of exposure to inmate lawsuits. *Ierardi,* 119 F.3d at 187; *Arteaga v. State,* 72 N.Y .2d 212, 218-20, 532 N.Y.S.2d 57, 60-62 (1988) (discussing policies behind immunity).

According to the New York Court of Appeals, if an act is done "while the servant [is] doing his [or her] master's work, no matter how irregularly, or with what disregard of instructions," it is performed within the

Deal v. Yurack, Not Reported in F.Supp.2d (2007)
Case 9:18-cv-00149-MAD-TWD    Document 24    Filed 09/07/18    Page 29 of 56
2007 WL 2789615

scope of employment. *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302 (1979) (citations omitted). Consistent with this precept, various courts have held that a correctional officer who uses force while on duty is acting within the scope of employment, and therefore is entitled to the protections of section 24.[15] *Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d Dept' 1987) (excessive force by correctional officer was within scope of employment when in response to assault by inmate in course of duty); *see also Boyd v. Selmer,* 842 F.Supp. 52, 57 (N.D.N.Y.1994) (McAvoy, J.); *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994) (McCurn, J.); *Wright v. Kelly,* No. 950CV-0688H, 1998 WL 912026, at *3 (W.D.N.Y. Oct. 16, 1998). The proper remedy in a federal court for inmates who feel they have excessive force claims is under section 1983, not through the assertion of tort claims precluded by section 24 of the state Correction Law. *Arteaga,* 72 N.Y.2d at 221, 532 N.Y.S.2d at 62.

**\*11** Based upon the foregoing, I recommend that defendants' motion for summary judgment dismissing plaintiff's state law claims of assault and battery under section 24 of the N.Y. Correction Law be granted.

### E. *Retaliation*

In addition to complaining of the use of excessive force against him, plaintiff also asserts a claim of retaliation, in violation of the First Amendment, alleging that in response to his complaints regarding defendant Yurack's actions prison officials retaliated against him through the issuance of multiple misbehavior reports. Defendants contend that plaintiff's retaliation claim is subject to dismissal as a matter of law.

At the outset it should be noted that "claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such claims as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). For this reason, "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty,* 713 F.2d at 13), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dawes,* 239 F.3d at 492. If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). As can be seen, evaluation of a claim of retaliation is a particularly fact-laden exercise, since such claims generally revolve around both the engaging in protected conduct, as well as establishment of a nexus between that conduct and an adverse action ultimately taken by the defendants.

In their motion, defendants concede that plaintiff's filing of a grievance on January 22, 2003 addressing defendant Yurack's actions is properly regarded as protected activity under the First Amendment. Defendants' Memorandum (Dkt. No. 69-3) at 11. Similarly, defendants do not seriously assert that the issuance of misbehavior reports does not constitute adverse action sufficient to satisfy the second element of the governing test. *See id.; see also Wells v. Wade,* No. 96 Civ. 1627, 2000 WL 1239085, at *3-4 (S.D.N.Y. Aug. 31, 2006). The focus of defendants' motion is upon the nexus requirement, with defendants arguing that no reasonable factfinder could conclude that the issuance of misbehavior reports to the plaintiff was the result of retaliatory animus stemming from the Yurack grievance.

**\*12** Undeniably, the January 18, 2003 misbehavior report predated plaintiff's grievance against defendant Yurack, and thus could not have been caused by retaliatory animus stemming from that grievance.[16] To this limited extent, defendants are entitled to summary judgment with regard to plaintiff's retaliation claim.

Deal v. Yurack, Not Reported in F.Supp.2d (2007)
Case 9:18-cv-00149-MAD-TWD    Document 24    Filed 09/07/18    Page 30 of 56
2007 WL 2789615

The remaining two misbehavior reports, issued on February 2, 2003, for smoking in the bathroom, and on February 3, 2003, for refusal to obey a direct order by contrast, occurred relatively shortly after the filing of plaintiff's grievance regarding corrections officer Yurack. This factor, particularly in view of the lack of any evidence of disciplinary action against the plaintiff from the time he entered the prison system in 1999 until the first misbehavior report on January 18, 2003, at a minimum could well support an inference that retaliatory animus prompted the issuance of the second and third misbehavior reports. *See generally Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (noting that "the temporal proximity of an alleged retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation"); *see also Lewis v. Blazejewski,* No. 03-CV-943S, 2007 WL 542117, at *5 (W.D.N.Y. Feb. 16, 2007) (Skretny, D.J. and Schroeder, M.J.). When, coupled with the statement attributed to defendant Almstead, to the effect that he was going to instruct prison officials to issue misbehavior reports to the plaintiff, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim as it relates to the February 2, 2003 and February 3, 2003 misbehavior reports.

### F. *Due Process*

In his complaint, plaintiff also contends that he was denied procedural due process during the course of the disciplinary hearings conducted with regard to his misbehavior reports. Defendants now seek dismissal of that due process claim, based both upon the lack of any showing that plaintiff experienced a liberty deprivation sufficient to trigger the Fourth Amendment's due process protections, and because in any event the record reveals that he received due process during the course of the relevant disciplinary hearings.

To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations

omitted); *Hynes v. Squillance,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a constitutionally significant liberty interest under the circumstances now presented, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.), I must find that the conditions of plaintiff's SHU confinement as alleged do not rise to the level of an atypical and significant hardship under *Sandin* in order to recommend that defendants' motion be granted based upon the lack of a showing that he experienced a cognizable liberty interest deprivation.

**\*13** Atypicality in a *Sandin* inquiry is normally a question of law .[17] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary .[18] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

In his complaint and opposing motion papers, plaintiff asserts that he served sixty days of disciplinary confinement in the Oneida SHU as a cumulative result of the two disciplinary hearings. Plaintiff makes no further showing, however, regarding the conditions of his disciplinary confinement, and specifically does not allege that during that time he was subjected to conditions

Deal v. Turack, Not Reported in F.Supp.2d (2007)
Case 9:18-cv-00149-MAD-TWD    Document 24    Filed 09/07/18    Page 31 of 56
2007 WL 2789615

more severe than those ordinarily associated with such SHU confinement. It is well-established that absent a greater showing, disciplinary confinement of such a modest duration does not rise to a level of constitutional significance necessary to support a procedural due process claim under the Fourteenth Amendment. *See Colon,* 215 F.3d at 231-32. Accordingly, I recommend that plaintiff's procedural due process claim be dismissed as deficient as a matter of law, and find it unnecessary to examine whether Deal was afforded procedural due process during the course of the disciplinary proceedings at issue.

### G. *Heck and Edwards*

In their motion, defendants argue that plaintiff's procedural due process claims are barred under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997). *See* Defendants' Memorandum (Dkt. No. 69-3) at 20-21. That argument is raised in view of the fact that the disciplinary hearings at issue appear to have resulted in a combination of sanctions which included the loss of good time credits, and those determinations were not set aside through applicable, internal channels before this action was commenced. In his response to defendants' motion, plaintiff asserts that he does not challenge the duration of his confinement, nor does he seek a restoration of good time credits. Under these circumstances, plaintiff has satisfied the requirements of *Peralta v. Vasquez,* 467 F.3d 98 (2d Cir.2006), thus permitting this court to adjudicate the section 1983 claims directed toward his disciplinary hearings notwithstanding his failure to succeed in overturning the results of those hearings.

### H. *Qualified Immunity*

As an alternative basis for dismissing plaintiff's claims against them, defendants assert their entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing

*Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 2007 WL 2067932, at *20-21 (2d Cir. July 20, 2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure from government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> **\*14** [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Qualified immunity analysis involves a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation. *Id.* If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

As can be seen, the first inquiry in the qualified immunity algorithm is to determine whether a constitutional violation has occurred. Since in this case I have found defendants entitled to summary judgment with regard to certain of plaintiff's claims, leaving intact his excessive

force claim and the portion of his retaliation cause of action associated with the second and third misbehavior reports issued to him during the relevant time period, those claims are the appropriate focus of the qualified immunity analysis.

The right under the First Amendment of a prisoner to be free from unlawful retaliation was well-established at the time in dispute. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004); *Dawes,* 239 F.3d at 492; *Collins v. Goord,* 438 F.Supp.2d 399, 421 (S.D.N.Y.2006) (citing, *inter alia, Gill* ). Similarly, the Eighth Amendment's proscription against the use of excessive force was equally ensconced and well-defined in 2003. *See Hudson,* 503 U.S. at 5, 112 S.Ct. at 998; *Boddie,* 105 F.3d at 862. Whether the defendants maintained a good faith belief that their actions did not violate these clearly established rights depends upon the resolution of fact issues similar to those identified as precluding the entry of summary judgment on the merits of plaintiff's retaliation and excessive force claims. As such, I find that the court is not currently positioned to determine defendants' entitlement to qualified immunity from suit, and thus recommend against granting defendants summary judgment dismissing plaintiff's claims against them on this basis.

## IV. *SUMMARY AND RECOMMENDATION*

 **\*15** Plaintiff's complaint in this action contains an amalgamation of constitutional and state law claims, all of which relate to or stem from the alleged use of excessive force by defendant Yurack against the plaintiff. Having thoroughly reviewed the record now before the court, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendant Yurack, as well as the retaliation claims asserted with regard to the misbehavior reports issued to the plaintiff on February 2, 2003 and February 3, 2003. I do find, however, that plaintiff's state tort law claims of assault and battery are subject to dismissal based on N.Y. Correction Law § 24, and that plaintiff's procedural due process cause of action is deficient as a matter of law, and thus recommend that summary judgment be entered dismissing those claims.

Turning to plaintiff's application for permission to amend his complaint in order to assert claims against several defendants not previously named or appearing in the action, I conclude that the interests of justice warrant denial of that motion, both because the governing deadline for amending pleadings and joining parties under the court's case management scheduling order has passed and plaintiff has offered nothing to establish good cause for overlooking the lateness of his motion, and in any event the factors normally informing the analysis of whether to permit amendment of pleadings and joinder of parties counsel against the amendment. Based upon the foregoing it is hereby

RECOMMENDED that plaintiff's motion for leave to amend his complaint and join additional defendants (Dkt. No. 71) be DENIED; and it is further

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 69) be GRANTED, IN PART, and that plaintiff's procedural due process claim and assault and battery causes of action, as well as the portion of plaintiff's retaliation claim related to the January 18, 2003 misbehavior report, be DISMISSED, but that defendants' motion otherwise be DENIED and that plaintiff's excessive force claims against defendant Yurack and retaliation cause of action against defendant Almstead related to the issuance of the February 2 and February 3, 2003 misbehavior reports remain pending for trial.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within *TEN* days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2789615

Footnotes

1   Defendant Paul Almstead, who is alleged to have been a corrections lieutenant at the Oneida Correctional Facility during the times relevant to plaintiff's claims, was mistakenly named by the plaintiff in his complaint as "Paul Armstead." Because it now appears that the proper spelling of this defendant's name is Almstead, I request that the clerk of the court revise his records accordingly.

2   In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

3   While plaintiff was released on parole from DOCS custody in March of 2004, after the events giving rise to his claim transpired, he was re-arrested in May of 2005 and is once again a DOCS inmate. Roth Aff. (Dkt. No. 69-14) Exh. A at pp. 86-87.

4   In his complaint, plaintiff describes the injuries resulting from the incident as "superficial." Amended Complaint (Dkt. No. 5) ¶ 8(b).

5   The record does not disclose whether the plaintiff pursued an appeal of that determination to the DOCS Central Office Review Committee ("CORC").

6   The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998). The record is unclear as to which of these levels applies to the January 20, 2003 hearing.

7   Plaintiff alleges that in addition to these sanctions imposed during this and a subsequent disciplinary hearing resulting in further SHU disciplinary confinement, he also forfeited good time credits.

8   In New York, SHU cells are utilized for segregating prisoners from general population areas for various reasons including, predominantly, disciplinary purposes. *Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (citing 7 NYCRR pts. 253, 254, and 301). The conditions typically experienced by inmates confined in an SHU include two showers per week; one hour of outdoor exercise per day; unlimited legal visits; one non-legal visit per week; access to counselors; access to sick call; cell study programs; and access to library books. *Husbands v. McClellan,* 990 F.Supp. 214, 218 (W.D.N.Y.1998) (citing 7 NYCRR pt. 304).

9   Plaintiff's amended complaint also named Corrections Sergeant Beverly as a defendant. Plaintiff's claims against that defendant, however, were subsequently dismissed as a result of a report and recommendation issued by me on December 6, 2004, addressing a motion on defendant Beverly's behalf seeking dismissal of plaintiff's complaint for failure to state a cause of action upon which relief may be granted, Dkt. No. 21, and a subsequent order issued by District Judge Lawrence E. Kahn on April 28, 2005 accepting that recommendation in its entirety. Dkt. No. 26.

10  This portion of defendants' motion is predicated upon the Supreme Court's decisions in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997).

11  As a non-dispositive matter, plaintiff's motion for leave to amend would ordinarily fall within my jurisdiction pursuant to the reference made by the court to me as the assigned magistrate judge. *See Rubin v. Valicenti Advisory Servs., Inc.,* 471 F.Supp.2d 329, 333 (W.D.N.Y.2007). In light of the fact that I am issuing a report and recommendation addressing defendants' summary judgment motion, which is dispositive and thus exceeds my non-consensual jurisdiction, however, I have chosen to cast my determination regarding plaintiff's motion for leave to amend in the form of a recommendation to the district judge.

12  Plaintiff also asserts that he was verbally harassed by both defendants Yurack and Almstead, as well as other prison officials. "It is well settled that verbal harassment, inexcusable as it may be, does not rise to the level of a constitutional violation." *Zimmerman v. Seyfert,* No. 03-CV-1389, 2007 WL 2080517, at *28 (N.D.N.Y. July 19, 2007) (McAvoy, J.) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) and *Rameriz v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996)).

13  It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

14  That statute provides, in relevant part, that

Deal v. Yurack, Not Reported in F.Supp.2d (2007)
Case 9:18-cv-00149-MAD-TWD    Document 24    Filed 09/07/18    Page 34 of 56
2007 WL 2789615

[n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

N.Y. Correct. Law § 24(1).

15    I am somewhat hesitant to summarily recommend dismissal of plaintiff's state law claims in this instance, as I think that the Third Department might well view plaintiff's claims differently. Among the *Riviello* factors to be weighed in determining scope of employment are the extent of departure from normal methods of performance and whether the act was one that was reasonably foreseeable. *Riviello,* 47 N.Y.2d at 303, 418 N.Y.S.2d at 302.

*Cepeda v. Coughlin,* relied upon by state and federal cases alike, partially considered plaintiffs' provocation of the excessive force in holding that state claims are precluded under Correction Law § 24, suggesting that a different result might obtain if, as I am required to assume for purposes of this motion, the force upon plaintiff was unprovoked. 128 A.D.2d 995, 996, 513 N.Y.S.2d 528, 530 (3d Dep't 1987); *see also Murray v. Reif,* 36 A.D.3d 1157, 1168, 828 N.Y.S.2d 669, 670 (3d Dep't 2007) (reversing lower court's conclusion on motion to dismiss, noting that if plaintiff's allegations of unprovoked assault by corrections officer were true, it cannot be concluded that defendant was not acting within the scope of his employment under N.Y. Correction Law § 24).

In *Sharrow v. State,* when considering the State's duty to indemnify under Public Officers Law § 17, the Third Department specifically distinguished its holding in *Cepeda* on the grounds that unjustified force is such a substantial departure from correctional officers' goal of maintaining order, discipline, and control that the State could not possibly be required to indemnify correctional officers for such unnecessary force. 216 A.D.2d 844, 845, 628 N.Y.S.2d 878, 880 (3d Dep't 1995). Indeed, under *Sharrow,* based on the fourth and fifth *Riviello* factors, plaintiff's claim would seem to involve conduct which is outside the scope of employment.

New York courts have not explicitly addressed this argument in the context of section 24, however, and federal courts both here and in the Western District which have encountered the issue since *Sharrow* have held otherwise. *Heyliger v. Gebler,* --- F.Supp.2d ----, No. 06-CV-6220, 2007 WL 2153235, at *2 (W.D.N.Y. July 24, 2007); *Boyd v. Selmer,* 842 F. Supp. 52, 57 (N.D.N.Y.1994) (McAvoy, J.); *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994) (McCurn, J.); *Wright v. Kelly,* No. 950CV-0688H, 1998 WL 912026, at *3 (W.D.N.Y. Oct. 16, 1998). Without clear contrary guidance from the Second Circuit, New York Court of Appeals, or Third Department, I feel constrained under principles of *stare decisis* to recommend dismissal of plaintiff's state law claims.

16    Although listed in plaintiff's amended complaint as a relevant event, Deal does not appear to press this incident as one of the bases for his retaliation claim, undoubtedly owing to this fact.

17    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

18    While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n.5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

End of Document    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Flemming v. King, N.D.N.Y., June 20, 2016

2011 WL 5975027
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jonathan HENRY, Plaintiff,

v.

James F. DINELLE, Corrections Officer; Russell
E. Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema,
Sergeant; and Jean Norton, Nurse, Defendants.

No. 9:10–CV–0456 (GTS/DEP).
|
Nov. 29, 2011.

**Attorneys and Law Firms**

Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel, New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Timothy P. Mulvey, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

## *MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this prisoner civil rights action filed by Jonathan Henry ("Plaintiff") against the five above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants"), is Defendants' motion for partial summary judgment. (Dkt. No. 24.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges that, between approximately January 29, 2009, and January 31, 2009, at Ulster Correctional Facility

in Napanoch, New York, Defendants violated Plaintiff's following rights in the following manner: (1) Defendants Nurse Jean Norton, Corrections Officer James F. Dinelle, Corrections Officer Russell E. Duckett and Corrections Officer Alfred J. DeLuca violated Plaintiff's rights under the First Amendment by filing retaliatory false misbehavior reports against him, and subsequently providing false testimony against him at administrative disciplinary hearings, which resulted in his spending time in the Special Housing Unit ("SHU"); (2) Defendant Dinelle violated Plaintiff's rights under the Eighth Amendment by assaulting him on two occasions, and Defendants DeLuca and Duckett violated Plaintiff's rights under the Eighth Amendment by assaulting him once; (3) Defendant Sergeant Donald L. Broekema violated Plaintiff's rights under the Eighth Amendment by failing to intervene to prevent one of these assaults from occurring; (4) Defendant Norton violated Plaintiff's rights under the Eighth Amendment by harassing him almost immediately before he was subjected to the above-described assaults; and (5) Defendants Norton, Dinelle, Duckett and DeLuca violated Plaintiff's rights under the Fourteenth Amendment by performing the aforementioned acts, which constituted atypical and significant hardships in relation to the ordinary incidents of prison life. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff was an inmate and Defendants were employees of the New York Department of Corrections and Community Supervision at Ulster Correctional Facility. On January 30, 2009, Defendant Dinelle took Plaintiff to the medical ward, because Plaintiff was experiencing a foul odor and oozing from a wound on his leg. After Defendant Norton treated Plaintiff, she filed an inmate misbehavior report against Plaintiff based on (1) Plaintiff's harassing behavior toward Defendant Norton and Defendant Dinelle, and (2) Plaintiff's disobedience of a direct order to be quiet. The misbehavior report was signed by Defendant Dinelle as an employee witness.

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was

then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton). [2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force

against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].). [3]

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [4]

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's*

*Dep't,* 04–CV–0828, 2009 WL 3165551, at *2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

#### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and

the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at *6 (S.D.N.Y. Feb.17, 2004).

#### 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

### 3. Fourteenth Amendment Substantive Due Process Claims

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ...

but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec.14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65). [5]

### 4. Qualified Immunity Defenses

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will

be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007). [7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). [8] As the Supreme Court has explained,

> [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not

be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. [9]

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [10]

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity. [11]

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected. [12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity." [13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. [14] Furthermore, those convictions were never subsequently reversed on administrative appeal. [15] As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

### B. Plaintiff's Claims Under the Eighth Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and

(3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v. S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011) (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has

adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced. [16]

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims, [17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff. [18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

### C. Plaintiff's Claim Under the Fourteenth Amendment

**\*10**  As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at \*11.

After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions. [19]  As a result, Plaintiff's substantive due process claim is dismissed.

### D. Defendants' Defense of Qualified Immunity

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

### 1. Retaliation

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are,

under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

### 2. Excessive Force

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11**  Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999). [20]  For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is *GRANTED* in part and *DENIED* in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is *GRANTED;*

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is *GRANTED;*

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is *GRANTED;*

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is *GRANTED;* and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is *DENIED;* and it is further

**ORDERED** that the following claims are *DISMISSED* **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are *DISMISSED* from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5975027

Footnotes

1    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

2    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

3    In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

4    Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

5    Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

6    *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

7    *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

8    *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

9    *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

10    Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

11    *See Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at *6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

12    The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at *4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at *3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at *15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at *3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1534368, at *6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

13    *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

14    *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

15    For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against

him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a mandatory work assignment, *"without a hearing or a misbehavior report"*) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

16   *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

17   (Dkt. No. 27, Attach. 2, at 19–20.)

18   (Dkt. No. 27, Attach. 2, at 10, 14.)

19   *See Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that were more restrictive than those in general population).

20   *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1994 WL 49696
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Maurice PARKER, Plaintiff,

v.

Superintendent Walter FOGG, Correction
Officers Dennis Schoonmaker, Ernest Benevento
& Correction Sergeant Longtin, Defendants.

No. 85–CV–177.
|
Feb. 17, 1994.

**Attorneys and Law Firms**

James M. Kerrigan, Ithaca, NY, for plaintiff.

Robert Abrams, Atty. Gen. for the State of New York,
Albany, NY (David B. Roberts, Asst. Atty. Gen., of
counsel), for defendants.

MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

**\*1** While incarcerated plaintiff *pro se,* Maurice Parker,
filed the present lawsuit. [1] This civil rights action,
brought pursuant to 42 U.S.C. § 1983, is predicated
upon allegations that plaintiff's Eighth and Fourteenth
Amendment rights under the United States Constitution
were violated, as well as his rights under Article I,
§§ 5 and 6 of the New York State Constitution, [2]
during an altercation which took place on October 12,
1983, at Coxsackie Correctional Facility ("Coxsackie"
or "the facility"), a maximum security prison. Besides
those alleged constitutional deprivations, plaintiff asserts
three pendent state law claims: (1) intentional infliction
of emotional distress, (2) assault and battery, and (3)
violations of New York Corrections Law § 137(5) [3] and
7 N.Y.C.R.R. §§ 250.2(g) and 251.2. [4] In his complaint
plaintiff seeks a declaratory judgment "that defendants
have violated [his] constitutional rights as protected by
the Eighth and Fourteenth Amendments to the United
States Constitution;...." Complaint at 5. He also seeks
compensatory damages of $250,000 and punitive damages

of $250,000, as well as reasonable costs and expenses,
including attorney's fees. *Id.*

Named as defendants in the complaint are Walter Fogg,
the Superintendent at Coxsackie at the time of the
alleged incident, [5] Correction Officers ("C.O.") Dennis
Schoonmaker and Ernest J. Benevento, and Sergeant
James Longtin. [6] On January 18 and 19, 1994 this matter
was tried before the court without a jury. In accordance
with Fed.R.Civ.P. 52(a), following constitutes the court's
findings of fact and conclusions of law in this regard.

*I. FINDINGS OF FACT*

To fully appreciate the relatively brief encounter between
plaintiff Parker and the defendants on the evening of
October 12, 1983, it is necessary to briefly examine
the background against which that incident occurred.
There is evidence in the record, in the form of "Inmate
Misbehavior Reports," showing that plaintiff had been
verbally harassing C.O. Judy Wood prior to October
12, 1983. *See* Defendants' exhs. E and F. Even though
plaintiff did not remember the incidents described in those
reports, he did remember having some differences with
C.O. Wood. Defendants suggest that those differences
arose out of the fact that C.O. Wood is a woman and at the
time was a "Block Officer," which apparently was quite
rare in the early 1980's. Plaintiff disagrees explaining that
his differences with Wood occurred because she accused
him of being a ringleader or instigator, provoking others
to engage in disturbances. In any event, it is against this
history of animosity between plaintiff Parker and Wood
(which most surely did exist, for whatever reason) that the
incident which is the subject of this litigation occurred.

Plaintiff's version of the events of October 12, 1983 is
as follows. That evening he was keeplocked [7] in his cell.
When the other inmates returned from evening recreation
there were problems with the "lock in" [8] because the
inmates thought that the C.O.s were bringing the inmates
back to the cells ten minutes early. Plaintiff testified that
the inmates were behaving in a raucous manner, with
continued screaming even after being locked in for the
night. During this time plaintiff claims to have been
writing letters.

**\*2** Then, between 9:15 and 9:40 p.m., the door to
plaintiff's cell was opened and he saw the defendants
standing there. Plaintiff states that at that time he was

Parker v. Fogg, Not Reported in F.Supp. (1994)

1994 WL 49696

wearing pajamas with no pockets and his slippers. When he tried to put on his boots, Schoonmaker, whom plaintiff believes had a baton, ordered him not to. In response to plaintiff's inquiry as to what was going on, Schoonmaker told him to, "Shut up," in no uncertain terms. Upon leaving the cell, plaintiff testified that he was not pat frisked, but that he was only escorted by the defendants to the center room. Apparently that room is so called because it is located between two sets of cell blocks. *See* Defendants' exh. A.

As they proceeded down the corridor, plaintiff admits to talking loudly and continuing to question defendants as to where he was being taken. He did that because he was the only one not locked in and he wanted his fellow inmates to know that he was being taken away by the defendants. Plaintiff was then placed in the corner of the center room, making it difficult for him to be seen or heard by other inmates in the surrounding cells. *See* Defendants' exh. A. At this time plaintiff's hands were behind his back, as they had been since he left the cell, and pressed against the wall. C.O.s Benevento and Schoonmaker flanked plaintiff, and by plaintiff's estimation Sergeant Longtin was behind the C.O.s, about two and a half feet from plaintiff.

Plaintiff further testified that it was only about three seconds from the time he was placed in the corner until Schoonmaker first hit him—either with an open right hand or a fist, plaintiff is not sure which. Prior to being struck, plaintiff testified that Schoonmaker was basically telling him that he had a big mouth and that he was a troublemaker. Trying to avoid getting hit, the plaintiff ducked. Plaintiff then claims that after that initial strike by Schoonmaker, both Benevento and Schoonmaker beat him up a little. Schoonmaker then hit plaintiff a second time with a right fist to plaintiff's temple, causing plaintiff's head to hit the wall and he began to bleed. Plaintiff testified that he was ducking and trying to protect himself after Schoonmaker struck him the first time. In fact, the plaintiff went so far as to demonstrate for the court the crouching position he assumed, with his hands covering his face, when the altercation started. Thus, because by his own admission plaintiff was protecting his face and head and in so doing obstructing his own vision, the court simply cannot credit plaintiff's testimony that C.O. Benevento struck or kicked plaintiff. Perhaps plaintiff was kicked or hit by more than one of the defendants, but the fact remains that he could not reasonably testify to

that because at that point, he could not see what was happening.

In any event, after this plaintiff claims that Benevento subdued him with a stick and no more punches were thrown. Plaintiff also claims that he was kicked in the groin, but again there is no credible testimony as to which defendant, if any, engaged in that conduct. Moreover, the medical records do not corroborate plaintiff's statement that he sustained injuries to the groin area as a result of this incident.

**\*3** The medical report contained in the "Unusual Incident Report" reveals that plaintiff sustained a cut measuring approximately 1 and # inches long on the outer area of his right eyebrow. Defendants' exh. B and H at 5. The facility nurse applied butterfly bandages. *Id.* The next day plaintiff was seen by a doctor who administered sutures. Defendants' exh. H at 5. Plaintiff received somewhere between four and six sutures. [9] The sutures were removed eleven days later. Defendants' exh. H. Photos of plaintiff taken eight days after the incident show that his right eye was still quite swollen, with significant bruising around it. Defendants' exh. I and plaintiff's exhs. 3A and 3B. [10] To this day, plaintiff still has a small scar (about one and a half inches long) above his right eyebrow, visible from approximately five feet away.

In addition to the scar, plaintiff claims that in the months after the incident he had a lot of headaches and vision problems, as well as pain in the groin area. Even today plaintiff claims that he continues to suffer from headaches, although he could not testify to the frequency of the same. Significantly, however, there is no mention in any of plaintiff's medical records, which are a part of the trial record, of headaches or vision problems. If plaintiff had, as he testified, a number of headaches in the two weeks immediately following the incident, surely that would be noted in his medical records from that time.

Likewise, even though plaintiff claimed at trial that he also sustained injury to his groin area, there is no mention of that in either the medical portion of the "Unusual Incident Report" or in his medical records for the date of the incident, or the visits immediately following that. In fact, there is no mention in the medical records of any such problem until nearly six weeks after the incident. Defendants' exh. H. In addition, when plaintiff again saw the doctor on November 28, 1983, he mentioned that

problems with "bloody ejaculate" were intermittent for the past two months "and also 1 yr. [year] ago." *Id.* Following treatment for prostate difficulties, by plaintiff's own admission, this problem subsided. Thus, insofar as plaintiff's injuries are concerned, the court finds that plaintiff did sustain a laceration to the area above his right eyebrow, which required sutures and resulted in a small permanent scar.

The court will not attribute plaintiff's other complaints of headaches, vision problems and pain and discomfort in the groin area to this incident, however, because those problems are not substantiated in plaintiff's medical records during the weeks immediately following the incident. Furthermore, the fact that headaches can be so easily feigned is another reason for not attributing that particular symptom to the October 12, 1983 incident, especially where these supposed headaches are not mentioned anywhere in plaintiff's medical records.

Not surprisingly, defendants' version of events is at odds with that offered by plaintiff. The defendants claim that earlier in the evening of October 12, 1983, plaintiff had again been verbally harassing C.O. Wood. Sergeant Longtin claims that he first became aware of this when he received a call from C.O. Wood at approximately 7:50 p.m. In response to that call, Sergeant Longtin testified that he went to plaintiff's cell to work out the problem by talking with plaintiff. According to Longtin he and plaintiff agreed to "forgive and forget" the whole matter. Sometime later, while he was making his rounds in another part of the facility, Longtin received a second call from C.O. Wood, again complaining about plaintiff Parker. This time she advised Longtin that the keeplocked inmates, including Parker, were creating a disturbance. Wood also expressed concern that plaintiff had indicated that when the nurse and another C.O. made their usual nightly rounds at 10:00 p.m., the inmates, led by plaintiff, planned to "break on" them, or, in other words, create a disturbance. Defendants' exh. G. Longtin advised Wood that he would be up shortly after finishing his rounds.

**\*4** The Sergeant did not come alone, though, as he had earlier. This time he was accompanied by defendants, Benevento and Schoonmaker. Sergeant Longtin testified that Schoonmaker was called to accompany him because that was part of his job. At the time, Schoonmaker had the official sounding title of "Evening Shift Assembly Desk Escort Officer," which in Schoonmaker's own words

meant that he was a "gopher," or as Longtin described it, a "go-getter." Longtin testified that he did not know why Benevento was also called upon to accompany the Sergeant, but he hypothesized that perhaps Benevento was working overtime that night. The Sergeant further testified that it was customary for one Sergeant to be accompanied by two Corrections Officers in a situation such as this, where they anticipated moving an inmate, as they did Parker.

When the three defendants arrived at plaintiff's cell, prior to giving the signal for the door to be opened, Sergeant Longtin testified that he informed plaintiff that he was being taken to the center room so that they could talk to him. Schoonmaker then ordered plaintiff Parker to put on his pants and plaintiff did that. After exiting the cell, Schoonmaker pat frisked plaintiff and he found contraband—namely a blade from a Bic brand razor measuring approximately 1½ inches by # inches. Defendants' exh. D and D1. Despite finding that contraband, the three defendants proceeded to escort plaintiff to the center room. Later that night, Schoonmaker wrote up an Inmate Misbehavior Report pertaining to both the contraband and the altercation; but no action was taken with respect to the contraband at the time it was found. Defendants' exh. D.

Upon entering the center room, plaintiff was ordered to stand in the corner and he did that. At that point, while directly in front of the plaintiff, Sergeant Longtin claims that he began talking to him, again questioning plaintiff about the alleged harassment and his supposed plan to instigate a disturbance on the block later that evening. Before he could finish, plaintiff began yelling. Schoonmaker told the plaintiff to stop yelling and to show a little more respect for the Sergeant, or words to that effect. According to the defendants, that prompted plaintiff to respond by removing his hands from his pockets, where he had been instructed to keep them, and to swing at Schoonmaker with a closed fist. Schoonmaker claims that in self-defense he responded by striking plaintiff on the left side of his head, causing plaintiff's head to hit the wall. Schoonmaker and Benevento then turned the plaintiff around, and both applied "bar hammer locks" to plaintiff's arms. Defendants' exh. B. Longtin issued handcuffs to Schoonmaker who handcuffed the plaintiff. After being escorted to the infirmary, plaintiff was seen by a facility nurse and then placed in another cell area.

Parker v. Fogg, Not Reported in F.Supp. (1994)

1994 WL 49696

Ascertaining exactly what happened on the evening of October 12, 1983 at Coxsackie is not easy because, admittedly, there are discrepancies, in varying degrees of significance, in the testimony of each of the witnesses, all of whom are parties to this action.[11] In addition to the discrepancies, the court's task of deciding the "facts" of this case is made even more difficult because it appears that all of the witnesses embellished their testimony to some extent. Difficulty in ascertaining where the "truth" lies here is also compounded by the fact that this incident occurred over ten years ago; and thus, understandably, the independent recollection of each party was significantly impaired. Nevertheless, after considering all of the evidence, and after having the opportunity to judge the credibility of the witnesses, the court concludes that plaintiff's version of events more closely resembles what happened between plaintiff and defendants on the evening of October 12, 1983 than does the defendants' version, and the matter will be decided based predominately upon that view of events.

**\*5** There are two primary reasons that the court is willing, for the most part, to accept plaintiff's version of events. First, the court is greatly troubled by the fact that once contraband was found on the plaintiff, the defendants did not proceed to immediately write him up or focus upon that undisputed violation of prison policy. It is incredible to the court that after finding that contraband on the plaintiff, who according to the Sergeant, had already been reprimanded earlier that same evening for verbal assaults, the defendants' agenda remained to take plaintiff down the hall and talk to him about Wood's claim that he planned to instigate another disturbance later that night. Given the sequence of events, the court finds it perplexing that once the contraband was found, the defendants did not simply remove plaintiff from his cell block, especially when they were supposedly concerned about him causing a disturbance there later on that night. If that remained defendants' concern, it seems only logical that once they found the contraband, in combination with plaintiff's earlier difficulties with C.O. Wood and her fear about the possibility of plaintiff instigating another cell block disturbance, the defendants would have taken immediate action to segregate plaintiff. Or, at the very least, they would have taken some action more severe then just taking plaintiff down the hall to discuss matters with him. After all, as defendants themselves emphasized at trial, Coxsackie is a maximum security prison and plaintiff

had a history of behavior problems, including problems with C.O. Wood—the very same C.O. who complained about him the night of October 12, 1983. Had defendants segregated plaintiff, any fear about his causing another disturbance would have been alleviated.

The court finds the defendants' description of what happened on the night of October 12, 1983 suspect for a second reason. As all the parties testified, although not in precisely this way, plaintiff, a 19 year old, 160 pound unarmed inmate, and familiar with prison mores having already served part of his sentence, was surrounded and literally cornered, by three guards whose combined weight was, conservatively, 500 pounds. Regardless of whether or not the defendants had batons,[12] it is implausible to the court that in this situation plaintiff would have "thrown the first punch,"[13] "in an effort to 'get in his licks,' "[14] as the defendants steadfastly maintain. It is far more likely, in the court's opinion, that defendants were agitated by plaintiff Parker's ongoing insolence, as documented in the Inmate Misbehavior Reports of C.O. Woods, and which apparently continued earlier that evening. And thus they, or at least defendant Schoonmaker, made the decision to take some action beyond just talking to the plaintiff.

## II. CONCLUSIONS OF LAW

### A. Eighth Amendment—Excessive Force

Given the proliferation of inmate instituted lawsuits over the years,[15] it is not surprising that the law is fairly well circumscribed, with respect to Eighth Amendment excessive force claims. Recently, Chief Judge McAvoy of this District had occasion to set forth the legal principles governing such claims. See *Richardson v. VanDusen,* 833 F.Supp. 146 (N.D.N.Y.1993); *see also Boyd v. Selmer,* 842 F.Supp. 52, 55–56 (N.D.N.Y.1994). Set forth in those decisions is a thorough and accurate recitation of the relevant legal principles, which closely follows that set forth by other courts in this Circuit when faced with Eighth Amendment excessive force claims.[16] Consequently, the court sees no need to restate what has already been so well put by a number of courts; instead the court will quote liberally from Judge McAvoy's recent published decision in *Richardson.*

**\*6** The Eighth Amendment protects prisoners from "cruel and unusual punishment." See *Wilson v. Seiter,* 501 U.S. 294, ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d

Parker v. Fogg, Not Reported in F.Supp. (1994)

1994 WL 49696

Case 9:18-cv-00149-MAD-TWD    Document 24    Filed 09/07/18    Page 50 of 56

271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102–05, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). However, it is "the unnecessary and wanton infliction of pain", *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290, and not simply the "ordinary lack of due care for the prisoner's interests or safety" *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), which the Eighth Amendment prohibits.

To prevail in this civil rights action grounded in the Eighth Amendment, the plaintiff must show that the defendants used such excessive force to subdue him that the force could fairly be characterized as the "unnecessary and wanton infliction of pain." *See Hendricks v. Coughlin,* 942 F.2d 109, 113 (2nd Cir.1991). What is necessary to establish an "unnecessary and wanton infliction of pain" varies according to the nature of the constitutional violation. *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084. "Wantonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.' " *Wilson v. Seiter,* 501 U.S. at ——, 111 S.Ct. at 2326 (1991) (quoting *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084.) In this manner, the court must consider the "wantonness" element within the context of the situation in which the underlying force occurred. *Id.* What may amount to the "unreasonable and wanton infliction of pain" is determined by the constraints facing the state official. As the *Whitley* court stated:

> Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 321–322, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

The Supreme Court has recently re-affirmed use of the *Whitley* test in situations such as the one now before the court. *See Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In *Hudson,* the Court stated that "whenever prison officials stand accused of using excessive force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

**\*7** Applying the *Whitley/Hudson* test, the Second Circuit recently stated:

> To determine whether the defendants acted maliciously, a jury should consider the following factors: the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. Id. (citing *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085). If an evaluation of these factors leads the jury to conclude that the defendants acted maliciously, wantonness has been established. And an Eighth Amendment violation has occurred. If, on the other hand, reflection upon these factors leads the jury to find that the defendants acted in a good-faith effort to maintain and restore discipline, no constitutional violation has occurred because the subjective component of the claim has not been satisfied.

*Romano v. Howarth,* 998 F.2d 101 (2d Cir.1993).

*Id.* at 151–52.

*1. Defendant Schoonmaker*
Convinced that defendant Schoonmaker delivered the first blow, the court must now consider whether, under the circumstances, that conduct amounted to a deprivation of plaintiff Parker's constitutional rights such that liability should be imposed under section 1983. When the facts of this case are analyzed in light of the *Romano* factors, the court is compelled to conclude that Schoonmaker's unprovoked attack on plaintiff, albeit brief, renders him liable under section 1983. Although plaintiff's injuries were not extensive, that does not militate against a finding of excessive force violative of the Eighth Amendment. *See Hudson,* 112 S.Ct. at 1000 (use of excessive physical force against an inmate may constitute cruel and unusual punishment even though the inmate does not suffer serious injury). In addition, crediting plaintiff's testimony that Schoonmaker struck him first, there is absolutely nothing in the record

Parker v. Fogg, Not Reported in F.Supp. (1994)

1994 WL 49696

demonstrating that Schoonmaker needed to apply force when plaintiff, a 19 year old, 160 pound unarmed inmate, was in a corner virtually surrounded by three prison guards who together substantially outweighed him. Again, accepting plaintiff's version of events, as just explained, Schoonmaker could not reasonably perceive plaintiff as a threat to Schoonmaker's well being. Lastly, Schoonmaker made no effort to temper his response to plaintiff's supposed disrespect; after verbally attacking plaintiff, Schoonmaker just hauled off and struck him. Based on all of the foregoing, the court finds that the force applied by defendant Schoonmaker was not done "in a good faith effort to maintain or restore discipline[,]" but rather was done "maliciously and sadistically to cause harm." *See id.* at 999. Consequently, plaintiff has shown to the court's satisfaction that Dennis Schoonmaker violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishments.

### 2. Defendant Longtin

**\*8** The legal analysis set forth above, and particularly those factors enumerated in *Romano,* are not necessarily applicable with respect to the other two defendants however. More specifically, as to Sergeant Longtin, because the court does not credit plaintiff's testimony that he was attacked by any defendant other than Schoonmaker, obviously Longtin cannot be held liable on the same basis as Schoonmaker—as a direct participant in the attack. At the time of the incident, along with the other Sergeant on duty during that shift, by his own admission Sergeant Longtin was the second highest ranking prison official on duty then. (The highest ranking on duty official was a Lieutenant.) As such, Sergeant Longtin stands in a different position legally from that of the other two defendants. And because of that status, the fact that Longtin himself did not actually strike the plaintiff, does not necessarily extricate him from a finding of liability under § 1983.

A defendant's liability for a constitutional deprivation under 42 U.S.C. § 1983 may arise in several different ways, as the Second Circuit has recognized.

> The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official

may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted)); *see also Van Pelt v. Finn,* No. 92 Civ. 2977, 1993 U.S.Dist. LEXIS 15951, at \* 19 (S.D.N.Y. filed Nov. 12, 1993) (same); and *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (quoting *Duchesne v. Sugarman,* 566 F.2d 817, 830 (2d Cir.1977)) ("Supervisory officials cannot be held liable under § 1983 solely for the acts of others; 'there must be some showing of personal responsibility.' "). In the present case there is simply no proof that Longtin participated in striking plaintiff; that he created a policy or custom under which this attack was allowed to take place; or that he allowed a policy or custom of unprovoked attacks on inmates to continue. Thus, of the types of personal involvement just described, the only category into which Sergeant Longtin could possibly be placed would be as a supervisor who was grossly negligent in managing a subordinate—C.O. Schoonmaker.

Sergeant Longtin cannot be found liable on that basis, however, because this was a single incident which happened in a matter of seconds. Therefore, even though he was acting in a supervisory capacity at the time plaintiff's constitutional rights were violated, Sergeant Longtin still cannot be held liable because he is no different than any other non-supervisory prison official who does not act because there is no reasonable opportunity to intercede. As defense counsel correctly pointed out, this case is no different than *O'Neill v. Krzeminski,* 839 F.2d 8 (2d Cir.1988), where the Court held that there was "insufficient evidence to permit a jury reasonably to conclude that [an officer's] failure to intercede was a proximate cause of the beating [,]" where "the three blows were struck in such rapid succession that [the officer] had no realistic opportunity to prevent them." *Id.* at 11. Just as in *O'Neill,* the blows by Schoonmaker were over and done with so quickly here that Sergeant Longtin "had no realistic opportunity to

attempt to prevent them." *Id. see also Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 207 n. 3 (1st Cir.1990), *cert. denied,* 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 1991) (no "realistic opportunity" for a police officer to prevent an attack in a police station booking room where it was over in a matter of seconds). Thus, while generally a corrections officer such as Longtin bears "an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers [,]" Sergeant Longtin was excused from that duty because there was no "realistic opportunity" to prevent this attack which was over in a matter of seconds. *See id.*

### 3. Defendant Benevento

**\*9** Similarly, there is no basis for finding liability under section 1983 as against C.O. Benevento. Not only was C.O. Benevento not in a supervisory position at the time of the incident, but just like Sergeant Longtin, he too did not have a reasonable opportunity to intercede. Therefore the legal analysis set forth above with respect to Sergeant Longtin applies with equal force to C.O. Benevento. Thus there is no basis for a finding that defendant Benevento violated plaintiff's rights under the Eighth Amendment.

### B. Fourteenth Amendment—Due Process

Given the complete lack of proof at trial on any due process claim other than one based upon Schoonmaker's unprovoked attacked on plaintiff Parker, [17] the court assumes that plaintiff has abandoned all other aspects of this claim. In other words, the court finds that defendant Schoonmaker is also liable under § 1983 for violating plaintiff's due process rights when Schoonmaker struck plaintiff in the head, but the other two defendants are not liable in any way for violating plaintiff's due process rights.

### C. Pendent State Law Claims

Before turning to a consideration of plaintiff's pendent state law claims, the court notes that although this case has been pending for nearly nine years, it was not until defendants' opening statement at trial that a statute of limitations defense was raised. Having failed to assert that affirmative defense in their answer, however, the defendants are deemed to have waived it. *See Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 752 (2d Cir.1992). In light of that waiver, the court need not

address the defendants' untimely statute of limitations argument.

During their opening statement, defendants raised a second procedural point with respect to plaintiff's pendent claims and that is that those claims are barred by § 24 of the New York State Corrections Law. That statute expressly states, in relevant part:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department [of corrections], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y.Correc.Law §§ 24(1) and 24(2) (McKinney 1987) (emphasis added). Relying upon that statute, defendants argue that because a state court would lack jurisdiction thereunder to decide plaintiff's pendent state claims, then so too would this court lack jurisdiction over those claims. [18] Case law construing section 24 is not plentiful. The few federal cases discussing that statute do make clear, though, that "a New York State inmate is foreclosed in New York State court— ...—from a private damage action against prison employees in their personal capacity for damages arising out of acts or failures to act taken within the scope of employment and in the discharge of duty." *Selby v. Ribeiro,* No. 78 Civ. 1281–CSH, slip op. at 3 (S.D.N.Y. Jan. 9, 1980) (citing *Ray v. Fritz,* 468 F.2d 586, 587 n. 2 (2d Cir.1972)) (emphasis added); *see also Boyd, supra,* slip op. at \*13–\*14; and *Brown v. Coughlin,* 758 F.Supp. 876, 886 (S.D.N.Y.1991). Thus, the court agrees that § 24 bars plaintiff's pendent tort claims. [19]

### D. Damages

**\*10** Having determined that defendant Schoonmaker is liable to plaintiff for violating his Eighth and Fourteenth Amendment rights, the only remaining question for the court is the amount of damages to be awarded. In that regard, the court notes its disagreement with defendants

Parker v. Fogg, Not Reported in F.Supp. (1994)

Case 9:18-cv-00149-MAD-TWD    Document 24    Filed 09/07/18    Page 53 of 56

1994 WL 49696

that plaintiff Parker should only be entitled to recover nominal damages. An award of nominal damages is proper "[a]bsent a showing of causation and actual injury." *Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (emphasis added) (citing, *inter alia, Carey v. Piphus,* 435 U.S. 247, 263, 266–67, 98 S.Ct. 1042, 1052, 1054, 55 L.Ed.2d 252 (1978)). As fully set forth herein, the plaintiff has made the requisite showing of causation and actual injury, at least with respect to the injury he sustained to his head. Thus, something more than a nominal damage award is mandated here.

After reviewing the medical records, listening to all of the testimony, and having an opportunity to observe the permanent scar near plaintiff's right eyebrow, which although not disfiguring, does remain visible today— some nine years later, the court is convinced that plaintiff is entitled to damages totalling $2,500.00. An award of that amount will, in the court's opinion, adequately compensate plaintiff for the actual injury he sustained, as well as for his pain and suffering.

An award of punitive damages is not, however, justified on the present record. In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court set forth the standard for assessing punitive damages in § 1983 actions. The Court held that punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. The *Smith* Court further "observed that though entitlement to compensatory damages is automatic upon a finding that the plaintiff's rights have been violated, an award of punitive damages is discretionary, reflecting a 'moral judgment,' and that the threshold of proof need not be different." *Vasbinder v. Ambach,* 926 F.2d 1333, 1342 (2d Cir.1991) (quoting *Smith,* 461 U.S. at 52, 52–55, 103 S.Ct. at 1638, 1638–40). The Supreme Court has also explained that the purpose of punitive damages "is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School District v. Stachura,* 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986); *see also In re Air Disaster at Lockerbie, Scotland,* 928 F.2d 1267, 1272 (2d Cir.), *cert. denied,* 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991) (reviewing history of punitive damages).

Keeping these general principles in mind, the court cannot find that punitive damages are warranted based upon the record before it. There is simply nothing in the record showing that defendant Schoonmaker acted recklessly or with "callous indifference" to plaintiff Parker's rights. Although defendant Schoonmaker violated plaintiff's constitutional rights, in the court's view his conduct was not sufficiently egregious to justify an award of punitive damages.

### *E. Attorney's Fees*

**\*11** In light of the foregoing, plaintiff's counsel has thirty (30) days from the date of entry of this memorandum-decision and order in which to file his application for attorney's fees. Counsel is reminded that such application must be submitted in a form consistent with the requirements for the same in this Circuit. Defendant Schoonmaker will then have fifteen (15) days in which to file any objections thereto. If no objections are filed by the end of that time, the court will award attorney's fees in the full amount sought by plaintiff's counsel. Having said all this, the court strongly urges both counsel to resolve the attorney's fees matter without further court intervention. If that is not possible, however, the above time frame applies.

### *III. CONCLUSION*

For the violation of his Eighth and Fourteenth Amendment rights, plaintiff Maurice Parker is awarded compensatory damages of $2,500.00 against defendant Dennis Schoonmaker. Plaintiff Parker is also entitled to a declaratory judgment that defendant Dennis Schoonmaker violated his Eighth and Fourteenth Amendment as fully explained herein. Plaintiff Parker is not, however, entitled to recover on any other aspect of this action.

Accordingly, the Clerk of the Court is directed to enter judgment on behalf of the plaintiff in the total amount of $2,500.00 as against defendant Dennis Schoonmaker. The Clerk of the Court is further directed to enter judgment dismissing the plaintiff's claims as against defendants Ernest Benevento and James Longtin, and dismissing plaintiff's state law claims as against all defendants.

IT IS SO ORDERED.

Case 9:18-cv-00149-MAD-TWD   Document 24   Filed 09/07/18   Page 54 of 56

Parker v. Fogg, Not Reported in F.Supp. (1994)
1994 WL 49696

**All Citations**

Not Reported in F.Supp., 1994 WL 49696

Footnotes

1   Although plaintiff initially proceeded *pro se,* by order dated July 19, 1989 Magistrate Judge Gustave DiBianco appointed attorney David Damico to represent the plaintiff. Docket Entry # 24. When Mr. Damico asked to be relieved as counsel because it was a hardship for him to travel to the prison where plaintiff was incarcerated, the Magistrate Judge granted that request. Docket Entry # 26. He then appointed attorney James Kerrigan to represent plaintiff on a *pro bono* basis. Docket Entry # 27. The court acknowledges its gratitude to Mr. Kerrigan's for his willingness to accept this *pro bono* assignment.

2   As does the Eighth Amendment of the United States Constitution, section 5 of the New York State Constitution contains a prohibition against "cruel and unusual punishments," and presumably it is that provision upon which plaintiff is relying, although the same is not specified in his complaint. *See* N.Y. Const. art. I, § 5 (McKinney 1982). Section 6 of the State Constitution is likewise similar to the Fourteenth Amendment of the United States Constitution in that in contains, *inter alia,* a due process clause. *See* N.Y. Const. art. I, § 6 (McKinney 1982). And once again, although not indicated in his complaint, it is apparently that provision of section 6 upon which plaintiff relies in this action.

3   Although not identified in his complaint, plaintiff is apparently relying upon the first part of this statute, which states:
    No inmate in the care or custody of the department [of corrections] shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection.
    N.Y.Correct. § 137(5) (McKinney 1987). This statute is not as one-sided as a reading of the just quoted passage might suggest. Section 137(5) goes on to provide:
    When any inmate, or group of inmates, shall offer violence to any person, or do or attempt to do any injury to property, or attempt to escape, or resist or disobey any lawful direction, the officers and employees shall use all suitable means to defend themselves, to maintain order, to enforce observation of discipline, to secure the persons of the offenders and to prevent any such attempt or escape.
    *Id.*

4   Section 250.2(g) of the New York Code of Rules and Regulations plainly states: "Corporal punishment is absolutely forbidden for any purpose and under all circumstances." 7 N.Y.C.R.R. § 250.2(g). Section 251–1.2 of the Code, contained in the section entitled "Initial Actions in Cases of Inmate Misbehavior," basically describes the circumstances under which it may be appropriate for physical force to be used in connection with an inmate who has misbehaved.

5   Just prior to trial, plaintiff moved to voluntarily discontinue this action as against Superintendent Fogg, and the court granted that motion. Docket Entry # 41.

6   The court observes that the complaint is silent as to which capacity—individual or official—the defendants are being sued. This is not an uncommon deficiency in a case such as this. *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991) (quoting *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) (quoting in turn *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 876, 88 L.Ed.2d 878 (1985)) (" 'In many cases,' a complaint against public officials 'will not clearly specify whether officials are sued personally, in their official capacity, or both,' and only" [t]he course of proceedings' ... will indicate the nature of the liability imposed.' "). Furthermore, in part because the defendants never filed any motions in this case, the issue of the capacity in which the defendants are being sued was never fully explored. The court will assume, however, that plaintiff Parker is suing the defendants in both their individual and official capacities.

    It is true that in their answer defendants asserted a qualified immunity defense, which applies, if at all, only insofar as they are being sued in their personal or individual capacities. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529–530 (2d Cir.1993). Presumably if defendants believed that they were also being sued in their official capacity, they would have included an Eleventh Amendment immunity defense in their answer. *See id.* at 529 (citations omitted) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."). Nonetheless, given the following comment by the Second Circuit, except as explained below, the court will not presume, as defendants seemingly did, that they are being sued only in their personal capacities.

    [A] plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other. By the same

Parker v. Fogg, Not Reported in F.Supp. (1994)

Case 9:18-cv-00149-MAD-TWD    Document 24    Filed 09/07/18    Page 55 of 56

1994 WL 49696

token, a party who is unclear in argument as to the capacity in which the defendant can be pursued should not lightly be deemed to have withdrawn a claim that was expressly stated. When the party's defense of her stated claim bespeaks a doctrinal confusion, the court should not presume that there has been abandonment but should instead give her the opportunity either to abandon the claim or to pursue it with a corrected understanding as to what proof will be required to establish it.

*Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

Having given plaintiff some leeway on this pleading issue, consistent with the relevant case law, the court will not read plaintiff's complaint as asserting a claim for monetary damages against the defendants in their official capacities, however, because such claim obviously would be barred by the Eleventh Amendment. *Gan,* 996 F.2d at 529. Thus, the court will construe plaintiff's complaint as seeking monetary damages against defendants in their personal or individual capacities only. The court will construe the complaint as seeking declaratory relief against defendants in both their personal and official capacities, however. (It is undisputed that a claim for declaratory relief is not barred by the Eleventh Amendment. *See Berman Enterprises, Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.1993)).

7    Keeplock is a means of administrative confinement. As plaintiff explains it, an inmate is keeplocked in his cell because of certain misbehavior. While keeplocked, an inmate must spend nearly the entire day in the cell, including taking meals there.

8    Sergeant Longtin testified that at 10:00 p.m. all the inmates are locked in their cells for the night and a head count is taken.

9    Plaintiff testified that he received six sutures, and the medical records are ambiguous. The one entry pertaining to the number of sutures appears to read four, but it is followed by and entry which is illegible. Defendants' exh. H at 5. This discrepancy, if it even exists, in the court's view, is inconsequential.

10    The court takes umbrage at the suggestion by plaintiff that the original photographs were "hidden away in the court's files for years [,]" implying an element of deceit on the part of the court or defense counsel. First of all, those photographs were provided by Prisoner's Legal Services of New York, which was at least nominally representing plaintiff at the time. *See* Docket Entry # 46 (Court Exhibit # 1). Second, the court file in this action is a matter of public record. Therefore, at any time prior to the trial plaintiff's counsel was free to review it. Indeed, the court would be surprised to learn if that was not done shortly after the appointment of plaintiff's current counsel. Thus, any suggestion that either the court or defense counsel were secreting these photographs is patently absurd.

11    In defendants' post-trial submission, they suggest that the plaintiff's testimony is inherently suspect because, among other reasons, he is a party to this action. While that may be true, obviously the same can also be said of the defendants, and thus the court is not willing to discredit the testimony of any witness here simply because he is a party to this action.
    As an additional basis for challenging plaintiff's testimony, defendants assert that he should be disbelieved simply because he is a convicted felon. The court declines to accept that view. Automatically discounting the testimony of a plaintiff-inmate would mean that he or she would never prevail in a case such as this. Certainly the Supreme Court did not intend such a harsh result when it stated, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84. 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). An obvious and dangerous ramification of the view suggested by defendants is that plaintiff-inmates would be deprived of all their constitutional rights solely by virtue of their status as inmates. Such a cynical view flies in the face of the Supreme Court's clear pronouncement in *Turner.*

12    The testimony conflicts on this point.

13    Letter of David B. Roberts to Court (Jan. 24, 1994) at 1.

14    *Id.* at 3.

15    *See* Report of the Federal Courts Study Committee—Part II, April 2, 1990 at 49; *see also* N.Y.Correc.Law § 137, Practice Commentary thereto at 137 ("Claims that unnecessary force was used against inmates by corrections officers have formed the basis for numerous lawsuits alleging a violation of the 8th Amendment."). In this District alone, inmate instituted cases, with the vast majority being brought under 42 U.S.C. § 1983, represented 34.3% of the total civil caseload for 1993. *See* Northern District of New York, 1993 Annual Report, *Pro Se* Staff Attorney's Office.

16    *See, e.g., Candelaria v. Coughlin,* 787 F.Supp. 368, 374 (S.D.N.Y.), *aff'd without published opinion,* 979 F.2d 845 (2d Cir.1992); *Gabai v. Jacoby,* 800 F.Supp. 1149, 1154–55 (S.D.N.Y.1992) (Grubin, Mag. J.), *Report–Recommendation Adopted in its Entirety,* No. 91 Civ. 2605 (S.D.N.Y. Sept. 9, 1992).

17    Besides forming the basis for an Eighth Amendment violation, an unprovoked attack such as the one which occurred in this case may also be the basis for a violation of an inmate's due process rights. *See Wilson v. White,* 656 F.Supp. 877, 879 (S.D.N.Y.1987) ("An attack on a prison inmate ... which is not part of an attempt to maintain or restore discipline violates the inmate's due process right to be free from unprovoked attack."); and *Vargas v. Correa,* 416 F.Supp. 266,

**Parker v. Fogg, Not Reported in F.Supp. (1994)**

1994 WL 49696

268–69 (S.D.N.Y.1976) (court held that an unprovoked assault upon an inmate constituted a violation of his due process rights).

18    Defendants also failed to raise this defense in their answer. Nevertheless, defendants are not deemed to have waived it because, as Fed.R.Civ.P. 12(h)(3) plainly states, "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3) (emphasis added); *see also Tongkook America, Inc. v. Shipton Sportswear Company,* 14 F.3d 781, 783 (2d Cir. Jan. 26, 1994) (citations omitted) ("The fact that [defendant] did not raise the defense of lack of subject-matter jurisdiction in its answer is not determinative, since subject-matter jurisdiction cannot be waived and the issue can be raised at any time in the course of the litigation.").

19    One thing is clear from the complaint and that is that plaintiff is seeking only monetary damages with respect to the pendent tort claims. His claim for declaratory relief is, as mentioned earlier, limited to the claims arising out of the alleged constitutional deprivations. *See supra* at 3.

---

**End of Document**                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    11