UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

ISAAC K. STROMAN,

                              Plaintiff,

                                                            9:18-CV-149
v.                                                          (GLS/TWD)

SCOTT RANZE, et al.,

                              Defendants.

———————————————————————————

APPEARANCES:                              OF COUNSEL:

ISAAC K. STROMAN
Plaintiff, *pro se*
11-A-0292
Riverview Correctional Facility
P.O. Box 247
Ogdensburg, New York 13669

HON. LETITIA JAMES                        RYAN L. ABEL, Esq.
Attorney General of the State of New York  ADRIENNE J. KERWIN, Esq.
Counsel for Defendants                    HELENA O. PEDERSON, Esq.
The Capitol                               Assistant Attorney Generals
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### ORDER AND REPORT-RECOMMENDATION

        Isaac Stroman ("Stroman" or "Plaintiff") commenced this civil rights action under 42

U.S.C. § 1983 regarding alleged violations of his constitutional rights.  (Dkt. No. 1.)  According

to Stroman, several correctional officers ("C.O.") at Coxsackie Correctional Facility

("Coxsackie") beat him on February 9, 2015, after he took a shower causing injuries to his head,

hand, face, and ribs.  (Dkt. No. 1.)  Based on these events, Stroman raises the following claims:

(1) Eighth Amendment excessive force claims against defendants C.O. Tirigllio ("Turriglio"[1]),

C.O. Bence ("Bence"), C.O. Steele ("Steele"), and Scott Ranze ("Ranze"); (2) Eighth

Amendment failure to intervene claims against C.O. Pasqurillio ("Pasqurillio") and Sgt. Bailey

("Bailey"); and (3) First Amendment retaliation claims against Turriglio and Bence.  (Dkt. No.

29.)

Defendants now move for summary judgement relative to Stroman's (1) excessive force

claims against Steele and Ranze; (2) failure to intervene claims against Pasqurillio and Bailey;

and (3) retaliation claim against Bence.  (Dkt. No. 41-2.)  For the reasons that follow, the Court

recommends granting Defendants' motion with respect to Plaintiff's retaliation claim against

Bence and excessive force claim against Steele and denying the motion in all other respects.

## I.    FACTUAL BACKGROUND AND THE CURRENT DISPUTE[2]

Plaintiff was a prison inmate being held in Coxsackie at the time the actions in the

complaint occurred.  (Dkt. No. 1 at ¶ 2.)  On or about February 1, 2015, Plaintiff was locked in

his cell when Turriglio approached him.  *Id.* at ¶ 15.  Turriglio questioned Plaintiff about

grievances filed against other officers and threatened that Plaintiff would be leaving the facility

in a body bag if the grievances were not retracted.  *Id.*  Plaintiff contacted the area supervisor to

---

[1]  The Court notes Defendants refer to this Defendant as Turriglio.  (Dkt. No. 41-2 at 6; Dkt. No. 41-14, 41-15.)  The Court assumes this is the correct spelling of this Defendant's name and therefore adopts this spelling and directs the Clerk of the Court to amend the caption accordingly.

[2]  Defendants' statement of material facts largely omits the background of this case presumably because they concede these facts are in dispute.  Thus, the following facts are drawn from Stroman's verified complaint.  The Court will treat the complaint as an affidavit for purposes of this motion and consider the factual allegations therein to the extent they are nonconclusory.  *See Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 210 (N.D.N.Y. 2008) (citations omitted).  Where relevant, the Court will indicate facts Defendants assert are material to their motion and undisputed.  (*See* Defendants' Statement of Material Facts, Dkt. No. 41-9; Plaintiff's Response to Defendants' Statement of Material Facts, Dkt. No 48-6.)

make him aware of Turriglio's threats.  *Id.* at ¶ 16.  Plaintiff was then moved from 2 Company, where he was housed, to 3 Company. *Id.*

On February 9, 2015, Bence asked Plaintiff if he would like his keep-lock shower.  *Id.* at ¶ 17.  Plaintiff stated that he would.  *Id.*  Bence then asked Plaintiff if he knew Turriglio.  *Id.*  Plaintiff confirmed that he did and asked why Bence wanted to know.  *Id.*  Bence responded "Because that's my brother. That's why."  *Id.*  Plaintiff was then released from his cell to take his shower.  *Id.* at ¶ 18.

Plaintiff entered the caged-in shower stall which Steele had opened.  *Id.* at ¶ 19.  Later, Bence entered the shower area and stated that showers were over.  *Id.* at ¶ 21.  Bence and Steele proceeded to release the other inmates from their showers.  *Id.*  Bence and Steele then re-entered the shower area to release Plaintiff.  *Id.*

Bence raised his hand and arm towards Plaintiff's torso, effectively blocking Plaintiff's attempt to leave the caged-in shower.  *Id.* at ¶ 22.  Plaintiff then took two steps back into the shower.  *Id.*  Bence followed Plaintiff into the shower stall and began taunting him.  *Id.* at ¶ 23.  Bence stated Plaintiff was a "pussy" for writing grievances against fellow officers and that Plaintiff would take a swing at Bence now if he was not a "pussy."  *Id.*  Plaintiff responded that if Bence swung first, he would defend himself.  *Id.*  Bence then pushed Plaintiff.  *Id.* at second ¶ 23.  Plaintiff dropped his towel, soap and clothing in his hands to the floor and informed Bence that if he put his hands on him again that Plaintiff would give Bence what he was looking for.  *Id*.

Bence responded by head-butting Plaintiff, resulting in a laceration on Plaintiff's forehead.  *Id*.  Plaintiff then swung and hit Bence in the jaw, causing Bence to fall to the ground.  *Id*.  Steele entered and attempted to strike Plaintiff.  *Id.* at ¶ 24.  Plaintiff threw two punches at

Steele causing Steele to fall to the floor. *Id*. Plaintiff was the first to strike Steele. (Dkt. No. 41-9 at ¶ 34.) While falling, Steele grabbed onto Plaintiff's shorts. (Dkt. No. 1 at ¶ 24.) Plaintiff struggled to prevent Steele from removing his shorts to avoid being naked and feeling defenseless. *Id*. at ¶ 25. Bence then struck Plaintiff in the shoulder and the chin. *Id*. Steele grabbed Plaintiff by the hair and pulled him to the ground. *Id*. at ¶ 26. Bence got on top of Plaintiff and struck him several times in the abdomen before continuing to strike Plaintiff in the facial area while Steele held down Plaintiff's arms. *Id*. In fear of becoming unconscious, Plaintiff turned over onto his stomach as Bence and Steele continued to strike him. *Id*. at ¶ 27.

A "response team" including Defendants Pasqurillio, Bailey and Turriglio, then arrived and entered the shower area. (Dkt. No. 41-11 at 58; Dkt. No. 1 at ¶ 28.) Turriglio shouted, "This grievance writing mother-fucker" and proceeded to kick Plaintiff under his right eye and in his facial area. *Id*. On the third kick Plaintiff raised his right hand, which was struck by the kick, causing his hand to fracture. (Dkt. No. 1 at ¶ 28.) Plaintiff is not sure whether Pasqurillio or Bailey ever entered the shower stall where the assault occurred but remembers Bailey saying "that's enough" "seconds" after the response team arrived. (Dkt. No. 41-9 at ¶¶ 19-20.)

Plaintiff was handcuffed and ordered to stand up by Pasqurillio. (Dkt. No. 1 at ¶ 28.) Turriglio used Plaintiff's towel to wipe the blood from Plaintiff's face. *Id*. at ¶ 29. Defendants told Plaintiff he was lucky they did not kill him and that Plaintiff would not be so lucky next time. *Id*. Defendants then twisted Plaintiff's arm, while he was cuffed behind his back, and took him to the infirmary. *Id*.

At the infirmary Ranze had Plaintiff's handcuffs removed and ordered Plaintiff to put both hands on the wall. *Id*. at ¶ 30. Plaintiff informed Ranze that he could not raise his arms high enough to do so. *Id*. Ramsey told Plaintiff he had better find a way. *Id*.

Dr. Miller entered the room to examine Plaintiff. *Id.* Dr. Miller informed Ranze that Plaintiff needed to be taken to an outside hospital based on the seriousness of his injuries. *Id.* Dr. Miller was then escorted out of the examination room. *Id.* at ¶ 31.

Ranze again ordered Plaintiff to place his hands on the wall. *Id.* Plaintiff informed Ranze that he still was not capable. *Id.* Ranze instructed the other Defendants to close the door first and followed by instructing the other Defendants to "beat him down but don't hit him in the face." *Id.* Turriglio and another unidentified individual hit Plaintiff on his back and legs. *Id.* After a few seconds, Plaintiff fell to the floor. *Id.* Ranze then ordered the other Defendants to stop. *Id.*

Plaintiff was handcuffed and taken to Albany Medical Center where it was determined that he suffered from multiple lacerations, contusions and fractured bones. *Id.* at ¶ 32. Plaintiff was given a CAT scan for his shoulder, neck, head and back. *Id.*

Plaintiff filed a grievance related to this incident on March 12, 2015. (Dkt. No. 41-9 at ¶ 10; Dkt. No. 41-4.) His grievance does not allege Bailey, Pasqurillio, or Bence retaliated against him for filing grievances. (Dkt. No. 41-9. at ¶¶ 13, 16, 17, 30).

As discussed above, Plaintiff raises the following claims: (1) Eighth Amendment excessive force claims against defendants Turriglio, Bence, Steele, and Ranze; (2) Eighth Amendment failure to intervene claims against Pasqurillio and Bailey; and (3) First Amendment retaliation claims against Turriglio and Bence. (Dkt. No. 29.) Defendants presumably concede there are material factual disputes regarding Plaintiff's excessive force and retaliation claims against Turriglio and excessive force claim against Bence. However, Defendants move for summary judgment as to the other claims.

Specifically, Defendants contend there is no dispute that Plaintiff hit Steele first and Ranze never laid his hands-on Plaintiff.  (Dkt. No. 41-2 at 18-19.)  Thus, according to Defendants, Plaintiff's excessive force claims fail.  *Id*.  Furthermore, Defendants assert Plaintiff's grievance did not alert prison officials to the nature of his retaliation claim against Bence and his failure to intervene claims against Pasqurillio and Bailey.  *Id*. at 8-10, 13-14. Therefore, Defendants argue the Court should dismiss these claims because Plaintiff failed to exhaust his administrative remedies.  *Id*.  In any event, Defendants contend Plaintiff's retaliation claim and his failure to intervene claims are meritless.  *Id*. at 10-13, 14-17.

Plaintiff responded, asserting he exhausted his claims and they have merit.  (Dkt. No. 48.) However, Plaintiff acquiesced to the dismissal of his retaliation claim against Bence.  *Id*. at 16.

## II.    DISCUSSION

### a.    Standard of Review

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at

273 (citations omitted). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and quotation marks omitted). A verified complaint, as Plaintiff has filed in this case (Dkt. No. 1), is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999[3]) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### b.    First Amendment Retaliation

As noted above, Stroman concedes his retaliation claim against Bence should be dismissed. (Dkt. No. 48 at 16.) The Court, likewise has considered this claim and finds Bence is

---

[3] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

entitled to summary judgment on Stroman's retaliation claim because there is no evidence imputing a retaliatory motive to Bence's actions. (*See, e.g.*, Dkt. No. 41-9 at ¶ 31 (Plaintiff admitting he had never encountered or communicated with Bence prior to the date of the incident).) Accordingly, the Court recommends granting Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim against Bence.

### c.    Eighth Amendment Excessive Force

#### 1.    *Applicable Legal Principles*

To state an excessive force claim, a prisoner must allege "two elements, one subjective and one objective." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (per curiam) (citation omitted). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). For excessive force claims, "the test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Harris*, 818 F.3d at 49 (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

"Second, [the inmate] must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citations omitted). "The objective component of the Eighth Amendment test is also context specific, turning upon 'contemporary standards of decency.'" *Id*. (citations omitted). But "certain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations *per se*." *Id*. (citations omitted).

### 2.     *Steele*

Defendants' main argument is focused on the subjective prong of an excessive force claim and asserts Steele did not use excessive force against Stroman because Stroman admits he hit Steele first.  (Dkt. No. 41-9 at ¶¶ 33-34.)  However, summary judgment does not turn simply on whether Steele was punched first but rather whether—granting Plaintiff's version of events as true—Steele's reaction was reasonable.  As Defendants appear to concede, there is a material dispute as to how the incident started, *i.e.*, whether Bence threatened and then headbutted Plaintiff.  According to Stroman, he was protecting himself from Bence's aggression and Steele subsequently lunged towards him to help Bence.

Nonetheless, Plaintiff has not alleged Steele ever struck him or did anything but attempt to get him under control.  The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).  The undisputed facts establish Steele only helped subdue Plaintiff and did not apply unnecessary or wanton force.  Indeed, Plaintiff's grievance does not even allege Steele hit Plaintiff, only that Steele was holding onto Plaintiff during the altercation with Bence.  (Dkt. No. 41-4 at 4.)  Thus, the Court finds no reasonable juror could conclude Steele possessed the requisite culpability to have violated Plaintiff's rights.  Accordingly, the Court recommends granting Steele's motion for summary judgment.

### 3.  *Ranze*[4]

The allegations in the complaint and Plaintiff's deposition transcript create a dispute of fact with respect to whether Ranze was involved in the use of force incident alleged to have taken place in the infirmary.  In the relevant sense, "personal involvement" is defined as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts, rather than doing them him- or herself."  *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

Here, Stroman alleges Ranze facilitated his beating in the infirmary.  Specifically, Stroman recalls Ranze telling Turriglio to "close the door" and not to hit Plaintiff in the face before giving Turriglio a "nod" before he kneed Plaintiff in the back of the leg and then beat him.  (Dkt. No. 41-11 at 76-79.)  Thus, contrary to Defendants' suggestion and granting all reasonable inferences in Plaintiff's favor, the evidence establishes Ranze was involved and arguably ordered the attack in the infirmary.  If proved, this would render Ranze liable for an excessive force claim as an indirect participant.  *See Provost*, 262 F.3d at 155.  Accordingly, the Court recommends denying Ranze's motion for summary judgment.

### d.   **Eighth Amendment Failure to Intervene**

### 1.   *Exhaustion*

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate-plaintiff to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the

---

[4]  As Defendants note, Plaintiff did not specifically address Defendants' arguments with respect to the merits of his excessive force claim against Ranze.  However, given Stroman's *pro se* status, the Court has undertaken an independent review of his claim against Ranze.

applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).

In New York, the inmate grievance procedure ("IGP") is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). At step-two, an inmate may appeal an adverse decision of the IGRC to the Superintendent of the Facility. *Id*. at § 701.5(c). Finally, at step-three, an inmate may appeal adverse decisions at the Superintendent's level to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). Grievances involving claims of excessive force, such as the grievance at issue in this case, are subject to an expedited procedure. *Id*. § 701.8; *Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009). In those cases, the IGRC step is skipped and the Superintendent is required to investigate and render a decision on the grievance within twenty-five calendar days. N.Y. Comp. Codes R. & Regs., tit. 7 § 701.8.

In this case, Stroman completed the relevant steps as outlined above. He filed a grievance the Superintendent denied. (Dkt. No. 41-5.) He then appealed to CORC, and, similarly received an unfavorable decision. (Dkt. No. 41-6.)

Defendants do not argue Stroman failed to appropriately go through each of the steps. Rather, Defendants contend Stroman did not exhaust his administrative remedies with respect to his failure to intervene claims against Bailey and Pasqurillio because his grievance did not mention Bailey and did not state Bailey or Pasqurillio failed to prevent the use of force against Plaintiff. (Dkt. No. 41-2 at 9-10.) Thus, according to Defendants, "the grievance satisfied none of the purposes of the exhaustion requirement." (Dkt. No. 54-3 at 5.) The Court finds Defendants' arguments relative to exhaustion meritless.

As noted above, exhaustion through the PLRA is a function of state law. In other words, to successfully exhaust administrative remedies, the inmate-plaintiff must adhere to the state's procedure. Thus, for example, if the state requires grievances be served within a certain time-frame, compliance with those rules is necessary to properly exhaust state remedies. The appropriate query for the Court in this case, therefore, is to consider whether New York state regulations require an inmate-plaintiff to name each defendant and state each putative legal theory.

The Second Circuit has previously considered the IGP and held it does not require a prisoner's grievance to name the responsible party or identify relevant legal theories. *See Espinal v. Goord*, 558 F.3d 119, 124, 127-28 (2d Cir. 2009). Indeed, New York's regulations specifically provide only that "the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint[.]" N.Y. Comp. Codes R. & Regs., tit. 7 § 701.7(a)(2). Furthermore, as Plaintiff argues (Dkt. No. 48 at 6), the form provided to inmates to file grievances (Form 2131) merely provides a small space to describe the "Problem" and advises the author to "be as brief as possible." (Dkt. No. 41-4.)

Thus, far from imputing a name-all-defendants-and-legal-theories requirement, "a prisoner must [only] allege facts sufficient to alert corrections officials 'to the nature of the claim,' and 'provide enough information about the conduct' at issue 'to allow prison officials to take appropriate responsive measures.'" *Wright v. Potter*, No. 914CV01041, 2016 WL 5219997, at *5 (N.D.N.Y. June 28, 2016), *report and recommendation adopted*, No. 914CV1041, 2016 WL 5173283 (N.D.N.Y. Sept. 21, 2016) (citing *Singh v. Lynch*, 460 Fed. Appx. 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). For example, in *Espinal*,

the plaintiff's grievance alleged the participation of "countless other security officers" in addition to alleging the involvement of two named correctional officers. *Espinal*, 558 F.3d at 127. The plaintiff's grievance in *Espinal* also included the specific date, time, and location of the incident. *Id*. The Second Circuit found the grievance gave officials the necessary information to investigate the complaints and which officers were involved in the incident. *Id*.

Here, the Court is satisfied that Plaintiff's grievance, as well as the other relevant evidence, reveals he properly exhausted his failure to intervene claims against Pasqurillio and Bailey. Indeed, it strains credulity to argue, as Defendants do, that Stroman's grievance did not alert prison officials to the nature of his claims. Stroman's grievance describes that a "response team" arrived including one unnamed officer and Turriglio. (Dkt. No. 41-4 at 4-5.) It also asserts Turriglio, who was the "second" officer in the response team, said "this grievance writing mother fucker" as soon as he arrived and right before he kicked Plaintiff in his face and hand several times. *Id*. Defendants rightfully concede that Stroman named Pasqurillio as one of the individuals in the response team. Such an acknowledgement is grounds enough to deny Pasqurillio's motion for summary judgment because he was identified as an individual who was present during an allegation of excessive force. Similarly, the Court finds it would have taken little effort to identify Bailey as a member of the response team on the scene during the assault. Indeed, the prison initiated a Tier III disciplinary proceeding where Bailey and Pasqurillio were called as *witnesses* to the incident. (Dkt. No. 54-1 at 5.)

This case is decidedly different than the case Defendants principally rely upon, *Wright v. Potter*, 2016 WL 5219997. In *Potter*, the plaintiff never mentioned the relevant doctor's name— *but more importantly*—never stated he received negligent medical treatment. In other words, the entire basis for the claim was left out of the grievance. Here, in stark contrast, Plaintiff's

grievance accuses Bence of headbutting him after which a response team arrived to apply more force and simultaneously allowed the assault to continue. (Dkt. No. 41-4.) Plaintiff's grievance sufficiently alerts prison officials that Bence and Turriglio applied excessive force and other members of the response team failed to intervene.

Accordingly, the Court recommends denying Defendants' motion for summary judgment on exhaustion grounds.

### 2.    *Merits*

A prison official who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010.). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by some other individual, and that the defendant under consideration: (1) possessed actual knowledge of the use by another of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). Thus, mere inattention or inadvertence does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *Cicio v. Lamora*, No. 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (citations omitted). Indeed, officers generally "cannot be held liable for failure to intervene in incidents that happen in a 'matter of seconds.'" *Henry v. Dinelle*, No. 9:10-CV-0456 (GTS/DEP), 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (quoting *Parker v. Fogg*, No. 85-CV-177 (NPM), 1994 WL 49696, at *8 (N.D.N.Y. Feb. 17, 1994)).

Moreover, an officer cannot be held liable for failure to intervene if there was not a "reasonable opportunity" to stop the alleged use of excessive force. *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 429 n. 9 (N.D.N.Y. 2009); *Parker*, 1994 WL 49696 at *8. However, this issue can be decided as a matter of law only if "considering all the evidence, a reasonable jury could not possibly conclude" that the officer had a reasonable opportunity to intervene. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Here, the primary issue with respect to the failure to intervene claims centers on Bailey and Pasqurillio's ability to stop Trugillio's alleged assault. As set forth above, Plaintiff claims while he was on the ground a "response team," including Defendants Pasqurillio, Bailey and Turriglio, arrived and entered the shower area. (Dkt. No. 1 at ¶¶ 27-28, 39, 42.) Turriglio shouted, "this grievance writing mother-fucker" and proceeded to kick Plaintiff under his right eye and in his facial area. *Id.* at ¶ 28. On the third kick Plaintiff raised his right hand, which was struck by the kick, causing Plaintiff's hand to fracture. *Id.* For the purposes of this motion, the Court assumes Turriglio's conduct occurred and it constitutes excessive force. The question is thus, whether Bailey and Pasqurillio had an opportunity to recognize and stop Turriglio's assault.

Defendants argue Stroman's failure to intervene claims fail on the merits because Plaintiff cannot establish they had an opportunity to stop Turriglio's use of force. The Court disagrees. Plaintiff alleges Pasqurillio and Bailey arrived at the shower area at the same time as Turriglio who made a defamatory comment *before* kicking Plaintiff in the face. Upon hearing Turriglio state "this grievance writing mother-fucker," Pasqurillio and Bailey would have been alerted to Turriglio's malicious motive. Thus, there is a triable issue of fact regarding whether Pasqurillio and Bailey had an opportunity to stop the alleged assault—at the moment they heard Turriglio's comments. Furthermore, considering Turriglio was able to kick Plaintiff multiple

15

times, both Pasqurillio and Bailey had a realistic opportunity to intervene and prevent harm from occurring. Though the Court recognizes the incident was over quick and Plaintiff alleges Bailey gave an order to stop, the evidence—viewed in Plaintiff's favor—raises an inference that Bailey and Pasqurillio sat idly during at least part of Turriglio's assault. Accordingly, the Court recommends denying Defendants' motion for summary judgment on these grounds.

## III.    CONCLUSION

For the reasons stated above, the Court recommends granting Defendants' motion for summary judgment in part and denying it in part. If the Court accepts the foregoing recommendations, the following claims would remain for trial: (1) Eighth Amendment excessive force claims against Ranze, Turriglio, and Bence; (2) First Amendment retaliation claim against Turriglio; and (3) Eighth Amendment failure to intervene claims against Pasqurillio and Bailey.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be **GRANTED** in part with respect to Plaintiff's retaliation claim against Bence and his excessive force claim against Steele; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be denied in all other respects; and it is further

**RECOMMENDED** that the Court appoint Plaintiff *pro bono* trial counsel to assist in the preparation for a trial; and it is further

**ORDERED** that the Clerk amend the caption of this case to reflect the correct spelling of Defendant Turriglio; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[5]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: December 13, 2019
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[5]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the
plaintiff was in keeplock because of an altercation with prison
guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with one hour
for recreation. (Affidavit of Anthony Annucci dated Dec. 1,
1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3).
Permission is granted unless prison officials determine that
the inmate's presence at the service would create a threat to
the safety of employees or other inmates. (Schneider Aff. ¶
3). The standard procedure at Green Haven is for the captain's
office to review all requests by inmates in keeplock to attend
religious services. (Schneider Aff. ¶ 3). Written approval is
provided to the inmate if authorization is granted. (Affidavit
of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.")
¶ 5). The inmate must then present the appropriate form to
the gate officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

 **\*2**  On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at **\*3**

(S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

*4 Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Wright v. Potter, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 22 of 74

2016 WL 5219997
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shamel WRIGHT, Plaintiff,
v.
Rowland POTTER, Michael Barkman, James
Thomsen, C.O. John Doe #1, C.O. John
Doe #2 and Sgt. John Doe, Defendants.

9:14-CV-01041 (DNH/TWD)
|
Signed 06/28/2016

**Attorneys and Law Firms**

SHAMEL WRIGHT, 346 Furman Street, 1st Floor,
Schenectady, NY 12304, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the
State of New York, The Capitol, OF COUNSEL: RYAN E.
MANLEY, ESQ., Assistant Attorney General, Albany, NY
12224, Counsel for Defendants.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1**  This matter was referred to the undersigned for report and
recommendation by the Honorable David N. Hurd, United
States District Judge, pursuant to 28 U.S.C. § 636(b) and
Northern District of New York Local Rule 72.3. *Pro se*
Plaintiff Shamel Wright, a former inmate in the custody
of the New York State Department of Correction and
Community Supervision ("DOCCS"), has commenced this
action pursuant to 42 U.S.C. § 1983 alleging violations of
his civil rights while confined at Greene Correctional Facility
("Greene").

Specifically, Plaintiff claims that on August 30, 2013,
Defendants Sergeant Rowland Potter ("Potter"), Sergeant
Michael Barkman ("Barkman"), Sergeant John Doe
("Sergeant Doe"), Correction Officer John Doe #1 ("Officer
Doe #1"), and Correction Officer John Doe #2 ("Officer
Doe #2") subjected him to excessive force as well as failed
to intervene or to protect Plaintiff. (*See generally* Dkt. No.
1.) Plaintiff also alleges an Eighth Amendment violation

arising out of medical indifference against Defendant James
Thomsen ("Thomsen"). *Id.* Currently pending before the
Court is Defendant Thomsen's motion for summary judgment
pursuant to Federal Rule of Civil Procedure 56. (Dkt. No.
30.) Plaintiff has not opposed the motion. For the following
reasons, I recommend that the Court grant Defendant
Thomsen's motion for summary judgment.

**I. BACKGROUND AND PROCEDURAL HISTORY**
The following facts are set forth as alleged in Plaintiff's
verified complaint. [1]  On August 30, 2013, at approximately
8:55pm, Plaintiff was restrained and transported by Officer
Doe #1 and Potter following a physical altercation between
Plaintiff and another inmate. (Dkt. No. 1 at ¶ 18.) Plaintiff
was initially placed in a holding room before he was moved to
an office. *Id.* at ¶ 21. Potter ordered Plaintiff to sit in a metal
folding chair situated to the left of the door. *Id.* Barkman asked
Plaintiff several questions about the cause of the physical
altercation with the other inmate. *Id.* at ¶ 23. When Plaintiff's
answers proved unsatisfactory, Officer Doe #2 pulled the
chair from underneath him, resulting in Plaintiff falling to
the ground. *Id.* at 25. Officer Doe #2 then proceeded to hit
Plaintiff over the head with the metal chair. *Id.* Plaintiff began
bleeding immediately. *Id.* at ¶ 26. Plaintiff then demanded that
pictures of his injury be taken and that the entire incident be
reported. *Id.* at ¶ 28. Plaintiff also requested that he be sent
to an outside hospital. *Id.* According to Plaintiff, Barkman,
Potter, Sergeant Doe, and Officer Doe #1 were present and
observed the assault. *Id.* at ¶¶ 21-26.

At approximately 9:30pm, Plaintiff was brought to the nurse's
office by Barkman and non-party Correction Officer Castillo
("Castillo"). [2]  *Id.* at ¶ 28. Defendant Thomsen attempted to
wipe the blood off of Plaintiff's head and chest. *Id.* at ¶
29. Plaintiff expressed his desire to have photographs taken
of the injury before it was cleaned. *Id.* Barkman refused
to photograph the injury sustained by Plaintiff. *Id.* Potter
came into the room and asked Plaintiff if he was refusing
medical treatment. *Id.* Plaintiff informed Potter that he was
not refusing medical care but that he wished for pictures to
be taken before the examination. *Id.* Potter informed Plaintiff
that he was refusing medical care and Potter, Defendant
Thomsen, and Castillo signed a refusal form stating that
Plaintiff had refused medical care. *Id.*

**\*2**  Plaintiff was taken to a cell and approximately forty-
five minutes later, Potter returned to Plaintiff's cell with two
nurses who examined and cleaned Plaintiff's forehead. *Id.* at

*Wright v. Potter*, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00149-MAD-TWD   Document 58   Filed 12/13/19   Page 23 of 74

¶ 30. Plaintiff was later taken to Albany Medical Center for treatment where he received two staples. *Id.* at ¶ 34.

Plaintiff alleges that Defendant Thomsen exercised deliberate indifference by failing to provide adequate medical care in violation of his Eighth Amendment rights. (Dkt. No. 1 at ¶ 54.) Specifically, Plaintiff alleges that Defendant Thomsen signed a form falsely indicating that Plaintiff had refused medical care for a laceration on Plaintiff's forehead instead of properly treating the injury. *Id.*

On September 12, 2013, Plaintiff filed an Inmate Grievance Complaint alleging that he had been struck on the head with a chair wielded by Officer Doe #2 on August 30, 2013. (Dkt. No. 30-8.) Plaintiff indicated that Potter, Barkman, and Officer Doe #1 were present for the alleged altercation. *Id.* Plaintiff titled his grievance "CO Assaulted Me With Chair." *Id.* Plaintiff did not fill out any other grievances associated with the incident. (Dkt. No. 30-5 at ¶¶10-18.)

The grievance was filed with Greene's inmate grievance resolution committee ("IGRC") office on September 12, 2013. (Dkt. No. 1 at ¶ 41.) On October 15, 2013, Plaintiff's grievance was denied. *Id.* at ¶ 42. Plaintiff's appeal was received by the IGRC office on October 21, 2013. *Id.* at ¶ 22. Plaintiff appealed the IGRC decision through the Central Office Review Committee ("CORC") and the appeal was received by CORC on November 15, 2013. *Id.* at ¶ 44. On March 26, 2014, CORC subsequently denied the appeal citing insufficient evidence to substantiate Plaintiff's claim. *Id.* at ¶ 45; *see also* Dkt. No. 1 at 12. [3]

Plaintiff commenced this action on August 22, 2014. *Id.* Defendant Thomsen now moves for summary judgment on the grounds that Plaintiff failed to properly exhaust his available administrative remedies with respect to his medical indifference claim. (Dkt. No. 30-2 at 3-6.) In the alternative, Defendant moves for summary judgement on the merits and also argues that he is entitled to qualified immunity. (Dkt. No. 30-2 at 3-6.) Plaintiff has not opposed the motion. The Court addresses only the exhaustion argument, as it is dispositive.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

(1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

**\*3** A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit and "therefore will be considered in determining whether material issues of fact exist[.]" *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 24 of 74

Wright v. Potter, Not Reported in Fed. Supp. (2016)

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) [4] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the defendants. *See Id.*; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001); L.R. 7.1(b)(3).

**\*4** Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts (its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se*, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See* L.R. 7.1(a)

(3); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *Champion*, 76 F.3d at 486.

Plaintiff was sent a notice of motion (Dkt. No. 30) by Defendant's counsel as well as an attached notification of the consequences of failing to respond to a summary judgment motion. (Dkt. No. 30-1.) Plaintiff failed to submit any papers in opposition to summary judgment as noted above.

### III. ANALYSIS

Defendant Thomsen argues that Plaintiff's Eighth Amendment claim of medical indifference should be dismissed because Plaintiff failed to properly exhaust his available administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), prior to filing this federal civil rights action. (Dkt. No. 30-2 at 3-6.) Defendant is correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b) (1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Wright v. Potter, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 25 of 74

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at § 701.5(d)(3)(ii).

**\*5** If a prisoner has failed to properly follow each of the applicable steps and complete the process prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93.

Plaintiff filed a single grievance concerning the August 30, 2013, chair incident. (Dkt. No. 30-5 at ¶¶ 10-18.) CORC issued its decision on March 26, 2013. (Dkt. No. 1 at 12.) However, the grievance at no point mentioned Defendant Thomsen or medical personnel at Greene, nor did the grievance mention receiving inadequate medical care after the incident. (*See* Dkt. No. 30-8.)

Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally. *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Consistent with this purpose, a prisoner must allege facts sufficient to alert corrections officials "to the nature of the claim," and "provide enough information about the conduct" at issue "to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 Fed.Appx. 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). Even though "a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies," the inmate is required to "provide a specific description of the problem." *Espinal v. Goord*, 558 F.3d 119, 126-27 (2d Cir. 2009) (citing NYCRR § 701.7(a)(1)(i)).

While Plaintiff is not required to specifically name Defendant Thomsen in his grievance, Plaintiff's failure to specifically describe *any* problem in his grievance concerning medical treatment after the incident did not give the facility enough

information to investigate allegations against Defendant Thomsen. *See Hemby v. Ferrari*, No. 9:13–CV–613, 2014 WL 1584160, at \*26 (N.D.N.Y. Apr. 21, 2014) (holding that Plaintiff had failed to exhaust medical indifference claim alleging denial of medication for an ulcer where Plaintiff had filed a grievance only alleging improper wound care of the ulcer.)

Plaintiff filed a single grievance concerning the August 30, 2013, chair incident. (Dkt. No. 30-5 at ¶¶ 10-18.) In the grievance, Plaintiff stated that he was hit in the head with a chair while handcuffed and subsequently taken to Albany Medical Center where he received staples before being released. (Dkt. No. 30-8.) Plaintiff described the assault as occurring in a sergeant's office with three sergeants and two correction officers present. *Id.* Plaintiff admitted he did not know the names of the correction officers but would be able to identify them in a picture. *Id.* Plaintiff did identify Sergeant Barkman and Sergeant Potter in the grievance. *Id.* Yet, in that same grievance, Plaintiff failed to mention Defendant Thomsen by name or profession, failed to reference any medical personnel, and failed to reference receiving inadequate medical treatment. *Id.* Because Plaintiff's grievance contained no mention of inadequate medical care after the incident, Plaintiff's Eighth Amendment medical indifference claim against Defendant Thomsen has not been exhausted.

**\*6** Plaintiff's failure to exhaust, however, does not end the review. For more than ten years, courts in this district have been guided by the Second Circuit's decision in *Hemphill v. New York*. 380 F.3d 680, 686 (2d Cir. 2004). Under *Hemphill*, the Second Circuit established a three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to exhaust available administrative remedies could nevertheless be justified by "special circumstances." *Id.*[5]

However, on June 6, 2016, the Supreme Court rejected the "special circumstances" exception applied by many circuits, and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross v. Blake*, 578 U.S. ____ (2016) *available at* 2016 WL 3128839, at \*11 (June 6, 2016). In *Ross*, the question before the Court was whether there is a "special circumstances" exception under the PLRA when the inmate erroneously believed that he had satisfied the exhaustion requirement. 2016 WL 3128839, at \*3. In an opinion by Justice Elena Kagan, the Supreme Court held that there is no such exception:

Wright v. Potter, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00149-MAD-TWD   Document 58   Filed 12/13/19   Page 26 of 74

The [PLRA] mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA.

*Id.* (internal citation omitted).

The Supreme Court's rejection of the "special circumstances" exception, however, still does not end a court's review "because the PLRA contains its own, textual exception to mandatory exhaustion." *Id.* at *7. Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Thus, courts are still tasked with determining whether or not a prisoner's administrative remedies are, in fact "available."

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." *Id.*

First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at *8. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In light of the above, the Court must now consider whether Plaintiff exhausted his *available* administrative remedies regarding his Eighth Amendment medical indifference claim before commencing this action.

Here, Plaintiff has not claimed that the administrative procedure was unavailable to him. To the contrary, Plaintiff utilized the administrative procedure to file a grievance concerning the August 30, 2013, incident. [6] (Dkt. No. 30-5 at ¶¶14-18.) Yet, Plaintiff still failed to file any grievance alleging inadequate medical care or calling into question his treatment at the hands of Greene's medical staff. Thus, Plaintiff's Eighth Amendment medical indifference claim against Defendant Thomsen is not exhausted. Accordingly, the Court recommends that said Defendant's motion for summary judgment (Dkt. No. 30) be granted.

**\*7** Since the Court is recommending that summary judgement be granted for failure to exhaust administrative remedies, the Court need not reach Defendant Thomsen's remaining arguments.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that the Court **GRANT** Defendant James Thomsen's motion for summary judgment (Dkt. No. 30); and it is further

**RECOMMENDED** that the Court dismiss all claims against Defendant James Thomsen and terminate him from this action; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5219997

Footnotes

Wright v. Potter, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 27 of 74

1    A verified complaint, such as Plaintiff's (Dkt. No. 1), is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit...and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

2    Castillo was originally named as a defendant in Plaintiff's complaint, however he was subsequently terminated from the suit upon initial review. (Dkt. No. 11 at 10-16.)

3    Citations to page numbers in Court documents refer to the page numbers assigned by the Court's electronic filing system.

4    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

5    Generally, the "special circumstances" exception was applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterpreted the statutory requirements of the appeals process. *Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004).

6    While Plaintiff testified during his deposition that one of the unidentified correction officers "threatened" him at a later date, Plaintiff does not allege that the threat prevented him from filing any additional grievances. In fact, Plaintiff subsequently filed an additional grievance based on that alleged threat. (Dkt. No. 30-5 at ¶¶ 10-20.)

---

**End of Document**                                                                 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.    6

Wright v. Potter, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 28 of 74

2016 WL 5173283
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shamel WRIGHT, Plaintiff,

v.

Rowland POTTER, Michael Barkman, James
Thomsen, C.O. John Doe #1, C.O. John
Doe #2 and Sgt. John Doe, Defendants.

9:14-CV-1041 (DNH/TWD)
|
Signed 09/21/2016

**Attorneys and Law Firms**

SHAMEL WRIGHT, 346 Furman Street, 1st Floor,
Schenectady, NY 12304, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for
the State of New York, The Capitol, OF COUNSEL: RYAN
E. MANLEY, ESQ., Ass't Attorney General, Albany, NY
12224, Attorneys for Defendant James Thomsen.

## AMENDED DECISION and ORDER

DAVID N. HURD, United States District Judge

**\*1** *Pro se* plaintiff Shamel Wright brought this civil rights
action pursuant to 42 U.S.C. § 1983. On June 28, 2016, the
Honorable Thérèse Wiley Dancks, United States Magistrate

Judge, advised by Report-Recommendation that defendant
James Thomsen's motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56 be granted, and that he be
dismissed from this action. See ECF No. 33. Plaintiff has not
filed timely objections.

Based upon a de novo review of the Report-Recommendation,
the Report-Recommendation is accepted in whole. See 28
U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendant James Thomsen's motion for summary
judgment (ECF No. 30) is **GRANTED;**

2. All claims against defendant James Thomsen are
**DISMISSED** and he is terminated from this action. The
causes of action against the remaining defendants will
continue; and

3. The Clerk serve a copy of this Decision and Order upon
plaintiff in accordance with the Local Rules.

The Clerk of the Court shall enter judgment and close this
case.

IT IS SO ORDERED.

Dated: September 21, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5173283

460 Fed.Appx. 45
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Navdeep SINGH, Plaintiff–Appellant,

v.

LYNCH, Correctional Officer, Fishkill
Correctional Facility, Defendant–Appellee,
William Mazzuca, Former Superintendent,
Fishkill Correctional Facility, Paul Annetts,
Superintendent, Downstate Correctional Facility,
Wohlrab, Lieutenant, Downstate Correctional
Facility, Commia, Correctional Officer, Downstate
Correctional Facility, Stewart, Correctional Officer,
Fishkill Correctional Facility, Michelle P. Stone,
Head of the Inmate Grievance Program at Fishkill
Correctional Facility, Officer John Doe # 2, John
Doe # 6, Brian Fisher, Commissioner of Docs,
William Connolly, Superintendent of Fishkill
Correctional Facility, Lance Tabor, Glenn S. Goord,
Commissioner Department of Correctional Services,
Larry Zwillinger, Acting Superintendent, Fishkill
Correctional Facility, Larkin, Deputy, Fishkill
Correctional Facility, Mendoza, Correctional
Officer, Fishkill Correctional Facility, Digirolamo,
Correctional Officer, Fishkill Correctional Facility,
Monzillo, Correctional Officer, Fishkill Correctional
Facility, K. Emminger, Correctional Officer, Fishkill
Correctional Facility, John Doe # 1–6, Defendants. *

No. 10–5186–pr.
|
Feb. 8, 2012.

**Synopsis**
**Background:** State inmate filed § 1983 action alleging that
corrections officer assaulted him, in violation of his Eighth
Amendment rights. The United States District Court for the
Southern District of New York, Stephen C. Robinson, J., 2010
WL 1903997, adopted report and recommendation of Lisa M.
Smith, United States Magistrate Judge, 2010 WL 1875653,
and entered summary judgment in officer's favor, and inmate
appealed.

**Holdings:** The Court of Appeals held that:

[1] inmate's grievance did not exhaust his administrative
remedies with regard to his assault claim, and

[2] inmate's failure to exhaust his assault claim was not
excused by his purported fear of retaliation.

Affirmed.

West Headnotes (2)

[1]    **Civil Rights**
       👉 Criminal law enforcement;  prisons

       State inmate's grievance asserting that
       corrections officer ordered him to work despite
       medical restrictions and spoke to him in
       derogatory manner was insufficient to exhaust
       his administrative remedies with regard to
       his claim that officer violated his Eighth
       Amendment rights by assaulting him, and thus
       inmate was barred from raising claim in his civil
       rights action against officer, despite statement
       in inmate's grievance that "there is a whole lot
       more that if I discussed, let alone put on paper I
       would be je[o]pardizing my saf[e]ty." U.S.C.A.
       Const.Amend. 8; Prison Litigation Reform Act
       of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

       3 Cases that cite this headnote

[2]    **Civil Rights**
       👉 Criminal law enforcement;  prisons

       State inmate's failure to exhaust his assault
       claim against corrections officer before filing
       civil rights action was not excused by his
       purported fear of retaliation, despite other
       inmates' warnings that officer was out to get him,
       where inmate had previously filed grievance
       charging different corrections official with
       assault, and there was no evidence that officer
       was looking to do more than harass inmate in
       ways specified in his grievance alleging that
       officer ordered him to work despite medical

restrictions and spoke to him in derogatory manner. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

17 Cases that cite this headnote

**\*46** Appeal from a judgment of the United States District Court for the Southern District of New York (Stephen C. Robinson, Judge; Lisa M. Smith, Magistrate Judge).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment entered on November 23, 2010, is AFFIRMED.

**Attorneys and Law Firms**

Kenneth D. O'Reilly (Shelby Ariella Boxenbaum, Rachel H. Kaufman, on the brief), Winston & Strawn LLP, New York, NY, for Appellant.

Matthew W. Grieco, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Cecilia Chang, Deputy Solicitor General, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, for Appellees.

PRESENT: B.D. PARKER, REENA RAGGI, RAYMOND J. LOHIER, JR., Circuit Judges.

## SUMMARY ORDER

**\*\*1** Plaintiff Navdeep Singh sued the named defendants in law and equity alleging myriad federal and state constitutional violations. Those claims having now been resolved against him on summary judgment or at trial, or having been dismissed as moot, Singh appeals a single ruling: the award of summary judgment in favor of defendant Corrections Officer Lynch on Singh's claim that Lynch violated the Eighth Amendment on June 6, 2005, by assaulting Singh while he was a prisoner at Fishkill Correctional Facility. Singh submits that the district court erred in granting summary judgment based on his failure to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a), for two reasons: (1) his June 21, 2005 grievance was sufficient to exhaust the assault claim, and (2) if it was not, the exhaustion failure was excused by his justifiable fear of physical retaliation by Lynch. We review an award of summary judgment *de novo, see Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 101 (2d Cir.2010), "constru[ing] the evidence in the light most favorable to

the plaintiff, [and] drawing all reasonable inferences and resolving all ambiguities in [his] favor," *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 603 (2d Cir.2006) (internal quotation marks omitted). We assume the parties' familiarity with the underlying facts and record of prior proceedings, which we reference only as necessary to explain our decision to affirm.

### 1. *Exhaustion*

**[1]** The exhaustion requirement of the Prison Litigation Reform Act ("PLRA") **\*47** affords "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006) (internal quotation marks omitted). Consistent with this purpose, a prisoner must allege facts sufficient to alert corrections officials "to the nature of the claim," and "provide enough information about the conduct" at issue "to allow prison officials to take appropriate responsive measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (internal quotation marks omitted). The burden is not a heavy one; it can be analogized to notice pleading. *See id.* Nevertheless, like the district court, we conclude that Singh did not satisfy it with respect to his assault claim.

Singh's June 21, 2005 grievance alleged the following specific misconduct by Officer Lynch: (1) ordering Singh to work despite medical restrictions, at unscheduled times, and at times that would deprive him of contact with visitors, and (2) speaking to Singh in a derogatory manner. Nowhere in the grievance, however, did Singh allege that Lynch had ever assaulted him. Singh submits that notice of such misconduct was implicit in the grievance's penultimate sentence, which stated that "there is a whole lot more that if I discussed, let alone put on paper I would be je[o]pardizing my saf[e]ty here at Fishkill." Grievance, June 21, 2005, at 2. The argument fails for the reasons noted by the district court: notice that an inmate fears future physical retaliation if he files a more detailed grievance does not equate to notice that the inmate has previously been a victim of physical assault so as to alert officials that they must investigate and respond to *that* misconduct. *See Brownell v. Krom,* 446 F.3d at 310 (observing that "grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally"). The conclusion is only reinforced by the fact that Singh did not complain of any assault by Lynch when he was interviewed by the senior officer investigating his grievance. Indeed, he made no mention of an assault by Lynch until October 17, 2005, months after his initial

grievance was denied and long past the time for filing a grievance as to conduct occurring on June 6, 2005.

2. *Excuse for Failure to Exhaust*

**\*\*2**  **[2]**   Singh submits that any failure to exhaust his assault claim against Officer Lynch is excused by his fear of retaliation, which effectively rendered the grievance procedure unavailable to him or, at least, estopped defendant from raising the non-exhaustion defense. *See Hemphill v. New York,* 380 F.3d 680, 686–90 (2d Cir.2004). Lynch submits that this claim is forfeited by Singh's failure to raise it before the magistrate judge to whom Lynch's motion for summary judgment was referred for report and recommendation. We need not here decide whether that failure is excused by Singh's citation to *Hemphill* in the objections he filed with the district court because, even if we were to resolve that question in Singh's favor, we would identify no merit in his *Hemphill* argument.

The test for determining the availability of grievance procedures to a prisoner is objective, *i.e.,* whether a similarly situated individual of ordinary firmness would have deemed the procedures available. *Id.* at 688. Singh's subjective fear of retaliatory physical harm derives from two facts: the unreported June 6, 2005 assault and other inmates' warnings that Lynch was out to get him. The former fact cannot, by itself, support an objective finding that grievance procedures were unavailable. To conclude otherwise would be to hold that no reasonable prisoner could think administrative relief

was available to him on a claim of **\*48** assault by a guard, an inference that cannot reasonably be drawn from the record here. Indeed, Singh himself filed a grievance charging a different corrections official with assault in July 2005. As for the alleged inmate warnings, in the absence of any particulars indicating that Lynch was looking to do more than harass Singh in the ways specified in his June 21, 2005 grievance, this fact cannot support a finding that grievance procedures for an assault claim were effectively unavailable.

Similarly, Singh's subjective fear of retaliation was insufficient to support estoppel. Estoppel of a non-exhaustion defense requires some evidence of threats or other conduct by Lynch that could reasonably be understood as intended to inhibit Singh from pursuing administrative remedies for the alleged assault. *See id.* at 688–89 (finding question of fact raised as to estoppel where evidence showed that defendant threatened and beat prisoner in retaliation for filing notice of intent to file grievance claim). Singh adduced no such evidence.

3. *Conclusion*

We have considered Singh's remaining arguments on appeal and conclude that they are without merit. Accordingly, the judgment is AFFIRMED.

**All Citations**

460 Fed.Appx. 45, 2012 WL 386416

Footnotes

\*       The Clerk of Court is directed to amend the official caption as shown above.

**End of Document**                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 980272
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,

v.

GRAHAM; Peter M. Sigona; Richard D. Ruston, III;
Phil J. Manna; A. Vega; and Ryerson, Defendants.

No. 9:08-CV-534 (NAM/DEP).
|
March 15, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, Adrienne J. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

HON. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action for declaratory and monetary relief under 42 U.S.C. § 1983, claiming excessive use of force, failure to intervene, and denial of adequate medical care stemming from a disturbance involving 17 or more inmates occurring in a "holding pen" or "cage" at Auburn Correctional Facility ("ACF") on March 7, 2006. Plaintiff moved for summary judgment (Dkt. No. 35) and defendants cross-moved for summary judgment (Dkt. No. 38). Upon referral of the motions pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge David E. Peebles issued a Report and Recommendation (Dkt. No. 41) recommending that this Court deny plaintiff's motion, grant defendants' motion, and dismiss the action.

Plaintiff has submitted an objection (Dkt. No. 42). Plaintiff states that the Court should have reviewed the transcripts from his disciplinary hearing, because the testimony of defendants

Peter M. Sigona and Richard D. Ruston, III at that hearing "contradicts the reports that [Magistrate Judge Peebles] relied on in making [his] decision." Plaintiff gives no specifics and thus appears to be interposing a general objection directed to the issues of excessive force and failure to intervene. His objection does not refer to the issue of medical indifference.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where, as here, a party interposes only general objections to a report and recommendation, the Court reviews for clear error or manifest injustice. *See Davis v. Chapple,* 2010 WL 145298, *2 (N.D.N.Y. Jan.8, 2010), *Brown v. Peters,* 1997 WL 599355,*2-* 3 (N.D.N.Y.), *aff'd without op., 175 F.3d 1007 (2d Cir.1999).* Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993).*

The Court accepts and adopts Magistrate Judge Peebles' Report and Recommendation. In view of plaintiff's objection, which, as noted, appears to be directed to the evidence on the issues of excessive force and failure to intervene, the Court briefly revisits these issues. Although plaintiff interposes only a general objection on these issues, in light of his *pro se* status and the nature of the objection, the Court conducts a *de novo* review. Plaintiff requests the Court to obtain the transcript of the disciplinary hearing and contends that the testimony given by Sigona and Ruston at that hearing contradicts the reports relied on by Magistrate Judge Peebles; however, as explained below, the award of summary judgment to defendants is based on plaintiff's own evidence.

The record evidence pertinent to the excessive force and failure to intervene claims is briefly summarized as follows. In a declaration supporting the motion for summary judgment, Sigona, a sergeant at ACF, states:

**\*2** On March 7, 2006, I was supervising the hospital depot area at Auburn. While waiting with a group of inmates in the holding pen in the hospital depot, inmate Baer became disruptive and began threatening staff. Baer ignored several orders by me to cease his behavior. I then entered the holding pen with Officers Manna and Ruston with the intention of removing inmate Baer.

All of the inmates in the pen were ordered to one side of the pen, while Baer remained on the other. Inmate Green refused to move, so I guided him to the side directed.

While I was guiding inmate Green, plaintiff Cicio then lunged at Officer Manna, striking him with a closed fist and knocking him to the ground. I immediately went to Officer Manna's aid and assisted with gaining control of Cicio by taking control of Cicio's right side. Officer Manna and I then escorted a struggling Cicio out of the pen, after which Cicio and Officer Manna fell to the floor. Once Cicio stopped struggling, he was removed from the area and taken to medical for examination.

The declaration from defendant Philip J. Manna, a corrections officer at ACF, is consistent with Sigona's declaration.

Plaintiff's complaint states that defendant Sigona pushed plaintiff into defendant Manna "who then grabbed plaintiff by the hair and began to pull plaintiff towards [the] holding pen door at which point plaintiff was thrown to the floor and kneed in [the] nose." The complaint further states that, after plaintiff was brought to his feet and escorted out of the immediate area, defendant Manna "once again grabbed plaintiff by his hair and pushed plaintiff's face into [the] wall." According to plaintiff, Sigona and Ruston "stood and watched the incident" and did not "intervene[ ] to stop the assault."

Plaintiff testified in his deposition that there were 17 or 18 inmates in the holding pen awaiting transport; that there were no corrections officers in the pen but there were some in the vicinity; that another inmate George Baer started "cursing up a storm" at a corrections officer; and that the sergeant told Baer to "cut it out," to which Baer responded, "No." The sergeant then said, "Take him out of there," ordered Baer to come up front, and ordered everyone else to the back of the pen. Instead of coming up front, Baer "sat down in the middle of the cage." Plaintiff stated that everyone else went to the back of the pen except plaintiff and inmate Green; according to plaintiff, they could not go back because "there was no more room." As plaintiff describes it:

> There wasn't any more room. And he [Green] was standing directly in front of Inmate Baer. So they started taking Green out of the holding pen, and that's where everything just a whole jumble of things happened. I ended up getting mixed up in that, because one of officers tried to barge in there and push me into the sergeant, and then I got into a use of force behind it. So a whole lot of events that took place after one move.

**\*3** \* \* \*

Once they started pulling [Green] out [of the pen], other officers barged into the cage. I don't know if done purposely or not, but I was pushed into the sergeant, and from there I was given an assault charge and taken down.

\* \* \*

... [Baer] was sitting there [in the middle of the pen] when Green was being taken out. After I was pushed to the sergeant, I don't know what happened.

Plaintiff's deposition testimony continued:

Q. Was Green eventually taken out?

A. Yes.

Q. Okay. Now, was he still in the cage when you got pushed into the sergeant?

A. I am not sure.

Q. It was all happening at the same time?

A. Yes.

Q. Did you see any officers go to Baer to get him up and out?

A. Not specifically, because by this time it was just chaos in the cage. I was on the floor somewhere. I don't know where.

Q. How many officers were taking out Green?

A. When I first seen, I only saw one before everything just-

Q. When the sergeant said, "Take him of there," meaning Baer, how many officers entered the pen?

A. At the time, there was about five or six.

Q. They entered at the time just to remove Baer because of the goings on?

A. Yes.

Q. Was one of them the sergeant?

A. Yes. There was a sergeant in there.

Q. So the sergeant and/or three or four officers?

A. Quite a few, yes. Something like that.

Q. Okay. So they enter. Then Green is told to move. He doesn't. Somebody, was it one of those officers that entered that tried to remove Green?

A. The first officer that enters, the one that ... talked to him at first trying to remove him. I don't know which officer that was.

Q. Okay. But no additional officers to deal with Green, it was somebody in there from Baer?

A. Right. Once Green, once they saw an officer pulling Green out of the cage, that's when more officers entered the cage.

Q. So I think, and when I try to recap what you just said, I am not trying to put words in your mouth, but tell me if I am doing it wrong. I am trying to make sure I get it right. You said five or six officers came in to deal with Baer; is that right?

A. Something close to, right.

Q. How many more entered once Green became an issue?

A. I have no idea, because by that time I was into the sergeant and on the floor.

Q. Okay. All right. So somebody, as they are rushing in, whether intentional or not, you don't know, pushed you into the sergeant?

A. Right.

Q. Then what happened?

A. From there, I was taken down. I got kneed in the nose.

Q. Do you know who took you to the floor?

A. I am only going by the reports.

Q. Okay.

A. I don't know specifically. Only in the reports that they wrote do I know any names.

Q. Okay.

A. But other than that, at the time of the incident, I didn't know anything.

Q. Okay. At what point in time did you-at some point in time did you see the report?

 **\*4**  A. I saw the reports after I got my misbehavior report, and I got my assistance, and I asked for the use of force report, and the unusual incident report, and everything else.

Q. Okay. Now, once you were taken to the floor, then what happened? Take me through it totally.

A, Once I was taken to the floor, another CO kneed me in the nose. I don't know who.

Q. You don't think it was the same person that took you to the floor? A. I doubt it.

Q. All right. Okay.

A. And once I was lifted, I was pulled [from] the cage by my hair. At the time I had a lot of hair. I was pulled out [of] the cage by my hair, and then I hit the floor again.

Q. Okay. Now when you hit the floor again, were you taken to the floor? Do you know how that happened, the second hitting of the floor?

A. I am not sure.

Q. Okay.

A. I am not sure.

Q. You ended up on the floor?

A. I just ended up on the floor with a couple C.O.s on top of me. I don't know if they fell, if I fell. I have no idea.

Q. There were other officers on the floor with you?

A. Right.

Plaintiff explained that he was then removed from the scene, taken upstairs to "their SHU" and given a ticket. He was placed in a different holding pen where a nurse came to see him within 15 or 20 minutes. According to plaintiff, he told the nurse that his nose hurt, he had pains in his right wrist, which was swollen, and some of his hair "had got pulled out in back." He was not bleeding. He requested and was denied pain medication, although at some later time he was given ibuprofen. He had headaches "off and on" for two or three weeks and his wrist was swollen for a few days, although it did not limit any of his activities.

When the disputed facts are viewed most favorably to plaintiff and considered in combination with the undisputed facts, the record shows the following: a group of 17 or 18 inmates was confined in the pen; one inmate, Baer, became disruptive and refused to comply with Sergeant Sigona's direction to stop; five or six corrections officers entered the pen to remove Baer; the other inmates were directed to move to the back of the pen; there was not room for Green and plaintiff to do so; Green was told to move but did not do so; and corrections officers began removing Green. The evidence further shows that at that point "just a whole jumble of things happened"; more corrections officers entered the pen; as they were entering, one of them-intentionally or not-pushed plaintiff into Sergeant Sigona; it was "chaos" in the pen; a corrections officer took plaintiff to the floor; and plaintiff then "got kneed in the nose," probably by a different corrections officer. Plaintiff was then pulled out of the pen. In his complaint he states that Officer Manna again grabbed him by the hair and pushed his face into the wall, whereas in his deposition, plaintiff stated that he was pulled out of the pen by his hair and "ended up on the floor again" with a couple of corrections officers on top of him, and added: "I don't know if they fell, if I fell." He was then removed and taken to SHU, where a nurse examined him within 20 minutes.

**\*5** The Court agrees with Magistrate Judge Peebles that defendants are entitled to summary judgment dismissing plaintiff's claims of excessive force. It is undisputed that the force used on plaintiff on March 7, 2006 occurred in the context of a disturbance involving 17 or 18 inmates in a holding pen. In plaintiff's own word, it was "chaos." Indeed, plaintiff states that when he was pushed into Sergeant Sindona it may have been unintentional, and that, when he went to the floor a second time, it may have been because he and/or the corrections officers fell. In view of this evidence and the minimal nature of plaintiff's injuries, no rational trier of fact could conclude that plaintiff was subjected to force that was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. *See Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). For the same reason, there is no basis for a claim of failure to intervene. Moreover, no rational trier of fact could find that plaintiff suffered a serious medical need. As to the other issues raised, the Court agrees with the Report and Recommendation. Accordingly, the Court hold that plaintiff has failed to establish that he is entitled to summary judgment; defendants have demonstrated their entitlement to summary judgment; and plaintiff has failed to show the existence of a material question of fact.

In addition to his objection to the Report and Recommendation (Dkt. No. 42), plaintiff has filed what appears to be an appeal from the Report and Recommendation (Dkt. No. 43). Because Magistrate Judge Peebles did not issue any order which could be the subject of the appeal, the appeal is denied. In the event that plaintiff wishes to appeal from this Memorandum-Decision and Order, he should follow the procedure set forth in the Civil Appeals Packet, which will be provided to him with this decision.

It is therefore

ORDERED that United States Magistrate Judge David E. Peebles's Report and Recommendation (Dkt. No. 41) is accepted and adopted; and it is further

ORDERED that the appeal (Dkt. No. 43) from the Report and Recommendation is denied; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 35) is denied; and it is further

ORDERED that defendants' cross motion for summary judgment (Dkt. No. 38) is granted and the complaint dismissed on the merits; and it is further

ORDERED that the Clerk is directed to provide plaintiff with a Civil Appeals Packet.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by one of the defendants while two others stood by and failed to intervene, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries. Plaintiff's complaint seeks both declaratory and monetary relief.

**\*6** Currently pending before the court are cross-motions for summary judgment. Plaintiff initiated the motion process, moving for summary judgment and claiming that the evidence in the record supports a finding in his favor on the issue of liability and that no reasonable factfinder could conclude otherwise. Defendants have responded by both opposing plaintiff's motion and seeking summary judgment dismissing plaintiff's complaint. In their motion defendants assert that based upon the record now before the court no reasonable factfinder could find in plaintiff's favor on any of his claims and that, in any event, they are deserving of qualified immunity from suit under the circumstances presented.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's motion be denied.

## I. *BACKGROUND*

The facts forming the basis for plaintiff's claims are not particularly complex, although the parties have given conflicting accounts of the relevant events, particularly with regard to the circumstances surrounding the use of force by prison officials of force against Cicio.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1). On March 7, 2006, while plaintiff was among a group of between sixteen and eighteen inmates confined in the Auburn hospital depot awaiting transfer out a disruption occurred involving a fellow prisoner. Complaint (Dkt. No. 1) Statement of Facts ¶ 1; Sigona Decl. (Dkt. No. 38-8) ¶ 3; Manna Decl. (Dkt. No. 38-9) ¶ 3; *see also* Kerwin Aff. (Dkt. No. 38-3) Exh. K (transcript of plaintiff's deposition, conducted on May 15, 2009 and hereinafter cited as "Plaintiff's Dep. Tr." at pp. 8-10). Defendants Sigona, Manna and Ruston, all three of whom are employed as corrections workers at the facility, responded to the incident, entering the cell and ordering all of the inmates to retreat to the back. Complaint (Dkt. No. 1) Statement of Facts ¶ 2, Manna Decl. (Dkt. No. 38-9) ¶ 3; Sigona Decl. (Dkt. No. 38-8) ¶ 3. While those corrections officers attempted to remove the dissident inmate from the cell plaintiff Cicio became involved. It is at this point that the parties' versions of the relevant events significantly diverge.

Plaintiff contends that during the ensuing events he was pushed into defendant Manna, who then grabbed him by the hair and began to pull him toward the cell door, resulting in Cicio being thrown to the floor and kneed in the nose. Complaint (Dkt. No. 1) Statement of Facts ¶ 4; Cicio Decl. (Dkt. No. 40-2) ¶ 4. Plaintiff maintains that after regaining his footing he was again grabbed by the hair and pushed face first into the wall. Complaint (Dkt. No. 1) Statement of Facts ¶ 5. Plaintiff asserts that while this was occurring defendants Sigona and Ruston stood by and watched without coming to his assistance. *Id.*

**\*7** Defendants offer a markedly different version of the relevant events. According to the defendants, while they were attempting to extricate the disruptive inmate from the holding cell Manna issued a direct order to the plaintiff to move to the back of the cage. Plaintiff's Exh. D (Dkt. No. 35-2) Disregarding the order, plaintiff blocked Corrections Officer Manna's path, lunged at him and struck him with a closed fist knocking him to the floor. *Id.; see also,* Manna Decl. (Dkt. No. 38-9) ¶ 4; Sigona Decl. (Dkt. No. 38-8) ¶ 5. Cicio then began yelling to the other inmates in the cage, encouraging them to join in, exclaiming, "let's get them." Plaintiff's Exh. D (Dkt. No. 35-2). At that point, defendants Manna and Sigona attempted to subdue Cicio, who continued to struggle and resist, resulting in Cicio and Officer Manna falling to the floor. Manna Decl. (Dkt. No. 38-9) ¶¶ 4-5; Sigona Decl. (Dkt. No. 38-8) ¶ 5.

As a result of the incident a misbehavior report was subsequently issued by Corrections Officer Manna charging Cicio with disciplinary infractions, including 1) assault on staff; 2) prison takeover; 3) engaging in violent conduct; 4) inciting inmates; 5) disobeying a direct order; 6) physically interfering with an employee; and 7) impeding inmate movement. Mann Decl. (Dkt. No. 38-9) ¶ 7. Following a Tier III disciplinary hearing commenced on March 13, 2006, plaintiff was found guilty of five of the six violations including, *inter alia,* assault on staff. Kerwin Aff. (Dkt. No. 38-3) Exh. I. As a result of that determination plaintiff received a series of sanctions which, after being modified on appeal, included twelve months of confinement in a facility special housing unit ("SHU") with a corresponding loss of packages, commissary, and telephone privileges, and an additional recommendation that plaintiff forfeit twelve months of good time credits. *Id.*

Following the incident plaintiff was immediately removed from the area and taken to be examined by facility medical

personnel. Manna Decl. (Dkt. No. 38-9) ¶ 6. Plaintiff was examined by defendant A. Vega, a registered nurse, within fifteen to twenty minutes after the incident. Cicio Decl. (Dkt. No. 40-2) ¶ 5; Plaintiff's Dep. Tr. at p. 22. During that examination Nurse Vega observed a reddened area on the bridge of plaintiff's nose and noted his reports of minor pain in the nose and head areas. Plaintiff's Dep. Tr. at pp. 25-26; *see also* Kerwin Aff. (Dkt. No. 38-3) Exhs. B and H. Plaintiff was not treated for his injuries nor was he scheduled to see a doctor. Complaint (Dkt. No. 1) Statement of Facts ¶ 8.

Plaintiff claims that following the incident he submitted sick call slips on March 8, 9, 13 and 19, 2006, requesting medical intervention to address his injuries. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 9, 11-12 and 15. Plaintiff contends, however, that those sick call slips were not processed by defendant Ryerson, the nurse administrator at Auburn. *Id.* ¶ 22. Defendant Ryerson denies that allegation and counters that based upon her review of all sick call slips received during the time period involved, there is no record of plaintiff having requested sick call at any time between March 8 and March 20, 2006. Ryerson Decl. (Dkt. No. 38-10) ¶ 4.

 **\*8** As is the case with regard to plaintiff's substantive allegations, the parties disagree over the procedural steps taken by the plaintiff to seek internal review of the relevant events. Plaintiff contends that following the incident he filed two separate grievances, filing the first on March 14, 2006, and both related to the failure of prison officials to permit him to attend sick call. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14, 16. Plaintiff does not assert in his complaint that he filed a grievance regarding the alleged use of force and failure of prison officials to intervene on his behalf, although in an affirmation in opposition to defendants' summary judgment motion Cicio succinctly states "[p]laintiff filed grievances on both incidents, only one was responded to." *See* Cicio Aff. (Dkt. No. 39) ¶ 3. Plaintiff's motion submission also includes a handwritten memorandum, dated March 14, 2006 and addressed to the facility inmate grievance review committee ("IGRC"), citing the events including the alleged assault by prison officials. *See* Plaintiff's Exhs. (Dkt. No. 35-3) p. 24 of 27.

According to the defendants, the sole grievance filed by plaintiff regarding the incident was submitted on March 24, 2006 and was denied by the facility IGRC on April 3, 2006 after plaintiff was transferred out of Auburn. Graham Decl. (Dkt. No. 38-7) ¶ 6. That denial was subsequently affirmed by defendant Graham, the Superintendent at Auburn,

on April 3, 2006. While plaintiff claims to have appealed that determination on June 12, 2006, presumably to the DOCS Central Office Review Committee ("CORC"), the record contains no further indication of whether that appeal was in fact taken, and if so, the result. *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 18. According to prison officials at Auburn, their research of relevant records at the facility failed to disclose additional documents regarding plaintiff's exhaustion of remedies and, significantly, to show that plaintiff appealed to Superintendent Graham from the disposition of his claimed use of force grievance. *See* Graham Decl. (Dkt. No. 38-7) ¶ 4.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on April 28, 2008.[1] As defendants, plaintiff's complaint names Auburn Superintendent Harold D. Graham; Corrections Sergeant Peter M. Sigona; Corrections Officers Richard D. Ruston and Phil J. Manna; Registered Nurse A. Vega; and Nurse Administrator Ryerson. The complaint alleges varying claims against those defendants including for the alleged use of excessive force and failure to protect the plaintiff from the use of force as well as indifference to his medical needs arising from the incident.[2] *See generally* Complaint (Dkt. No. 1).

Issue was initially joined in the action by defendant Manna through his filing of an answer on September 25, 2008. Dkt. No. 23. Following the denial of their pre-answer motion seeking dismissal of plaintiff's claims against them on a variety of bases, *see* Dkt. Nos. 29, 32, an answer was filed on behalf of the remaining defendants on February 25, 2009. Dkt. No. 30.

 **\*9** On July 15, 2009, following pretrial discovery, plaintiff filed a motion for summary judgment in his favor. Dkt. No. 35. While plaintiff's motion appears to focus on the defendants' use of force, it purports to seek summary judgment on all of his claims. *See id* . On September 28, 2009, defendants responded in opposition to plaintiff's motion and in support of a cross-motion requesting judgment dismissing all of plaintiff's claims against them as a matter of law. Dkt. No. 38. In their motion, defendants argue that 1) plaintiff's deliberate medical indifference claim is legally deficient based both upon his inability to establish the existence of a serious medical need and the lack of evidence of indifference on the part of defendants Vega or Ryerson, the two medical personnel against whom the claim appears to have been lodged; 2) plaintiff's claim surrounding the alleged use of

a excessive force and failure to intervene lacks merit; 3) plaintiff's claims against Superintendent Graham are subject to dismissal based upon his lack of personal involvement in the constitutional deprivations alleged; and 4) in any event defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion and in further support of his initial summary judgment motion. Dkt. Nos. 38, 39, 40.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending

against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*10** When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See* *Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See* *Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

B. *Excessive Force/ Failure To Intervene*
At the heart of plaintiff's complaint is his claim that on March 7, 2006 he was subjected to an unprovoked attack by defendant Manna and that defendants Sigona and Ruston watched and failed to take any measures to end the assault and that, as a result, he suffered physical injuries. Plaintiff claims that the record supports his excessive force and failure to intervene claims as a matter of law. Defendants counter by arguing that no reasonable factfinder could conclude, based upon the record now before the court, that plaintiff's constitutional rights were violated, even assuming the truth of his version of the relevant events.

1. *Excessive Force*
Plaintiff's excessive force claim must be analyzed under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also* *Whitley v. Albers,* 475 U.S. 312, 319,

106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom .,* *John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

**\*11** Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. - - - - , --- S.Ct. ----, --- L.Ed.2d - - - - , 2010 WL 596513, at \*3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the

Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see also Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a de *minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*12** Addressing the objective prong of the Eighth Amendment analysis, the fact that Cicio suffered minor though discernable injuries from the use of force distinguishes this case from others in which the lack of injury has justified summary judgment dismissing excessive force

claims under the Eighth Amendment. *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002).[3] Under the circumstances now presented it would be inappropriate to find, as a matter of law, that objectively plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

Turning to the subjective element, the record is devoid of any evidence from which a reasonable factfinder could conclude that this element of plaintiff's excessive force claim against Manna has been met. Rather than representing an unprovoked use of force, by plaintiff's own version, the use of force against the plaintiff occurred during a period of turmoil when one or more disruptive inmates in a group of between sixteen and eighteen combined in a single holding cell became unruly and were being urged to lash out against corrections officers. Plaintiff alleges in his complaint and states in a sworn declaration that he was pushed into a corrections officer by Sergeant Sigona, pulled out of the holding pen by his hair, and thrown to the floor and kneed in the nose. During his deposition, however, plaintiff testified that five or six corrections officers rushed into the holding pen directing him to move to the back, which he could not do because there was no room. Plaintiff's Dep. Tr. at pp. 16 and 51. From there, plaintiff is not exactly sure what happened; he does not know whether he was pushed intentionally, only that "[he] was taken down ... [and] ... kneed in the nose." *Id.* at p. 16. Additionally, at the time of the incident, plaintiff did not know who the officers involved were, who "took him down", or who kneed him in the nose, and could not say whether there were also officers on the floor with him.[4] *Id.* at pp. 16-17, 52. Plaintiff further testified that after he fell to the floor, he was lifted and pulled out of the cage by his hair, and then he hit the floor again. *Id.* at p. 18. Again, plaintiff admittedly does not know how he ended up on the floor a second time, or whether he fell or the corrections officers fell on him, although he recalls that he was on the floor with a couple of corrections officers on top of him. *Id.*

Under the circumstances presented, even accepting as true plaintiff's version of the events, when considering the four factors informing the subjective analysis no reasonable factfinder could conclude that the force applied was malicious

or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. Moreover, considering the extent of the force applied and the relatively minor injuries suffered even by plaintiff's account, coupled with the lack of evidence of malicious motives on the part of the corrections officers involved, I recommend a finding that the use of force was truly *de minimis* and did not abridge plaintiff's Eighth Amendment rights.[5]

### 2. Failure to Intervene

**\*13** A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

Based upon my finding that plaintiff's Eighth Amendment rights were not violated through the actions of defendant Manna, there can be no cognizable claim for liability on the part of defendants Sigona and Ruston for failure to intervene and protect plaintiff from the constitutional violation. *See*

*Curley,* 268 F.3d at 72. I therefore recommend that plaintiff's claims against those defendants be dismissed as well.

### C. *Medical Indifference*

The second component of plaintiff's complaint alleges that defendants Vega and Ryerson failed to provide him with needed medical treatment. Plaintiff's claim against Nurse Vega apparently stems from her failure, upon examining Cicio immediately following the March 7, 2006 incident, to arrange for him to see a doctor or to prescribe pain medication. The allegations against defendant Nurse Administrator Ryerson result from her alleged failure to process sick call slips submitted on several occasions following the incident by plaintiff. While plaintiff's summary judgment motion does not speak directly to this claim, he apparently seeks summary judgment on the issue of liability on this claim as well. For their part, defendants urge dismissal of plaintiff's medical indifference claims as a matter of law due to his failure to assert the existence of a serious medical need and additionally for lack of any evidence to satisfy the subjective element of the controlling test.

**\*14** Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809,

at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at \*2 (same).

### 1. *Serious Medical Need*

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at \*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

**\*15** The record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a swollen and painful wrist as well as head pain. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; *see also* Plaintiff's Dep. Tr. at pp. 21-22, 24-26. The record, including plaintiff's submission in support of his summary judgment motion and later opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory

nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at *12 (S.D.N.Y. Mar.27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of which diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment", and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. Even if plaintiff could establish the existence of a serious medical need, the record does not provide a basis for a reasonable factfinder to conclude that either defendant Vega or defendant Ryerson was deliberately indifferent to such a need. Plaintiff's claim against Nurse Vega is that on one occasion she failed to provide pain medication or to refer the plaintiff to a physician as a result of his injuries. Such an allegation of a single instance of delayed or denied medical care does not establish constitutional claim of medical deliberate indifference. *See Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003).

**\*16** Turning to the allegations against defendant Ryerson, those stem from an alleged failure to process sick call slips on four or five occasions following the March 7, 2006 incident. Even assuming the existence of a serious medical condition prompting the need for medical care and defendant Ryerson's failure to process sick call slips over a brief period of time, these facts alone do not suffice to establish a deliberate indifference claim as against defendant Ryerson since there is no evidence suggesting that the minimal delay caused any significant adverse effect to plaintiff's health. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 324 (W.D.N.Y.2007). Accordingly, I recommend dismissal of plaintiff's deliberate indifference claim against defendant Ryerson on this alternative basis.

### D. *Personal Involvement*

In their motion defendants assert that even if plaintiff could establish a cognizable excessive force or deliberate indifference claim, his cause of action against defendant Graham, the superintendent at Auburn, is legally insufficient based upon his lack of personal involvement in any conduct forming the basis for those claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Importantly, a supervisor like Superintendent Graham cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability

on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 2931 (2009); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*17** In my earlier report and recommendation, addressing a pre-answer dismissal motion filed by certain of the defendants including Superintendent Graham, I recommended against dismissing plaintiff's claim against defendant Graham, finding that the proof at trial could potentially establish that defendant Graham learned, through the appeal of plaintiff's grievance denial, that he was deprived of medical care at a point when he had an opportunity to cure that alleged constitutional deficiency. *See* Report and Recommendation dated February 10, 2009 (Dkt. No. 29) at pp. 17-21. The more fully developed record now before the court, however, firmly establishes that this is not the case. There is no indication that defendant Graham was aware of plaintiff's circumstances prior to plaintiff's appeal on April 12, 2006 of the IGRC's grievance denial. *See* Graham Decl. (Dkt. No. 38-7) ¶ 6. By that point, plaintiff had been transferred out of Auburn, and thus even if defendant Graham was placed on notice of a constitutional deprivation in the form of denial of adequate medical treatment, he was no longer in a position to cure that deficiency. *Id.* Accordingly, because the record fails to disclose any basis on which defendant Graham could be held liable for the constitutional violations alleged, there is an independent, alternate basis for dismissing plaintiff's claims against him.

## IV. SUMMARY AND RECOMMENDATION

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendant Manna during the course of the March 7, 2006 incident and that defendants Sigona and Ruston failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of that incident or that the defendants were subjectively indifferent to the medical needs presented by those injuries. Finally, the record discloses no basis on which a reasonable factfinder could assign liability on the part of defendant Graham, as superintendent of the Auburn Correctional Facility. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED and that plaintiff's complaint be dismissed in its entirety, and that based upon that determination plaintiff's summary judgment motion (Dkt. No. 35) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 980272

---

Footnotes

1    This action was filed in the Western District of New York but was subsequently transferred here by order issued on May 2, 2008 by Chief District Judge Richard J. Arcara. Dkt. Nos. 1, 3.

2    In his motion submission, plaintiff also claims to have asserted a cause of action for violation of procedural due process, based upon the defendants' alleged failure to process and investigate his grievances. Plaintiff's Memorandum (Dkt. No. 35-3) at p. 2. Such a claim, if indeed present in this action, is nonetheless subject to dismissal, since it is well established that a prison inmate has no cognizable constitutional right of access to the grievance process or to have grievances which

have been filed investigated. *Avent v. Doe,* No. 9:05-CV-1311, 2008 WL 877176, at *8 (N.D.N.Y. Mar.31, 2008) (Scullin, S.J. & DiBianco, M.J.) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)).

3   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

4   Plaintiff later learned the names of the officers he identified in his complaint when he received a copy of the misbehavior report that was issued to him as a result of the incident. Plaintiff's Dep. Tr. at p. 17.

5   By plaintiff's own account, the injures suffered as a result of the incident were minor. *See* Plaintiff's Dep. Tr. at pp. 21-26.

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,

v.

R. LAMORA, R. Scott, R. MacWilliams,
K. Crossett, E. Facteau, C.O. Demers,
R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

**1**    **Federal Civil Procedure**
👉 **Civil Rights Cases in General**

Genuine issue of material fact existed as to whether corrections officer repeatedly hit the inmate after the inmate was subdued and thus summary judgment was precluded on the inmate's excessive force claim. The inmate alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that the corrections officer punched him unnecessarily in the head several times during the inmate's cell extraction. Although the cell extraction was supposed to be videotaped, the video was never recorded. Despite the fact that the inmate's injuries were slight and were at least indirectly brought about by his own action of refusing handcuffs, there were credibility issues to be determined. U.S.C.A. Const.Amend. 8.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, C. Harris Dague, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1**    Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In his complaint Cicio, who refused multiple orders from prison officials to exit his cell in order to effectuate a transfer to another location, complains that in the course of the ensuing cell extraction, during which he was removed through the use of force, one of the corrections officers who participated exerted excessive force causing him to suffer injuries, while the others involved failed to intervene, all in violation of the Eighth Amendment's protection against cruel and unusual punishment. As relief for the violation, plaintiff seeks the recovery of compensatory and punitive damages from defendants.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint. In their motion defendants challenge the legal sufficiency of plaintiff's excessive force and failure to intervene claims and additionally assert their entitlement to Eleventh Amendment immunity from suit in their official capacities and good faith qualified immunity from suit as individuals. Because a reasonable factfinder could conclude from the record now before the court that more force than necessary to subdue and remove Cicio from his cell was applied maliciously and sadistically by prison officials, I am constrained to recommend that defendants' motion be denied, except as to plaintiff's claims against defendant Woods and those against defendants in their official capacities, which are subject to dismissal.

I. *BACKGROUND* [1]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶ 3 and Exh. A (Dkt. No. 35–17). At the times relevant to his claims, plaintiff was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York.[2] *Id.*

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to

return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal of surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

**\*2** On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶ 4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A

(Dkt. No. 34–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶ 13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWiliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections

Officers Richard Scott, Richard MacWilliams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion,[3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct.

at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. *Fed.R.Civ.P. 56(e); Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998).[4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Excessive Force*

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193

F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. — U.S. – – – –, — S.Ct. ——, — L.Ed.2d – – – , 2010 WL 596513, at *3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

**\*6** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting Hudson, 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211

(N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints. [5] Moreover, during his deposition, plaintiff acknowledged that the photographs

accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

**\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

### C. *Failure To Intervene*

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants observed the incident but stood by without intervening on his behalf . [6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at \*4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). [7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555

(S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-

employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daiseria v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

E. *Qualified Immunity*

In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

**\*10** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from

the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.; see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 15774, at \*14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to [plaintiff's] excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

IV. *SUMMARY AND RECOMMENDATION*
Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others

in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063875

Footnotes

1    In light of the procedural posture of this case, the following recitation is from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 128, 137 (2d Cir.2003). It should

be noted that while most of the pertinent facts are undisputed, defendants sharply contest plaintiff's allegation that he was unnecessarily punched by defendant MacWilliams during the forcible removal from his cell.

2    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at \*4 n. 11 (S.D.N.Y. Sept. 12, 2002).

3    Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

4    With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement.

5    Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

6    Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

7    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

8    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

9    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry," also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

10   Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    9

KeyCite Yellow Flag - Negative Treatment
Distinguished by Flemming v. King, N.D.N.Y., June 20, 2016

2011 WL 5975027
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jonathan HENRY, Plaintiff,

v.

James F. DINELLE, Corrections Officer; Russell
E. Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema,
Sergeant; and Jean Norton, Nurse, Defendants.

No. 9:10–CV–0456 (GTS/DEP).
|
Nov. 29, 2011.

**Attorneys and Law Firms**

Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel, New
York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this prisoner civil rights
action filed by Jonathan Henry ("Plaintiff") against the
five above-captioned employees of the New York State
Department of Corrections and Community Supervision
("Defendants"), is Defendants' motion for partial summary
judgment. (Dkt. No. 24.) For the reasons set forth below,
Defendants' motion is granted in part and denied in part.

# I. RELEVANT BACKGROUND

## A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges
that, between approximately January 29, 2009, and January
31, 2009, at Ulster Correctional Facility in Napanoch, New
York, Defendants violated Plaintiff's following rights in
the following manner: (1) Defendants Nurse Jean Norton,

Corrections Officer James F. Dinelle, Corrections Officer
Russell E. Duckett and Corrections Officer Alfred J. DeLuca
violated Plaintiff's rights under the First Amendment by
filing retaliatory false misbehavior reports against him,
and subsequently providing false testimony against him
at administrative disciplinary hearings, which resulted in
his spending time in the Special Housing Unit ("SHU");
(2) Defendant Dinelle violated Plaintiff's rights under the
Eighth Amendment by assaulting him on two occasions,
and Defendants DeLuca and Duckett violated Plaintiff's
rights under the Eighth Amendment by assaulting him
once; (3) Defendant Sergeant Donald L. Broekema violated
Plaintiff's rights under the Eighth Amendment by failing to
intervene to prevent one of these assaults from occurring;
(4) Defendant Norton violated Plaintiff's rights under the
Eighth Amendment by harassing him almost immediately
before he was subjected to the above-described assaults;
and (5) Defendants Norton, Dinelle, Duckett and DeLuca
violated Plaintiff's rights under the Fourteenth Amendment
by performing the aforementioned acts, which constituted
atypical and significant hardships in relation to the ordinary
incidents of prison life. (*See generally* Dkt. No. 1 [Plf.'s
Compl.].) Familiarity with the factual allegations supporting
these claims in Plaintiff's Complaint is assumed in this
Decision and Order, which is intended primarily for review
by the parties. (*Id.*)

## B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff was
an inmate and Defendants were employees of the New York
Department of Corrections and Community Supervision at
Ulster Correctional Facility. On January 30, 2009, Defendant
Dinelle took Plaintiff to the medical ward, because Plaintiff
was experiencing a foul odor and oozing from a wound on
his leg. After Defendant Norton treated Plaintiff, she filed
an inmate misbehavior report against Plaintiff based on (1)
Plaintiff's harassing behavior toward Defendant Norton and
Defendant Dinelle, and (2) Plaintiff's disobedience of a direct
order to be quiet. The misbehavior report was signed by
Defendant Dinelle as an employee witness.

At his deposition, Plaintiff testified, while leaving the
infirmary, he was punched and kicked by Defendant Dinelle
and two unknown prison officials. Plaintiff was then taken
to the SHU, where he waited with Defendants Dinelle and
Duckett, and up to three more individuals, for a sergeant to
arrive. When Defendant Broekema (a sergeant) arrived at the
SHU, Plaintiff was taken to a frisk room, where a frisk was
conducted. During the frisk, Defendants Dinelle, Duckett and

(Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton). [2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational

factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].). [3]

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [4]

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs.' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

#### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an

inmate's exercise of his First Amendment rights. *See Gill, 389 F.3d at 381–383.* Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).* As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).*

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Gill, 389 F.3d at 380* (citing *Dawes v. Walker, 239 F.3d 489, 492 [2d Cir.2001]* ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996).*

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.1996); Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).* Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994); Jordan v. Garvin, 01–CV–4393, 2004 WL 302361, at \*6 (S.D.N.Y. Feb.17, 2004).*

### 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord, 554 F.3d 255, 268 (2d Cir.2009).* In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi, 186 F.3d 252, 262 [2d Cir.1999]* ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright, 554 F.3d at 268* (quoting *Hudson v. McMillian, 503 U.S. 1, 8 [1992]* ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir.2001); Anderson v. Branen, 17 F.3d 552, 557 (2d Cir.1994).* "It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora, 08–CV–0431, 2010 WL 1063875, at \*8 (N.D.N.Y. Feb.24, 2010)* (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id. at \*8.* To establish a claim of failure-to-intervene, the

plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

### 3. Fourteenth Amendment Substantive Due Process Claims

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec.14, 2009) (Kahn, J. adopting

Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[5]

### 4. Qualified Immunity Defenses

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[8] As the Supreme Court has explained,

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[9]

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a

result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.)[10]

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.[11]

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the

Court has trouble finding that such a vague statement is constitutionally protected. [12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity." [13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. [14] Furthermore, those convictions were never subsequently reversed on administrative appeal. [15] As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

### B. Plaintiff's Claims Under the Eighth Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v. S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at \*11 (N.D.N.Y. Sept.14, 2011) (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants

Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced. [16]

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims, [17] and that both Defendant Broekema's use-of-force report, and

Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff. [18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

### C. Plaintiff's Claim Under the Fourteenth Amendment

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions. [19] As a result, Plaintiff's substantive due process claim is dismissed.

### D. Defendants' Defense of Qualified Immunity

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a

matter of law, by the doctrine of qualified immunity, under the circumstances.

### 1. Retaliation

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

### 2. Excessive Force

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist

a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999). [20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is ***GRANTED*** in part and ***DENIED*** in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is ***GRANTED;***

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is ***GRANTED;***

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is ***GRANTED;***

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is ***GRANTED;*** and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is ***DENIED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** with **prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are *DISMISSED* from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 5975027

---

Footnotes

1    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

2    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

3    In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

4    Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

5    Generally, " [n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker, 2009 WL 5033939, at \*5 n. 27* (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

6    *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

7    *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

8    *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

9    *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

10   Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees

that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

11    *See Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at *6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

12    The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at *4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at *3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he has a First Amendment right to threaten the facilitators of lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at *15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at *3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at *6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

13    *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

14    *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

15    For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

16    *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a

prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

17    (Dkt. No. 27, Attach. 2, at 19–20.)

18    (Dkt. No. 27, Attach. 2, at 10, 14.)

19    *See Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998)* (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998)* (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997)* (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997)* (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996)* (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996)* (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995)* (270 days in SHU under numerous conditions of confinement that were more restrictive than those in general population).

20    *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987)* ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    11

Parker v. Fogg, Not Reported in F.Supp. (1994)

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 65 of 74

1994 WL 49696
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Maurice PARKER, Plaintiff,

v.

Superintendent Walter FOGG, Correction
Officers Dennis Schoonmaker, Ernest Benevento
& Correction Sergeant Longtin, Defendants.

No. 85–CV–177.
|
Feb. 17, 1994.

**Attorneys and Law Firms**

James M. Kerrigan, Ithaca, NY, for plaintiff.

Robert Abrams, Atty. Gen. for the State of New York, Albany, NY (David B. Roberts, Asst. Atty. Gen., of counsel), for defendants.

MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

**\*1** While incarcerated plaintiff *pro se,* Maurice Parker, filed the present lawsuit. [1] This civil rights action, brought pursuant to 42 U.S.C. § 1983, is predicated upon allegations that plaintiff's Eighth and Fourteenth Amendment rights under the United States Constitution were violated, as well as his rights under Article I, §§ 5 and 6 of the New York State Constitution, [2] during an altercation which took place on October 12, 1983, at Coxsackie Correctional Facility ("Coxsackie" or "the facility"), a maximum security prison. Besides those alleged constitutional deprivations, plaintiff asserts three pendent state law claims: (1) intentional infliction of emotional distress, (2) assault and battery, and (3) violations of New York Corrections Law § 137(5) [3] and 7 N.Y.C.R.R. §§ 250.2(g) and 251.2. [4] In his complaint plaintiff seeks a declaratory judgment "that defendants have violated [his] constitutional rights as protected by the Eighth and Fourteenth Amendments to the United States Constitution;...." Complaint at 5. He also seeks compensatory damages of $250,000 and punitive damages of $250,000, as well as reasonable costs and expenses, including attorney's fees. *Id.*

Named as defendants in the complaint are Walter Fogg, the Superintendent at Coxsackie at the time of the alleged incident, [5] Correction Officers ("C.O.") Dennis Schoonmaker and Ernest J. Benevento, and Sergeant James Longtin. [6] On January 18 and 19, 1994 this matter was tried before the court without a jury. In accordance with Fed.R.Civ.P. 52(a), following constitutes the court's findings of fact and conclusions of law in this regard.

*I. FINDINGS OF FACT*

To fully appreciate the relatively brief encounter between plaintiff Parker and the defendants on the evening of October 12, 1983, it is necessary to briefly examine the background against which that incident occurred. There is evidence in the record, in the form of "Inmate Misbehavior Reports," showing that plaintiff had been verbally harassing C.O. Judy Wood prior to October 12, 1983. *See* Defendants' exhs. E and F. Even though plaintiff did not remember the incidents described in those reports, he did remember having some differences with C.O. Wood. Defendants suggest that those differences arose out of the fact that C.O. Wood is a woman and at the time was a "Block Officer," which apparently was quite rare in the early 1980's. Plaintiff disagrees explaining that his differences with Wood occurred because she accused him of being a ringleader or instigator, provoking others to engage in disturbances. In any event, it is against this history of animosity between plaintiff Parker and Wood (which most surely did exist, for whatever reason) that the incident which is the subject of this litigation occurred.

Plaintiff's version of the events of October 12, 1983 is as follows. That evening he was keeplocked [7] in his cell. When the other inmates returned from evening recreation there were problems with the "lock in" [8] because the inmates thought that the C.O.s were bringing the inmates back to the cells ten minutes early. Plaintiff testified that the inmates were behaving in a raucous manner, with continued screaming even after being locked in for the night. During this time plaintiff claims to have been writing letters.

**\*2** Then, between 9:15 and 9:40 p.m., the door to plaintiff's cell was opened and he saw the defendants standing there. Plaintiff states that at that time he was wearing pajamas with no pockets and his slippers. When he tried to put on his boots, Schoonmaker, whom plaintiff believes wore a baton, ordered him not to. In response to plaintiff's inquiry as to what was going on, Schoonmaker told him to, "Shut up," in no uncertain

terms. Upon leaving the cell, plaintiff testified that he was not pat frisked, but that he was only escorted by the defendants to the center room. Apparently that room is so called because it is located between two sets of cell blocks. *See* Defendants' exh. A.

As they proceeded down the corridor, plaintiff admits to talking loudly and continuing to question defendants as to where he was being taken. He did that because he was the only one not locked in and he wanted his fellow inmates to know that he was being taken away by the defendants. Plaintiff was then placed in the corner of the center room, making it difficult for him to be seen or heard by other inmates in the surrounding cells. *See* Defendants' exh. A. At this time plaintiff's hands were behind his back, as they had been since he left the cell, and pressed against the wall. C.O.s Benevento and Schoonmaker flanked plaintiff, and by plaintiff's estimation Sergeant Longtin was behind the C.O.s, about two and a half feet from plaintiff.

Plaintiff further testified that it was only about three seconds from the time he was placed in the corner until Schoonmaker first hit him—either with an open right hand or a fist, plaintiff is not sure which. Prior to being struck, plaintiff testified that Schoonmaker was basically telling him that he had a big mouth and that he was a troublemaker. Trying to avoid getting hit, the plaintiff ducked. Plaintiff then claims that after that initial strike by Schoonmaker, both Benevento and Schoonmaker beat him up a little. Schoonmaker then hit plaintiff a second time with a right fist to plaintiff's temple, causing plaintiff's head to hit the wall and he began to bleed. Plaintiff testified that he was ducking and trying to protect himself after Schoonmaker struck him the first time. In fact, the plaintiff went so far as to demonstrate for the court the crouching position he assumed, with his hands covering his face, when the altercation started. Thus, because by his own admission plaintiff was protecting his face and head and in so doing obstructing his own vision, the court simply cannot credit plaintiff's testimony that C.O. Benevento struck or kicked plaintiff. Perhaps plaintiff was kicked or hit by more than one of the defendants, but the fact remains that he could not reasonably testify to that because at that point, he could not see what was happening.

In any event, after this plaintiff claims that Benevento subdued him with a stick and no more punches were thrown. Plaintiff also claims that he was kicked in the groin, but again there is no credible testimony as to which defendant, if any, engaged in that conduct. Moreover, the medical records do not corroborate plaintiff's statement that he sustained injuries to the groin area as a result of this incident.

**\*3** The medical report contained in the "Unusual Incident Report" reveals that plaintiff sustained a cut measuring approximately 1 and ⅛ inches long on the outer area of his right eyebrow. Defendants' exh. B and H at 5. The facility nurse applied butterfly bandages. *Id.* The next day plaintiff was seen by a doctor who administered sutures. Defendants' exh. H at 5. Plaintiff received somewhere between four and six sutures. [9] The sutures were removed eleven days later. Defendants' exh. H. Photos of plaintiff taken eight days after the incident show that his right eye was still quite swollen, with significant bruising around it. Defendants' exh. I and plaintiff's exhs. 3A and 3B. [10] To this day, plaintiff still has a small scar (about one and a half inches long) above his right eyebrow, visible from approximately five feet away.

In addition to the scar, plaintiff claims that in the months after the incident he had a lot of headaches and vision problems, as well as pain in the groin area. Even today plaintiff claims that he continues to suffer from headaches, although he could not testify to the frequency of the same. Significantly, however, there is no mention in any of plaintiff's medical records, which are a part of the trial record, of headaches or vision problems. If plaintiff had, as he testified, a number of headaches in the two weeks immediately following the incident, surely that would be noted in his medical records from that time.

Likewise, even though plaintiff claimed at trial that he also sustained injury to his groin area, there is no mention of that in either the medical portion of the "Unusual Incident Report" or in his medical records for the date of the incident, or the visits immediately following that. In fact, there is no mention in the medical records of any such problem until nearly six weeks after the incident. Defendants' exh. H. In addition, when plaintiff again saw the doctor on November 28, 1983, he mentioned that problems with "bloody ejaculate" were intermittent for the past two months "and also 1 yr. [year] ago." *Id.* Following treatment for prostate difficulties, by plaintiff's own admission, this problem subsided. Thus, insofar as plaintiff's injuries are concerned, the court finds that plaintiff did sustain a laceration to the area above his right eyebrow, which required sutures and resulted in a small permanent scar.

The court will not attribute plaintiff's other complaints of headaches, vision problems and pain and discomfort in the groin area to this incident, however, because those problems

are not substantiated in plaintiff's medical records during the weeks immediately following the incident. Furthermore, the fact that headaches can be so easily feigned is another reason for not attributing that particular symptom to the October 12, 1983 incident, especially where these supposed headaches are not mentioned anywhere in plaintiff's medical records.

Not surprisingly, defendants' version of events is at odds with that offered by plaintiff. The defendants claim that earlier in the evening of October 12, 1983, plaintiff had again been verbally harassing C.O. Wood. Sergeant Longtin claims that he first became aware of this when he received a call from C.O. Wood at approximately 7:50 p.m. In response to that call, Sergeant Longtin testified that he went to plaintiff's cell to work out the problem by talking with plaintiff. According to Longtin he and plaintiff agreed to "forgive and forget" the whole matter. Sometime later, while he was making his rounds in another part of the facility, Longtin received a second call from C.O. Wood, again complaining about plaintiff Parker. This time she advised Longtin that the keeplocked inmates, including Parker, were creating a disturbance. Wood also expressed concern that plaintiff had indicated that when the nurse and another C.O. made their usual nightly rounds at 10:00 p.m., the inmates, led by plaintiff, planned to "break on" them, or, in other words, create a disturbance. Defendants' exh. G. Longtin advised Wood that he would be up shortly after finishing his rounds.

 **\*4** The Sergeant did not come alone, though, as he had earlier. This time he was accompanied by defendants, Benevento and Schoonmaker. Sergeant Longtin testified that Schoonmaker was called to accompany him because that was part of his job. At the time, Schoonmaker had the official sounding title of "Evening Shift Assembly Desk Escort Officer," which in Schoonmaker's own words meant that he was a "gopher," or as Longtin described it, a "go-getter." Longtin testified that he did not know why Benevento was also called upon to accompany the Sergeant, but he hypothesized that perhaps Benevento was working overtime that night. The Sergeant further testified that it was customary for one Sergeant to be accompanied by two Corrections Officers in a situation such as this, where they anticipated moving an inmate, as they did Parker.

When the three defendants arrived at plaintiff's cell, prior to giving the signal for the door to be opened, Sergeant Longtin testified that he informed plaintiff that he was being taken to the center room so that they could talk to him. Schoonmaker then ordered plaintiff Parker to put on his pants

and plaintiff did that. After exiting the cell, Schoonmaker pat frisked plaintiff and he found contraband—namely a blade from a Bic brand razor measuring approximately 1½ inches by ⅜ inches. Defendants' exh. D and D1. Despite finding that contraband, the three defendants proceeded to escort plaintiff to the center room. Later that night, Schoonmaker wrote up an Inmate Misbehavior Report pertaining to both the contraband and the altercation; but no action was taken with respect to the contraband at the time it was found. Defendants' exh. D.

Upon entering the center room, plaintiff was ordered to stand in the corner and he did that. At that point, while directly in front of the plaintiff, Sergeant Longtin claims that he began talking to him, again questioning plaintiff about the alleged harassment and his supposed plan to instigate a disturbance on the block later that evening. Before he could finish, plaintiff began yelling. Schoonmaker told the plaintiff to stop yelling and to show a little more respect for the Sergeant, or words to that effect. According to the defendants, that prompted plaintiff to respond by removing his hands from his pockets, where he had been instructed to keep them, and to swing at Schoonmaker with a closed fist. Schoonmaker claims that in self-defense he responded by striking plaintiff on the left side of his head, causing plaintiff's head to hit the wall. Schoonmaker and Benevento then turned the plaintiff around, and both applied "bar hammer locks" to plaintiff's arms. Defendants' exh. B. Longtin issued handcuffs to Schoonmaker who handcuffed the plaintiff. After being escorted to the infirmary, plaintiff was seen by a facility nurse and then placed in another cell area.

Ascertaining exactly what happened on the evening of October 12, 1983 at Coxsackie is not easy because, admittedly, there are discrepancies, in varying degrees of significance, in the testimony of each of the witnesses, all of whom are parties to this action. [11] In addition to the discrepancies, the court's task of deciding the "facts" of this case is made even more difficult because it appears that all of the witnesses embellished their testimony to some extent. Difficulty in ascertaining where the "truth" lies here is also compounded by the fact that this incident occurred over ten years ago; and thus, understandably, the independent recollection of each party was significantly impaired. Nevertheless, after considering all of the evidence, and after having the opportunity to judge the credibility of the witnesses, the court concludes that plaintiff's version of events more closely resembles what happened between plaintiff and defendants on the evening of October 12, 1983 than does

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 68 of 74

Parker v. Fogg, Not Reported in F.Supp. (1994)

the defendants' version, and the matter will be decided based predominately upon that view of events.

**\*5** There are two primary reasons that the court is willing, for the most part, to accept plaintiff's version of events. First, the court is greatly troubled by the fact that once contraband was found on the plaintiff, the defendants did not proceed to immediately write him up or focus upon that undisputed violation of prison policy. It is incredible to the court that after finding that contraband on the plaintiff, who according to the Sergeant, had already been reprimanded earlier that same evening for verbal assaults, the defendants' agenda remained to take plaintiff down the hall and talk to him about Wood's claim that he planned to instigate another disturbance later that night. Given the sequence of events, the court finds it perplexing that once the contraband was found, the defendants did not simply remove plaintiff from his cell block, especially when they were supposedly concerned about him causing a disturbance there later on that night. If that remained defendants' concern, it seems only logical that once they found the contraband, in combination with plaintiff's earlier difficulties with C.O. Wood and her fear about the possibility of plaintiff instigating another cell block disturbance, the defendants would have taken immediate action to segregate plaintiff. Or, at the very least, they would have taken some action more severe then just taking plaintiff down the hall to discuss matters with him. After all, as defendants themselves emphasized at trial, Coxsackie is a maximum security prison and plaintiff had a history of behavior problems, including problems with C.O. Wood—the very same C.O. who complained about him the night of October 12, 1983. Had defendants segregated plaintiff, any fear about his causing another disturbance would have been alleviated.

The court finds the defendants' description of what happened on the night of October 12, 1983 suspect for a second reason. As all the parties testified, although not in precisely this way, plaintiff, a 19 year old, 160 pound unarmed inmate, and familiar with prison mores having already served part of his sentence, was surrounded and literally cornered, by three guards whose combined weight was, conservatively, 500 pounds. Regardless of whether or not the defendants had batons,[12] it is implausible to the court that in this situation plaintiff would have "thrown the first punch,"[13] "in an effort to 'get in his licks,' "[14] as the defendants steadfastly maintain. It is far more likely, in the court's opinion, that defendants were agitated by plaintiff Parker's ongoing insolence, as documented in the Inmate Misbehavior Reports of C.O. Woods, and which apparently continued earlier that evening. And thus they, or at least defendant Schoonmaker, made the decision to take some action beyond just talking to the plaintiff.

## II. CONCLUSIONS OF LAW

### A. Eighth Amendment—Excessive Force

Given the proliferation of inmate instituted lawsuits over the years,[15] it is not surprising that the law is fairly well circumscribed, with respect to Eighth Amendment excessive force claims. Recently, Chief Judge McAvoy of this District had occasion to set forth the legal principles governing such claims. See Richardson v. VanDusen, 833 F.Supp. 146 (N.D.N.Y.1993); see also Boyd v. Selmver, 842 F.Supp. 52, 55–56 (N.D.N.Y.1994). Set forth in those decisions is a thorough and accurate recitation of the relevant legal principles, which closely follows that set forth by other courts in this Circuit when faced with Eighth Amendment excessive force claims.[16] Consequently, the court sees no need to restate what has already been so well put by a number of courts; instead the court will quote liberally from Judge McAvoy's recent published decision in Richardson.

**\*6** The Eighth Amendment protects prisoners from "cruel and unusual punishment." See Wilson v. Seiter, 501 U.S. 294, ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); Estelle v. Gamble, 429 U.S. 97, 102–05, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). However, it is "the unnecessary and wanton infliction of pain", Estelle v. Gamble, 429 U.S. at 103, 97 S.Ct. at 290, and not simply the "ordinary lack of due care for the prisoner's interests or safety" Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), which the Eighth Amendment prohibits.

To prevail in this civil rights action grounded in the Eighth Amendment, the plaintiff must show that the defendants used such excessive force to subdue him that the force could fairly be characterized as the "unnecessary and wanton infliction of pain." See Hendricks v. Coughlin, 942 F.2d 109, 113 (2nd Cir.1991). What is necessary to establish an "unnecessary and wanton infliction of pain" varies according to the nature of the constitutional violation. Whitley v. Albers, 475 U.S. at 320, 106 S.Ct. at 1084. "Wantonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.' " Wilson v. Seiter, 501 U.S. at ——,

Parker v. Fogg, Not Reported in F.Supp. (1994)

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 69 of 74

111 S.Ct. at 2326 (1991) (quoting *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084). In this manner, the court must consider the "wantonness" element within the context of the situation in which the underlying force occurred. *Id.* What may amount to the "unreasonable and wanton infliction of pain" is determined by the constraints facing the state official. As the *Whitley* court stated:

> Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 321–322, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

The Supreme Court has recently re-affirmed use of the *Whitley* test in situations such as the one now before the court. *See Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In *Hudson,* the Court stated that "whenever prison officials stand accused of using excessive force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

**\*7** Applying the *Whitley/Hudson* test, the Second Circuit recently stated:

> To determine whether the defendants acted maliciously, a jury should consider the following factors: the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. Id. (citing *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085). If an evaluation of these factors leads the jury to conclude that the defendants acted maliciously, wantonness has been established. And an Eighth Amendment violation has occurred. If, on the other hand, reflection upon these factors leads the jury to find that the defendants acted in a good-faith effort to maintain or restore discipline, no constitutional violation has occurred

because the subjective component of the claim has not been satisfied.

*Romano v. Howarth,* 998 F.2d 101 (2d Cir.1993).

*Id.* at 151–52.

### 1. Defendant Schoonmaker

Convinced that defendant Schoonmaker delivered the first blow, the court must now consider whether, under the circumstances, that conduct amounted to a deprivation of plaintiff Parker's constitutional rights such that liability should be imposed under section 1983. When the facts of this case are analyzed in light of the *Romano* factors, the court is compelled to conclude that Schoonmaker's unprovoked attack on plaintiff, albeit brief, renders him liable under section 1983. Although plaintiff's injuries were not extensive, that does not militate against a finding of excessive force violative of the Eighth Amendment. *See Hudson,* 112 S.Ct. at 1000 (use of excessive physical force against an inmate may constitute cruel and unusual punishment even though the inmate does not suffer serious injury). In addition, crediting plaintiff's testimony that Schoonmaker struck him first, there is absolutely nothing in the record demonstrating that Schoonmaker needed to apply force when plaintiff, a 19 year old, 160 pound unarmed inmate, was in a corner virtually surrounded by three prison guards who together substantially outweighed him. Again, accepting plaintiff's version of events, as just explained, Schoonmaker could not reasonably perceive plaintiff as a threat to Schoonmaker's well being. Lastly, Schoonmaker made no effort to temper his response to plaintiff's supposed disrespect; after verbally attacking plaintiff, Schoonmaker just hauled off and struck him. Based on all of the foregoing, the court finds that the force applied by defendant Schoonmaker was not done "in a good faith effort to maintain or restore discipline[,]" but rather was done "maliciously and sadistically to cause harm." *See id.* at 999. Consequently, plaintiff has shown to the court's satisfaction that Dennis Schoonmaker violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishments.

### 2. Defendant Longtin

**\*8** The legal analysis set forth above, and particularly those factors enumerated in *Romano,* are not necessarily applicable with respect to the other two defendants however. More specifically, as to Sergeant Longtin, because the court does not credit plaintiff's testimony that he was attacked by any

defendant other than Schoonmaker, obviously Longtin cannot be held liable on the same basis as Schoonmaker—as a direct participant in the attack. At the time of the incident, along with the other Sergeant on duty during that shift, by his own admission Sergeant Longtin was the second highest ranking prison official on duty then. (The highest ranking on duty official was a Lieutenant.) As such, Sergeant Longtin stands in a different position legally from that of the other two defendants. And because of that status, the fact that Longtin himself did not actually strike the plaintiff, does not necessarily extricate him from a finding of liability under § 1983.

A defendant's liability for a constitutional deprivation under 42 U.S.C. § 1983 may arise in several different ways, as the Second Circuit has recognized.

> The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir.1991) (quoting Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted)); see also Van Pelt v. Finn, No. 92 Civ. 2977, 1993 U.S.Dist. LEXIS 15951, at * 19 (S.D.N.Y. filed Nov. 12, 1993) (same); and Garrido v. Coughlin, 716 F.Supp. 98, 100 (S.D.N.Y.1989) (quoting Duchesne v. Sugarman, 566 F.2d 817, 830 (2d Cir.1977)) ("Supervisory officials cannot be held liable under § 1983 solely for the acts of others; 'there must be some showing of personal responsibility.' "). In the present case there is simply no proof that Longtin participated in striking plaintiff; that he created a policy or custom under which this attack was allowed to take place; or that he allowed a policy or custom of unprovoked attacks on inmates to continue. Thus, of the types

of personal involvement just described, the only category into which Sergeant Longtin could possibly be placed would be as a supervisor who was grossly negligent in managing a subordinate—C.O. Schoonmaker.

Sergeant Longtin cannot be found liable on that basis, however, because this was a single incident which happened in a matter of seconds. Therefore, even though he was acting in a supervisory capacity at the time plaintiff's constitutional rights were violated, Sergeant Longtin still cannot be held liable because he is no different than any other non-supervisory prison official who does not act because there is no reasonable opportunity to intercede. As defense counsel correctly pointed out, this case is no different than O'Neill v. Krzeminski, 839 F.2d 8 (2d Cir.1988), where the Court held that there was "insufficient evidence to permit a jury reasonably to conclude that [an officer's] failure to intercede was a proximate cause of the beating [,]" where "the three blows were struck in such rapid succession that [the officer] had no realistic opportunity to a prevent them." Id. at 11. Just as in O'Neill, the blows by Schoonmaker were over and done with so quickly here that Sergeant Longtin "had no realistic opportunity to attempt to prevent them." Id. see also Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 207 n. 3 (1st Cir.1990), cert. denied, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 1991) (no "realistic opportunity" for a police officer to prevent an attack in a police station booking room where it was over in a matter of seconds). Thus, while generally a corrections officer such as Longtin bears "an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers [,]" Sergeant Longtin was excused from that duty because there was no "realistic opportunity" to prevent this attack which was over in a matter of seconds. See id.

### 3. Defendant Benevento

**\*9** Similarly, there is no basis for finding liability under section 1983 as against C.O. Benevento. Not only was C.O. Benevento not in a supervisory position at the time of the incident, but just like Sergeant Longtin, he too did not have a reasonable opportunity to intercede. Therefore the legal analysis set forth above with respect to Sergeant Longtin applies with equal force to C.O. Benevento. Thus there is no basis for a finding that defendant Benevento violated plaintiff's rights under the Eighth Amendment.

### B. Fourteenth Amendment—Due Process

Given the complete lack of proof at trial on any due process claim other than one based upon Schoonmaker's unprovoked attacked on plaintiff Parker, [17] the court assumes that plaintiff has abandoned all other aspects of this claim. In other words, the court finds that defendant Schoonmaker is also liable under § 1983 for violating plaintiff's due process rights when Schoonmaker struck plaintiff in the head, but the other two defendants are not liable in any way for violating plaintiff's due process rights.

### C. Pendent State Law Claims

Before turning to a consideration of plaintiff's pendent state law claims, the court notes that although this case has been pending for nearly nine years, it was not until defendants' opening statement at trial that a statute of limitations defense was raised. Having failed to assert that affirmative defense in their answer, however, the defendants are deemed to have waived it. *See Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 752 (2d Cir.1992). In light of that waiver, the court need not address the defendants' untimely statute of limitations argument.

During their opening statement, defendants raised a second procedural point with respect to plaintiff's pendent claims and that is that those claims are barred by § 24 of the New York State Corrections Law. That statute expressly states, in relevant part:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department [of corrections], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y.Correc.Law §§ 24(1) and 24(2) (McKinney 1987) (emphasis added). Relying upon that statute, defendants argue that because a state court would lack jurisdiction thereunder to decide plaintiff's pendent state claims, then so too would this court lack jurisdiction over those claims. [18] Case law construing section 24 is not plentiful. The few federal cases

discussing that statute do make clear, though, that "a New York State inmate is foreclosed in New York State court— ... —from a private damage action against prison employees in their personal capacity for damages arising out of acts or failures to act taken within the scope of employment and in the discharge of duty." *Selby v. Ribeiro,* No. 78 Civ. 1281– CSH, slip op. at 3 (S.D.N.Y. Jan. 9, 1980) (citing *Ray v. Fritz,* 468 F.2d 586, 587 n. 2 (2d Cir.1972)) (emphasis added); *see also Boyd, supra,* slip op. at *13–*14; and *Brown v. Coughlin,* 758 F.Supp. 876, 886 (S.D.N.Y.1991). Thus, the court agrees that § 24 bars plaintiff's pendent tort claims. [19]

### D. Damages

**\*10** Having determined that defendant Schoonmaker is liable to plaintiff for violating his Eighth and Fourteenth Amendment rights, the only remaining question for the court is the amount of damages to be awarded. In that regard, the court notes its disagreement with defendants that plaintiff Parker should only be entitled to recover nominal damages. An award of nominal damages is proper "[a]bsent a showing of causation and actual injury." *Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (emphasis added) (citing, *inter alia, Carey v. Piphus,* 435 U.S. 247, 263, 266–67, 98 S.Ct. 1042, 1052, 1054, 55 L.Ed.2d 252 (1978)). As fully set forth herein, the plaintiff has made the requisite showing of causation and actual injury, at least with respect to the injury he sustained to his head. Thus, something more than a nominal damage award is mandated here.

After reviewing the medical records, listening to all of the testimony, and having an opportunity to observe the permanent scar near plaintiff's right eyebrow, which although not disfiguring, does remain visible today—some nine years later, the court is convinced that plaintiff is entitled to damages totalling $2,500.00. An award of that amount will, in the court's opinion, adequately compensate plaintiff for the actual injury he sustained, as well as for his pain and suffering.

An award of punitive damages is not, however, justified on the present record. In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court set forth the standard for assessing punitive damages in § 1983 actions. The Court held that punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. The *Smith* Court further "observed that though entitlement to compensatory damages is automatic

Parker v. Fogg, Not Reported in F.Supp. (1994)

Case 9:18-cv-00149-MAD-TWD   Document 58   Filed 12/13/19   Page 72 of 74

upon a finding that the plaintiff's rights have been violated, an award of punitive damages is discretionary, reflecting a 'moral judgment,' and that the threshold of proof need not be different." *Vasbinder v. Ambach,* 926 F.2d 1333, 1342 (2d Cir.1991) (quoting *Smith,* 461 U.S. at 52, 52–55, 103 S.Ct. at 1638, 1638–40). The Supreme Court has also explained that the purpose of punitive damages "is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School District v. Stachura,* 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986); *see also In re Air Disaster at Lockerbie, Scotland,* 928 F.2d 1267, 1272 (2d Cir.), *cert. denied,* 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991) (reviewing history of punitive damages).

Keeping these general principles in mind, the court cannot find that punitive damages are warranted based upon the record before it. There is simply nothing in the record showing that defendant Schoonmaker acted recklessly or with "callous indifference" to plaintiff Parker's rights. Although defendant Schoonmaker violated plaintiff's constitutional rights, in the court's view his conduct was not sufficiently egregious to justify an award of punitive damages.

*E. Attorney's Fees*

**\*11** In light of the foregoing, plaintiff's counsel has thirty (30) days from the date of entry of this memorandum-decision and order in which to file his application for attorney's fees. Counsel is reminded that such application must be submitted in a form consistent with the requirements for the same in this Circuit. Defendant Schoonmaker will then have fifteen (15) days in which to file any objections thereto. If no objections are filed by the end of that time, the court will award attorney's fees in the full amount sought by plaintiff's counsel. Having said all this, the court strongly urges both counsel to resolve the attorney's fees matter without further court intervention. If that is not possible, however, the above time frame applies.

*III. CONCLUSION*

For the violation of his Eighth and Fourteenth Amendment rights, plaintiff Maurice Parker is awarded compensatory damages of $2,500.00 against defendant Dennis Schoonmaker. Plaintiff Parker is also entitled to a declaratory judgment that defendant Dennis Schoonmaker violated his Eighth and Fourteenth Amendment as fully explained herein. Plaintiff Parker is not, however, entitled to recover on any other aspect of this action.

Accordingly, the Clerk of the Court is directed to enter judgment on behalf of the plaintiff in the total amount of $2,500.00 as against defendant Dennis Schoonmaker. The Clerk of the Court is further directed to enter judgment dismissing the plaintiff's claims as against defendants Ernest Benevento and James Longtin, and dismissing plaintiff's state law claims as against all defendants.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1994 WL 49696

**Footnotes**

1   Although plaintiff initially proceeded *pro se,* by order dated July 19, 1989 Magistrate Judge Gustave DiBianco appointed attorney David Damico to represent the plaintiff. Docket Entry # 24. When Mr. Damico asked to be relieved as counsel because it was a hardship for him to travel to the prison where plaintiff was incarcerated, the Magistrate Judge granted that request. Docket Entry # 26. He then appointed attorney James Kerrigan to represent plaintiff on a *pro bono* basis. Docket Entry # 27. The court acknowledges its gratitude to Mr. Kerrigan's for his willingness to accept this *pro bono* assignment.

2   As does the Eighth Amendment of the United States Constitution, section 5 of the New York State Constitution contains a prohibition against "cruel and unusual punishments," and presumably it is that provision upon which plaintiff is relying, although the same is not specified in his complaint. *See* N.Y. Const. art. I, § 5 (McKinney 1982). Section 6 of the State Constitution is likewise similar to the Fourteenth Amendment of the United States Constitution in that in contains, *inter alia,* a due process clause. *See* N.Y. Const. art. I, § 6 (McKinney 1982). And once again, although not indicated in his complaint, it is apparently that provision of section 6 upon which plaintiff relies in this action.

3   Although not identified in his complaint, plaintiff is apparently relying upon the first part of this statute, which states:
   No inmate in the care or custody of the department [of corrections] shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection.

N.Y.Correct. § 137(5) (McKinney 1987). This statute is not as one-sided as a reading of the just quoted passage might suggest. Section 137(5) goes on to provide:

> When any inmate, or group of inmates, shall offer violence to any person, or do or attempt to do any injury to property, or attempt to escape, or resist or disobey any lawful direction, the officers and employees shall use all suitable means to defend themselves, to maintain order, to enforce observation of discipline, to secure the persons of the offenders and to prevent any such attempt or escape.
>
> *Id.*

4   Section 250.2(g) of the New York Code of Rules and Regulations plainly states: "Corporal punishment is absolutely forbidden for any purpose and under all circumstances." 7 N.Y.C.R.R. § 250.2(g). Section 251–1.2 of the Code, contained in the section entitled "Initial Actions in Cases of Inmate Misbehavior," basically describes the circumstances under which it may be appropriate for physical force to be used in connection with an inmate who has misbehaved.

5   Just prior to trial, plaintiff moved to voluntarily discontinue this action as against Superintendent Fogg, and the court granted that motion. Docket Entry # 41.

6   The court observes that the complaint is silent as to which capacity—individual or official—the defendants are being sued. This is not an uncommon deficiency in a case such as this. *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991) (quoting *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) (quoting in turn *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 876, 88 L.Ed.2d 878 (1985))) (" 'In many cases,' a complaint against public officials 'will not clearly specify whether officials are sued personally, in their official capacity, or both,' and only" "[t]he course of proceedings' ... will indicate the nature of the liability imposed.' "). Furthermore, in part because the defendants never filed any motions in this case, the issue of the capacity in which the defendants are being sued was never fully explored. The court will assume, however, that plaintiff Parker is suing the defendants in both their individual and official capacities.

It is true that in their answer defendants asserted a qualified immunity defense, which applies, if at all, only insofar as they are being sued in their personal or individual capacities. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529–530 (2d Cir.1993). Presumably if defendants believed that they were also being sued in their official capacity, they would have included an Eleventh Amendment immunity defense in their answer. *See id.* at 529 (citations omitted) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."). Nonetheless, given the following comment by the Second Circuit, except as explained below, the court will not presume, as defendants seemingly did, that they are being sued only in their personal capacities.

> [A] plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other. By the same token, a party who is unclear in argument as to the capacity in which the defendant can be pursued should not lightly be deemed to have withdrawn a claim that was expressly stated. When the party's defense of her stated claim bespeaks a doctrinal confusion, the court should not presume that there has been abandonment but should instead give her the opportunity either to abandon the claim or to pursue it with a corrected understanding as to what proof will be required to establish it.

*Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

Having given plaintiff some leeway on this pleading issue, consistent with the relevant case law, the court will not read plaintiff's complaint as asserting a claim for monetary damages against the defendants in their official capacities, however, because such claim obviously would be barred by the Eleventh Amendment. *Gan,* 996 F.2d at 529. Thus, the court will construe plaintiff's complaint as seeking monetary damages against defendants in their personal or individual capacities only. The court will construe the complaint as seeking declaratory relief against defendants in both their personal and official capacities, however. (It is undisputed that a claim for declaratory relief is not barred by the Eleventh Amendment. *See Berman Enterprises, Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.1993)).

7   Keeplock is a means of administrative confinement. As plaintiff explains it, an inmate is keeplocked in his cell because of certain misbehavior. While keeplocked, an inmate must spend nearly the entire day in the cell, including taking meals there.

8   Sergeant Longtin testified that at 10:00 p.m. all the inmates are locked in their cells for the night and a head count is taken.

9   Plaintiff testified that he received six sutures, and the medical records are ambiguous. The one entry pertaining to the number of sutures appears to read four, but it is followed by and entry which is illegible. Defendants' exh. H at 5. This discrepancy, if it even exists, in the court's view, is inconsequential.

Parker v. Fogg, Not Reported in F.Supp. (1994)

Case 9:18-cv-00149-MAD-TWD    Document 58    Filed 12/13/19    Page 74 of 74

10    The court takes umbrage at the suggestion by plaintiff that the original photographs were "hidden away in the court's files for years [,]" implying an element of deceit on the part of the court or defense counsel. First of all, those photographs were provided by Prisoner's Legal Services of New York, which was at least nominally representing plaintiff at the time. *See* Docket Entry # 46 (Court Exhibit # 1). Second, the court file in this action is a matter of public record. Therefore, at any time prior to the trial plaintiff's counsel was free to review it. Indeed, the court would be surprised to learn if that was not done shortly after the appointment of plaintiff's current counsel. Thus, any suggestion that either the court or defense counsel were secreting these photographs is patently absurd.

11    In defendants' post-trial submission, they suggest that the plaintiff's testimony is inherently suspect because, among other reasons, he is a party to this action. While that may be true, obviously the same can also be said of the defendants, and thus the court is not willing to discredit the testimony of any witness here simply because he is a party to this action. As an additional basis for challenging plaintiff's testimony, defendants assert that he should be disbelieved simply because he is a convicted felon. The court declines to accept that view. Automatically discounting the testimony of a plaintiff-inmate would mean that he or she would never prevail in a case such as this. Certainly the Supreme Court did not intend such a harsh result when it stated, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84. 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). An obvious and dangerous ramification of the view suggested by defendants is that plaintiff-inmates would be deprived of all their constitutional rights solely by virtue of their status as inmates. Such a cynical view flies in the face of the Supreme Court's clear pronouncement in *Turner.*

12    The testimony conflicts on this point.

13    Letter of David B. Roberts to Court (Jan. 24, 1994) at 1.

14    *Id.* at 3.

15    *See* Report of the Federal Courts Study Committee—Part II, April 2, 1990 at 49; *see also* N.Y.Correc.Law § 137, Practice Commentary thereto at 137 ("Claims that unnecessary force was used against inmates by corrections officers have formed the basis for numerous lawsuits alleging a violation of the 8th Amendment."). In this District alone, inmate instituted cases, with the vast majority being brought under 42 U.S.C. § 1983, represented 34.3% of the total civil caseload for 1993. *See* Northern District of New York, 1993 Annual Report, *Pro Se* Staff Attorney's Office.

16    *See, e.g., Candelaria v. Coughlin,* 787 F.Supp. 368, 374 (S.D.N.Y.), *aff'd without published opinion,* 979 F.2d 845 (2d Cir.1992); *Gabai v. Jacoby,* 800 F.Supp. 1149, 1154–55 (S.D.N.Y.1992) (Grubin, Mag. J.), *Report–Recommendation Adopted in its Entirety,* No. 91 Civ. 2605 (S.D.N.Y. Sept. 9, 1992).

17    Besides forming the basis for an Eighth Amendment violation, an unprovoked attack such as the one which occurred in this case may also be the basis for a violation of an inmate's due process rights. *See Wilson v. White,* 656 F.Supp. 877, 879 (S.D.N.Y.1987) ("An attack on a prison inmate ... which is not part of an attempt to maintain or restore discipline violates the inmate's due process right to be free from unprovoked attack."); and *Vargas v. Correa,* 416 F.Supp. 266, 268–69 (S.D.N.Y.1976) (court held that an unprovoked assault upon an inmate constituted a violation of his due process rights).

18    Defendants also failed to raise this defense in their answer. Nevertheless, defendants are not deemed to have waived it because, as Fed.R.Civ.P. 12(h)(3) plainly states, "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3) (emphasis added); *see also Tongkook America, Inc. v. Shipton Sportswear Company,* 14 F.3d 781, 783 (2d Cir. Jan. 26, 1994) (citations omitted) ("The fact that [defendant] did not raise the defense of lack of subject-matter jurisdiction in its answer is not determinative, since subject-matter jurisdiction cannot be waived and the issue can be raised at any time in the course of the litigation.").

19    One thing is clear from the complaint and that is that plaintiff is seeking only monetary damages with respect to the pendent tort claims. His claim for declaratory relief is, as mentioned earlier, limited to the claims arising out of the alleged constitutional deprivations. *See supra* at 3.

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.